. . . are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law. It is only when State law incapacitates the [national] banks from discharging their duties to the federal government that it becomes unconstitutional.[4]

In *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25 (1996), the Supreme

Court held that a state may not "forbid, or impair significantly, the exercise of a power that

Congress *explicitly* granted" to national banks. Id. at 33 (emphasis added). However,

immediately following that statement, the Court explained that "[t]o say this is *not* to deprive

States of the power to regulate national banks, where . . . doing so *does not prevent or*

*significantly interfere with* the national bank's exercise of its powers." Id. (emphasis added).[5] In

*Barnett,* as in *Atherton,* the Supreme Court cited several prior decisions requiring national banks

to comply with state laws that did not create any irreconcilable conflict with federal statutes.[6] In

those decisions, the Court affirmed that "general and undiscriminating state laws [apply to] the

---

[4] *National Bank v. Commonwealth,* 76 U.S (9 Wall.) 353, 362 (1870), quoted in *Atherton,* 519 U.S. at 222-23.

[5] In Pltf. Mem. 18, Plaintiffs quote the Court's statement in *Barnett* that the express and incidental "powers" of national banks should be interpreted as "grants of authority not normally limited by, but rather ordinarily pre-empting contrary state law." 517 U.S. at 32. However, the Court's use of the terms "normally," "ordinarily" and "contrary" clearly indicates that a finding of preemption can only be made *after* determining whether, in fact, a state law is "contrary" to federal law under the "prevent or significantly interfere" test for conflict preemption articulated in *Barnett,* id. at 33. *See Peatros v. Bank of America NT&SA,* 990 P.2d 539, 542-43, 550 (Cal. 2000) (reading *Barnett* in a similar manner).

[6] See *Barnett,* 517 U.S. at 33-34; *Atherton,* 519 U.S. at 222-23.

contracts of national banks, so long as such laws do not conflict with the letter or the object and purposes of Congressional legislation."[7]

In view of this history, it is clear that Congress has *not* "regulate[d] national banks to the exclusion of state control," and "congressional support remains for dual regulation." *National State Bank v. Long*, 630 F.2d 981, 985 (3d Cir. 1980).[8] Congress strongly reaffirmed its approval for the general application of state laws to national banks when it passed the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, Pub. L. No. 103-328, 108 Stat. 2338 ("Riegle-Neal Act"). The conference report on the Riegle-Neal Act declared:

> States have a strong interest in the activities and operations of depository institutions doing business within their jurisdictions, *regardless of the type of charter an institution holds*. In particular, States have a legitimate interest in protecting the rights of their consumers, businesses and communities. . . .
>
> Under well-established judicial principles, *national banks are subject to State law in many significant respects*. . . . Courts generally use a rule of construction that *avoids finding a conflict between the Federal and State law where possible*. The [Riegle-Neal Act] does not change these judicially established principles.[9]

---

[7] *McClellan v. Chipman*, 164 U.S. 347, 356-59, 361 (quote) (1896) (quoting *Davis v. Elmira Savings Bank*, 161 U.S. 275, 290 (1896)). *Accord, e.g., Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 247-52 (1944); *Lewis v. Fidelity & Deposit Co.*, 292 U.S. 559, 564-66 (1934); *First National Bank in St. Louis v. Missouri*, 263 U.S. 640, 656-59 (1924).

[8] *Accord, e.g., Best v. U.S. National Bank*, 739 P.2d 554, 560-61 (Ore. 1987); *Perdue v. Crocker National Bank*, 702 P.2d 503, 520 (Cal. 1985), *appeal dism'd*, 475 U.S. 1001 (1986); *Video Trax, Inc. v. NationsBank, N.A.*, 33 F. Supp. 2d 1041, 1048 (S.D. Fla. 1998), *aff'd*, 205 F.2d 1358 (11th Cir.) (per curiam), *cert. denied*, 531 U.S. 822 (2000).

[9] H.R. Rep. No. 103-651 (Conf. Rep.), at 53 (1994) (emphasis added), reprinted in 1994 U.S. Code Cong. & Ad. News 2068, 2074.

In adopting the Riegle-Neal Act, members of Congress expressed their strong support for

the dual banking system. Members also explained that the application of state laws to national

banks in four broadly-defined areas – viz., community reinvestment, consumer protection, fair

lending and intrastate branching – was essential to preserve the vitality of that system.[10]

Based on Congress' longstanding support for the dual banking system, most courts have

recognized a presumption in favor of applying state laws to the activities of national banks,

*unless* federal preemption is mandated in a particular area by "the clear and manifest purpose of

Congress." *Long*, 630 F.2d at 985.[11] In two decisions, the Supreme Court indicated its

agreement with this presumption in favor of state laws:

> *[T]he rule* [is] the operation of general state laws upon the dealings and contracts
> of national banks, [while] *the exception* [is] the cessation of operation of such
> laws whenever they expressly conflict with the laws of the United States or

---

[10] The Riegle-Neal Act requires local branches of out-of-state national banks to comply
with nondiscriminatory host state laws in the four designated areas, except where federal law
preempts the application of such state laws to national banks. 12 U.S.C. § 36(f). See 140 Cong.
Rec. H 6775 (daily ed. Aug. 4, 1994) (remarks of Rep. Neal, explaining that the Riegle-Neal Act
"respects States' rights by . . . ensur[ing] that certain State laws will continue to apply to interstate
branches of national banks"); id. at H 6777 (remarks of Rep. Roukema, stating that "[t]he dual
banking system and States' rights are preserved in that the [Riegle-Neal Act] . . . preserves the
States' ability to apply State laws regarding intrastate branching, fair lending and consumer
protection"); id. at H 6780 (remarks of Rep. Castle, declaring that "[w]e have indeed protected
the duel [sic] banking system which is so important to the United States"); 140 Cong. Rec. S
12784 (daily ed. Sept. 13, 1994) (remarks of Sen. Ford, declaring that the Reigle-Neal Act "has
been carefully structured in a manner which protects important States' rights under our dual
banking system"); id. at S 12787 (remarks of Sen. Dodd, stating that the Riegle-Neal Act "strikes
the proper balance between creating a more efficient national banking system and protecting
States rights and the dual banking system . . . [by] requiring branches to abide by applicable State
laws").

[11] *Accord, e.g., Peatros*, 990 P.2d at 542-43; *Perdue*, 702 P.2d at 519-23; *Video Trax*, 33
F. Supp. 2d at 1048.

8

frustrate the purpose for which national banks were created, or impair their efficiency to discharge the duties imposed upon them by the laws of the United States.[12]

In view of the federalism policies underlying our dual banking system, Plaintiffs are

plainly wrong in arguing that national banks enjoy a general exemption from state laws.

Plaintiffs' assertion that operating subsidiaries are immune from state oversight is even more

untenable, because it ignores the unquestioned primacy of the states in regulating state-chartered

corporations. The courts have repeatedly upheld the authority of each state (i) to exercise

comprehensive supervision over the corporations it charters, and (ii) to license and regulate

---

[12] *McClellan v. Chipman*, 164 U.S. at 357 (emphasis added); *St. Louis*, 263 U.S. at 656 (same). In *Bank of America v. City and County of San Francisco*, 309 F.3d 551, 559 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 2220 (2003), the Ninth Circuit refused to apply a "presumption against preemption" in determining whether national banks must comply with local ordinances that prohibited banks from charging a designated service fee. In holding that the presumption was inapplicable, the Ninth Circuit relied primarily on *United States v. Locke*, 529 U.S. 89, 108 (2000). However, *Locke* dealt with state laws that imposed restrictions on oil tankers operating in navigable waterways. The Supreme Court declined to apply an "'assumption' of nonpreemption" in *Locke* because the challenged state laws interfered with "national and international maritime commerce," an area in which Congress had shown a clear desire to establish "a *uniformity* of regulation." Id. at 108 (emphasis added). By contrast, in *Atherton*, after reviewing the long tradition of state regulation of banks (including national banks), the Supreme Court concluded that federal policy did *not* require a "uniformity" of regulatory treatment for federally-chartered banks. Accordingly, the Court refused in *Atherton* to adopt a federal common-law rule that would displace state law. *See* 519 U.S. at 219-26. Thus, the Ninth Circuit's refusal to apply a presumption against preemption in *Bank of America* is clearly inconsistent with the Supreme Court's holding in *Atherton*, as well as its earlier decisions in *McClellan* and *St. Louis*, quoted above.

For Supreme Court decisions that have applied a presumption against preemption in other areas of traditional state regulation, *see, e.g., Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 484-85 (1996); *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-56 (1995); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516-18 (1992).

companies chartered by other states that transact business within its borders. With regard to
locally-chartered companies, the Supreme Court held in 1987 that:

> No principle of corporation law and practice is more firmly established than a
> State's authority to regulate domestic corporations. . . .
>
> [S]tate regulation of corporate governance is regulation of entities whose very
> existence and attributes are a product of state law. . . .
>
> It is thus an accepted part of the business landscape in this country for States to
> create corporations, to prescribe their powers, and to define the rights that are
> acquired by purchasing their shares. . . .[13]

Almost a century earlier, the Court declared that "the powers of corporations . . . are such and
such only, as are conferred upon them by the acts of the legislatures of the several States under
which they are organized."[14]

    With respect to corporations chartered by other states, the Supreme Court has affirmed
that each state "is legitimately concerned with safeguarding the interests of its own people in
business dealings with corporations not of its own chartering but who do business within its
borders." *Union Brokerage Co. v. Jensen,* 322 U.S. 202, 208 (1944). The Court has therefore
upheld the authority of states to license and regulate foreign corporations in accordance with the
following guidelines:

> In the absence of applicable federal regulation, a State may impose
> non-discriminatory regulations on those engaged in foreign commerce 'for the
> purpose of insuring the public safety and convenience; . . . a license fee no larger

---

[13] *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 89, 91 (1987) (citing, inter
alia, *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 636 (1819)).

[14] *Oregon Railway & Navigation Co. v. Oregonian Railway Co.,* 130 U.S. 1, 20 (1889).

10

in amount than is reasonably required to defray the expense of administering the regulations may be demanded."[15]

Courts have also emphasized the longstanding policy of Congress to refrain from adopting a "federal corporate law" that would "overturn or at least impinge severely on the tradition of state regulation of corporate law." *Business Roundtable v. SEC,* 990 F.2d 406, 412 (D.C. Cir. 1990).[16]

In the area of financial services, courts have affirmed the authority of each state to regulate banks and nonbank corporations for the purpose of protecting the state's economy and its citizens from threats posed by unsound or fraudulent providers. In *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27 (1980), the Supreme Court said:

> We readily accept the submission that, both as a matter of history and as a matter of present commercial reality, banking and related financial activities are of profound local concern. . . . [S]ound financial institutions and honest financial practices are essential to the health of any State's economy and to the well-being of its people. Thus, it is not surprising that ever since the early days of our Republic, the States have chartered banks and have actively regulated their activities.[17]

In *Lewis,* the Court also noted that 12 U.S.C. § 1846 "does reserve to the States a general power to enact regulations" applicable to bank holding companies and their subsidiaries, provided such

---

[15] *Jensen,* 322 U.S. at 211-12 (quoting *Sprout v. South Bend,* 277 U.S. 163, 169 (1928)).

[16] *Accord, Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479 (1977) ("Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden").

[17] 447 U.S. at 38. *Accord, Northeast Bancorp v. Board of Governors,* 472 U.S. 159, 177-78 (1985) (upholding a Connecticut statute). *See also Old Stone Bank v. Michaelson,* 439 F. Supp. 252, 256 (D.R.I. 1977) ("It has long been recognized that a state may regulate banking to protect the public welfare in the exercise of its police power").

11

"state legislation . . . operates within the boundaries marked by the Commerce Clause." 447 U.S. at 48-49.[18]

In the specific field of mortgage lending – the business in which Wachovia Mortgage engages – both federal and state courts have upheld the validity of state laws designed to prevent lenders from engaging in fraud, predatory lending, redlining and other unconscionable practices.[19]  Three recent decisions have applied a presumption *against* preemption in determining that the Alternative Mortgage Transaction Parity Act, 12 U.S.C. § 3801 et seq. ("AMTPA"), does *not* preempt the application of many state laws to "alternative mortgage transactions" entered into by state-chartered mortgage lenders.  In all three cases, the courts

---

[18]  In 12 U.S.C. § 1846(a), the Bank Holding Company Act reserves to each state the power to regulate "companies, banks, bank holding companies, and subsidiaries thereof." In *Lewis,* the Supreme Court noted that the challenged Florida law was not preempted by any federal statute. 447 U.S. at 35.  The Court struck down the law because it discriminated against investment advisory firms owned by out-of-state banking organizations, thereby violating the Commerce Clause. *See* 447 U.S. at 31-32, 35-37, 42-44.  Plaintiffs have not raised any Commerce Clause claim in this case.  Indeed, Plaintiffs acknowledge that the challenged Connecticut laws apply equally to "all persons engaged in the business of making . . . mortgage loans in Connecticut." Pltf. Mem. 10.

[19]  *E.g., Long,* 630 F.2d at 986-87; *United Companies Lending Corp. v. Sargeant,* 20 F. Supp. 2d 192, 200-04 (D. Mass. 1998); *In re Maxwell,* 281 B.R. 101, 123-31 (Bankr. D. Mass. 2002); *Solomon v. Gilmore,* 731 A.2d 280, 283-89 (Conn. 1999).  A recent study concluded that North Carolina's mortgage lending statute, enacted in 1999, has effectively reduced the frequency of "subprime lending practices that have been criticized as constituting predatory lending." *See* Richard Cowden, "Researchers Find North Carolina Law Has Reduced Certain Lending Practices," 80 BNA's Banking Report 892 (June 2, 2003) (reporting on study by Walter R. Davis).

applied a presumption against preemption, reflecting the fact that "real property transactions" and "consumer protection" are areas traditionally regulated by the states.[20]

Given the foregoing judicial precedents and congressional mandates, Wachovia Mortgage's assertion of blanket immunity from state regulation violates core principles of federalism embodied in our systems of financial regulation and corporate governance. As demonstrated below, none of the federal statutes and OCC rulings cited by Plaintiffs provides a valid basis for ignoring those principles.

**B.    Federal Statutes Do Not Immunize Plaintiffs from State Regulation**

Plaintiffs (and the OCC rulings on which Plaintiffs rely) have cited three federal statutes – 12 U.S.C. §§ 484, 24(Seventh) & 24a – in advancing the claim that national banks and their operating subsidiaries (i) are "subject to the . . . *exclusive* licensing, regulatory, supervisory, examination, and enforcement powers of the OCC" (Pltf. Mem. 9; emphasis added); and (ii) are "exempt from the licensing, regulation, supervision, examination, and enforcement powers of a

---

[20] *Nat'l Home Equity Mortgage Ass'n v. Office of Thrift Supervision,* 2003 WL 21663983 (D.D.C. July 14, 2003) (hereinafter "*NHEMA v. OTS*"), slip op. at *6 (first quote) (holding that AMTPA did not preempt state laws restricting late fees and prepayment penalties); *Black v. Financial Freedom Senior Funding Corp.,* 112 Cal. Rptr. 2d 445, 452-453 (second quote), 456-58 (Cal. App. 2001) (holding that AMTPA did not preempt state laws prohibiting elder abuse, unfair business practices, fraudulent concealment and negligent misrepresentation), *cert. denied sub nom. ULLICO, Inc. v. Black,* 536 U.S. 959 (2002); *Glukowsky v. Equity One, Inc.,* 821 A.2d 485, 500, 507-10 (N.J. Super. App. Div. 2003) (holding that AMTPA did not preempt state laws prohibiting prepayment penalties). AMTPA defines "alternative mortgage transactions" to include residential mortgage loans other than "traditional fixed-rate, fixed-term transactions." 12 U.S.C. § 3802(1).

13

state regulator like the Commissioner" (Pltf. Mem. 10).  None of these statutes supports

Plaintiffs' position.

### 1.    Section 484 Does Not Preempt the States' Authority to Enforce State Laws Against National Banks and Their Operating Subsidiaries

#### a.    Section 484 Permits State Officials to Sue in Federal and State Courts to Enforce State Laws Against National Banks

Section 484(a) provides:

> No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or shall have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

The text of Section 484(a) "does *not* contain an *explicit* grant of *exclusive* regulatory or

visitorial power over national banks to the OCC." *First Union National Bank v. Burke,* 48 F.

Supp. 2d 132, 144 (D. Conn. 1999) (emphasis added); see also id. at 137 ("the OCC is not

explicitly referenced in Section 484").  In addition, other provisions of federal law make clear

that the OCC does *not* enjoy *exclusive* visitorial powers over national banks.  For example, the

Federal Deposit Insurance Corporation ("FDIC")  has authority to make special examinations of

national banks, and the FDIC may terminate a national bank's deposit insurance.  12 U.S.C. §§

1820(b)(3) & 1818(a).  The FDIC may also take other enforcement measures against a national

bank if the OCC fails to act after receiving the FDIC's request for such measures.  Id. § 1818(t).

Similarly, the Federal Reserve Board ("FRB") may require national banks that are subsidiaries of

bank holding companies to furnish reports and submit to special examinations.  Id. §§ 1844(c)(1)

& (2).

14

Of particular importance is Section 484's explicit recognition that "the courts of justice" have authority to exercise "visitorial powers" over national banks. Since 1871, state officials and private parties have successfully sued in federal and state courts to enforce state laws against national banks.[21]  Courts have also issued enforcement orders – including subpoenas, writs of mandamus and penalties – to compel national banks to produce their records in compliance with state laws.[22]

It is true that Section 484 does not permit state officials to impose *administrative* enforcement measures  (e.g., cease-and-desist orders) against national banks. *Long,* 630 F.2d at 987-89; *Burke,* 48 F. Supp. 2d at 140, 143-50.  However, courts have repeatedly held that Section 484 allows state officials and private parties to institute *judicial proceedings* in either federal or state courts to enforce state laws against national banks. *St. Louis,* 263 U.S. at 659-61; *Guthrie,* 199 U.S. at 159; *Best,* 739 P.2d at 563; *Burke,* 48 F. Supp. 2d at 145-46, 148-49.

For example, in *St. Louis,* the defendant national bank and the United States claimed that Rev. Stat. § 5241 (the predecessor of Section 484) barred the Attorney General of Missouri from suing the bank to halt a violation of state law.  See 263 U.S. at 642-43 (argument by bank's counsel); id. at 645-47 (argument by Solicitor General of the United States).  The Court,

---

[21]  *E.g., Bank of Bethel v. Pahquioque Bank,* 81 U.S. (14 Wall.) 383, 392-95 (1871); *Waite v. Dowley,* 94 U.S. 527 (1877); *Guthrie v. Harkness,* 199 U.S. 148, 152-53, 157-59 (1905); *St. Louis,* 263 U.S. at 655-61; *Colorado National Bank v. Bedford,* 310 U.S. 41, 43-46, 51-53 (1940); *First National Bank of Logan v. Walker Bank & Trust Co.,* 385 U.S. 252 (1966); *Perdue,* 702 P.2d at 516-25; *Best,* 739 P.2d at 556-63; *Brown v. Clarke,* 878 F.2d 627 (2d Cir. 1989).

[22]  *E.g., Guthrie v. Harkness,* 199 U.S. at 150, 156, 159 (mandamus); *Waite v. Dowley,* 94 U.S. at 532-33 (penalty); *First National Bank v. Hughes,* 6 Fed. 737, 740-43 (C.C.N.D. Ohio

15

however, *rejected* that claim. After concluding that federal law did not preempt the relevant state

statute, the Court held that the Attorney General had full power to sue the bank "to vindicate and

enforce [Missouri's] law." Id. at 660.

> **b.    Section 484 Does Not Limit the States' Authority to Regulate Operating Subsidiaries of National Banks**

Because Section 484's limitation on visitorial powers applies *only* to "national banks," it

does *not* restrict the authority of state officials to license and regulate operating subsidiaries of

national banks. The term "national bank," as used in Section 484, is governed by the definitions

set forth in 12 U.S.C. §§ 221 & 221a(a). As those sections and related federal banking statutes

make clear, a "national bank" is a financial institution that (i) files articles of association and an

organization certificate with the OCC, pursuant to 12 U.S.C. §§ 21-24 & 26; (ii) receives from

the OCC a certificate of authority to carry on the "business of banking," pursuant to id. §§ 24 &

27; and (iii) becomes and remains a member of the Federal Reserve System ("FRS"), as required

by id. §§ 282 & 501a. Operating subsidiaries do *not* qualify as "national banks" under Sections

221 and 221a(a), because they are chartered as *nonbank* corporations under *state* law, they do *not*

receive certificates of authority to conduct the "business of banking" from the OCC, and they

*cannot* become members of the FRS.[23] Accordingly, operating subsidiaries *cannot* be treated as

---

1881) (subpoena), *appeal dism'd,* 106 U.S. 523 (1883).

[23] Pursuant to 12 U.S.C. §§ 21-24 & 26-27, the OCC's regulations provide:

> A national bank becomes a legal entity after it has filed its organization certificate and articles of association with the OCC as required by law. . . . The proposed bank shall not conduct the business of banking until the OCC grants final

16

"national banks" for purposes of Section 484 and are *not* entitled to any immunity from state oversight.

The foregoing analysis is confirmed by Section 221a(b), which defines "affiliate" to include "any corporation" that controls or *is controlled by* a national bank. Under the OCC's regulations, an operating subsidiary *must* be controlled by its parent national bank (*see* supra note 1). Therefore, an operating subsidiary is *always* an "affiliate" of the parent bank for purposes of Section 221a(b) and cannot be viewed as a "national bank."

Congress' recognition of the separate legal status of "affiliates" is confirmed by 12 U.S.C. § 481. Under Section 481, the OCC may examine "affiliates" of a national bank "as shall be necessary to disclose fully the relations between such bank and such affiliates and the effect of such relations on the affairs of such bank." In contrast to Section 481, Congress did *not* include the term "affiliates" in Section 484. Accordingly, the only reasonable conclusion is that Section 484's limitation on visitorial powers applies *only* to "national banks" and does *not* extend to their "affiliates" (including their operating subsidiaries). Conversely, unlike Section 484, Congress did *not* insert in Section 481 any restriction on the authority of state officials to exercise visitorial powers over "affiliates" of national banks. Once again, the only reasonable conclusion is that

---

approval.

12 C.F.R. § 5.23(i)(5). Under the OCC's own regulations, it is obvious that an operating subsidiary cannot qualify for legal status as a "national bank," because an operating subsidiary cannot file the requisite organization certificate and articles of association and also cannot receive final approval to conduct "the business of banking."

17

Section 481 does *not* restrict the authority of states to regulate "affiliates."[24] Read together, Sections 481 and 484 clearly indicate that Congress has *not* preempted the authority of state officials to supervise operating subsidiaries of national banks.

Congress enacted 12 U.S.C. §§ 371c & 371c-1 to regulate transactions between national banks and their "affiliates." Both sections specifically exempt operating subsidiaries from being treated as "affiliates" of their parent banks, unless the FRB decides to cancel that exemption in a particular case. Id. §§ 371c(b)(2)(A) & 371c-1(d)(1). There would be no reason for Congress to include this *specific* exemption for operating subsidiaries in Sections 371c and 371c-1, *unless* Congress understood that operating subsidiaries are *generally* treated as "affiliates" of their parent banks under Section 221a(b). Plaintiffs' contention that Wachovia Mortgage should be viewed as "a department or division of its parent [national bank] for regulatory purposes" (Pltf. Mem. 16, quoting case) must be rejected, because Plaintiffs' position (i) would obliterate the careful distinction that Congress has drawn between national banks and their "affiliates" in Section 221a, and (ii) would reduce the special exemption for operating subsidiaries in Sections 371 and 371c-1 to the status of "meaningless . . . surplusage." *Independent Ins. Agents of America, Inc. v. Hawke,* 211 F.3d 638, 643-44 (D.C. Cir. 2000).[25]

---

[24] *See Chicago v. Environmental Defense Fund,* 511 U.S. 328, 338 (1994) (holding that "it is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statue but omits it in another") (internal quotations and citation omitted).

[25] *See also Board of Governors v. Investment Co. Institute,* 450 U.S. 46 (1981) ("*FRB v. ICI*"), at 58-59 n.24 (finding that the "structure of the Glass-Steagall Act . . . reveals a congressional intent to treat banks separately from their affiliates," and rejecting a proposed

18

In the field of mortgage lending, AMTPA shows a clear congressional intent to regulate state-chartered *nonbank* lenders, like Wachovia Mortgage, in an entirely different manner from *federally-chartered banks*. AMTPA recognizes that the OCC and other federal banking agencies have "adopted regulations authorizing *federally chartered depository institutions* to engage in alternative mortgage financing." 12 U.S.C. § 3801(a)(3) (emphasis added). AMTPA seeks to "prevent discrimination against State-chartered depository institutions and other nonfederally chartered housing creditors" by authorizing those state-chartered lenders to enter into alternative mortgage transactions. Id. § 3803(a). To accomplish this purpose, AMTPA authorizes (1) the OCC to adopt rules permitting state-chartered banks to enter into alternative mortgage transactions, (2) the National Credit Union Administration ("NCUA") to adopt similar rules for state-chartered credit unions, and (3) the Office of Thrift Supervision ("OTS") to adopt similar rules for *all other state-chartered housing creditors,* including *nonbank* lenders. Id. § 3803(a)(1)-(3).[26] It is highly significant that state-chartered housing creditors may rely on the authority granted by AMTPA *only if* those lenders comply with applicable "licensing requirements imposed under State law" as well as "applicable regulatory requirements and

---

interpretation of that Act which would cause one of its sections, dealing with "affiliates," to become "meaningless"); *American Textile Mfrs. Institute, Inc. v. Donovan,* 452 U.S. 490, 513 (1981) (rejecting a proposed interpretation that would render one provision of a statute "nugatory, thereby offending the well-settled rule that all parts of a statute, if possible, are to be given effect").

[26] *See NHEMA v. OTS,* slip op. at *8 (noting that, under AMTPA, "while OCC identifies regulations for state-commercial banks, and NCUA does so for state-chartered credit unions, OTS identifies regulations for *all other state-chartered housing creditors"*) (emphasis added).

19

enforcement mechanisms provided by State law." Id. § 3802(2); *see Black,* 112 Cal. Rptr. 2d at 455-57.

After carefully reviewing the terms, structure and purposes of AMTPA, three courts have recently concluded that state-chartered *nonbank* mortgage lenders do *not* receive the same exemption from state law that *federally-chartered banks* are granted under regulations of the OCC and OTS. The courts determined that AMTPA ensures the ability of state-chartered nonbank lenders to engage in the business of alternative mortgage financing. However, AMTPA does *not* establish "competitive equality" or "absolute parity" between federally-chartered *banks* and state-chartered *nonbank* lenders, because AMTPA does *not* exempt the latter group from state laws such as licensing requirements and other regulations designed to protect consumers. *See NHEMA v. OTS,* slip op. at *4 - *7; *Black,* 112 Cal. Rptr. 2d at 453-58; *Glukowsky,* 821 A.2d at 507-10.

Thus, AMTPA reflects Congress' intent to draw a clear distinction between the regulation of national banks and the supervision of state-chartered nonbank lenders in the field of mortgage lending. In particular, Section 3802(2) of AMTPA clearly undermines Plaintiffs' view that a state-chartered nonbank mortgage lender may ignore state licensing requirements and other state regulations simply because it is owned by a national bank.

Plaintiffs' claim that the OCC exercises "exclusive" – and therefore preemptive – authority over Wachovia Mortgage is also contradicted by *Minnesota v. Fleet Mortgage Corp.,* 181 F. Supp. 2d 995 (D. Minn. 2001). In that case, the court *rejected* the OCC's claim of "exclusive jurisdiction" over a state-chartered operating subsidiary of a national bank, which was

engaged (like Wachovia Mortgage) in mortgage lending.  The court determined that the operating

subsidiary was *not* "itself a bank" for purposes of Section 133 of the Gramm-Leach-Bliley Act

("GLBA"), 113 Stat. 1383 (reprinted in 15 U.S.C.A. § 41 note).  Based on that determination, the

court held that (i) the OCC did *not* have "exclusive jurisdiction" to enforce laws applicable to the

operating subsidiary, and (ii) the operating subsidiary was subject to the shared enforcement

jurisdiction of the Federal Trade Commission ("FTC") and state officials under the FTC's

Telemarketing Sales Rule.  *See* 181 F. Supp. 2d. at 997-1001.   In rejecting the OCC's claim of

"exclusive jurisdiction," the court declared:

> The OCC's insistence that it must have exclusive jurisdiction over [operating]
> subsidiaries in order to avoid having its authority "restricted" is not persuasive. . . .
> Congress simply chose *not* to provide exclusivity to the OCC in the GLBA.  *There
> is no direct authority establishing exclusive jurisdiction over national bank
> operating subsidiaries,* and . . . there is no compelling reason to believe that
> [allowing the FTC and the states to exercise] concurrent jurisdiction would
> "produce a result demonstrably at odds with the intentions of [Congress]".

181 F. Supp. 2d at 1001-02 (emphasis added; citations and footnotes omitted).   The court

concluded that Section 133(a) of GLBA – which incorporates the definition of "bank" contained

in Section 3 of the Federal Deposit Insurance Act, 12 U.S.C. § 1813 – is "unambiguous" and

"simply does not include subsidiaries of banks."  181 F. Supp. 2d at 1000.  The court also noted

that an operating subsidiary "fits precisely into the category of entities described in the language

of § 133 as an entity controlled by a bank that is *not itself a bank* according to the prescribed

definition."  Id. (emphasis added).

     The definitions of "bank" and "affiliate" in Section 1813, which the court construed in

*Fleet Mortgage,* are substantially identical to the definitions of the same terms in 12 U.S.C. §§

21

221 & 221a.  Compare 12 U.S.C. §§ 1813(a)(1)(A) (defining "bank") & 1813(w)(6)

(incorporating the definition of "affiliate" from id. § 1841(k)), with id. §§ 221 & 221a(a) & (b).

Thus, the holding in *Fleet Mortgage* as to the meaning of "bank" in Section 1813 vitiates

Plaintiffs' claim that a state-chartered nonbank operating subsidiary should be treated as a

"national bank" for purposes of Section 484.

>    **2.    Sections 24 (Seventh) and 24a Do Not Preempt the Authority of States
>          to Regulate Operating Subsidiaries of National Banks**

Plaintiffs also cite 12 U.S.C. § 24(Seventh), but that statute does not express any

congressional purpose to bar the states from regulating operating subsidiaries of national banks.

Under Section 24(Seventh), a "national banking association" has authority "[t]o exercise . . . all

such incidental powers as shall be necessary to carry on the business of banking."  Like Section

484, Section 24(Seventh) refers *only* to "national banking associations" and does *not* grant any

explicit authority or immunity to "affiliates."  *See FRB v. ICI*, 450 U.S. at 58 n.24 (pointing out

that Section 24(Seventh) "by its terms applies only to banks," while "[o]rganizations affiliated

with banks . . . are dealt with by other sections of the [Glass-Steagall] Act").  Section

24(Seventh) may allow national banks to establish operating subsidiaries, but it contains no

language preempting the authority of states to regulate such subsidiaries.

Indeed, the fourth sentence of the first proviso of Section 24(Seventh) declares: "Except

as hereinafter provided *or otherwise permitted by law,* nothing herein contained shall authorize

the purchase by the [national bank] for its own account of any shares of stock of any corporation"

(emphasis added).  This sentence  indicates that national banks do *not* have power under Section

22

24(Seventh) to make investments in subsidiaries in violation of applicable "law" – a term whose plain meaning encompasses state law – *unless* the bank can point to a specific, overriding grant of authority under a federal statute.[27] Unlike certain other types of bank subsidiaries, operating subsidiaries do *not* derive their authority from any *specific* statutory grant.[28] Accordingly, the first proviso of Section 24(Seventh) indicates a congressional understanding that operating subsidiaries must generally comply with applicable state laws.

Under established canons of statutory construction, Section 24(Seventh)'s general language regarding the "incidental powers" of national banks must be construed in a manner that is consistent with the more specific terms of Sections 221, 221a, 371c, 371c-1, and 481. *See Hawke,* 210 F.3d at 643-45 (holding that the general grant of "incidental powers" under Section 24(Seventh) must be construed in harmony with the specific limitations on insurance powers of national banks under 12 U.S.C. § 92); *American Land Title Ass'n v. Clarke,* 968 F.2d 150 (2d Cir. 1992) ("*ATLA v. Clarke*"), at 157 (same), *cert. denied,* 508 U.S. 971 (1993). As shown above in Part B(1), the statutes dealing specifically with "affiliates" of national banks

---

[27] *See Video Trax,* 33 F. Supp. 2d at 1047-49, 1058 (holding that 12 U.S.C. § 24 does *not* preempt state laws from applying to national banks, unless those laws conflict with a specific provision of federal law); *Best,* 739 P.2d at 560-61 (same); *Perdue,* 702 P.2d at 520-23 (same).

[28] For example, the second, fourth and fifth provisos of Section 24(Seventh) authorize national banks to invest in subsidiaries that (i) engage in the "safe-deposit business," (ii) provide agricultural credit, and (iii) operate as "banker's banks." Similarly, the Bank Service Company Act, 12 U.S.C. §§ 1861-67, empowers national banks and FDIC-insured state banks to establish subsidiaries that operate as "bank service companies." In contrast, operating subsidiaries of national banks do *not* derive their authority from any *specific* congressional grant of power. The OCC's regulations state that the term "operating subsidiary" does *not* include "a subsidiary in which the bank's investment is made pursuant to specific authorization in a statute." 12 C.F.R. §

23

demonstrate that Congress has *not* preempted the authority of state officials to license and regulate operating subsidiaries of such banks.

The OCC asserts that Section 121 of GLBA, codified at 12 U.S.C. § 24a, manifests a congressional intent to give the OCC "exclusive visitorial authority" over operating subsidiaries of national banks. *See* OCC Interpretive Letters 957 & 958, at 6. Section 24a permits national banks to establish "financial subsidiaries," which may engage in certain activities (e.g., securities underwriting and dealing) that are *not* lawful for their parent banks. Subsections (a)-(f) of Section 24a require national banks to satisfy several conditions (including capital requirements, managerial ratings and community reinvestment standards) in order to establish and maintain "financial subsidiaries."

Section 24a(g)(3) provides that the term "financial subsidiary" does *not* include a subsidiary that "engages solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks." Thus, Section 24a(g)(3) simply *exempts* operating subsidiaries from having to comply with the *federal statutory requirements* imposed on financial subsidiaries under Section 24a(a)-(f). Section 24a(g)(3) is *not* a power-granting provision, and it does *not* reveal any congressional purpose to bar the states from regulating operating subsidiaries.

The Senate committee report on GLBA expressly *disclaimed* any intent to expand the powers of operating subsidiaries of national banks, because it declared: "Nothing in this

---

5.34(e)(2)(i).

24

legislation is intended to affect any authority of national banks to engage in bank permissible activities through subsidiary corporations." S. Rep. No. 106-44, at 8 (1999). In fact, Congress understood that Section 24a would *restrict* – not expand – the OCC's authority to define the powers of operating subsidiaries. The conference report on GLBA instructed the OCC to *rescind* a prior regulation, which allowed operating subsidiaries to conduct activities that were *not* lawful for their parent national banks. *See* H.R. Rep. No. 106-434, at 160 (1999) (Conf. Rep.), reprinted in 1999 U.S. Code Cong. & Ad. News 245, 255 (stating that Section 24a would "supercede and replace the OCC's Part 5 regulations on operating subsidiaries"). The OCC responded to GLBA by rescinding its prior rule and by amending 12 C.F.R. § 5.34(e) to provide that operating subsidiaries may conduct *only* those activities that are permissible for their parent national banks. *See* 65 Fed. Reg. 3157, 3160 (Jan. 20, 2000) (proposed rule); id. at 12905, 12911 (Mar. 10, 2000) (final rule). It is completely illogical for the OCC to assert that Section 24a – a statute intended to *restrict* the OCC's authority over operating subsidiaries – can now be construed as a grant of *additional preemptive power* to the OCC.

C.    **The OCC's Interpretive Rulings Are Not Entitled to Judicial Deference and Therefore Do Not Exempt Operating Subsidiaries from State Regulation**

1.    **The OCC's Rulings Are Contrary to Clearly Manifested Congressional Intent**

Plaintiffs argue that the following regulations and interpretive rulings of the OCC preempt the states' authority to regulate operating subsidiaries of national banks: 12 C.F.R. §§ 5.34(e), 7.4000 & 7.4006; and OCC Interpretive Letters 957 and 958. In fact, however, none of these agency rulings provides a valid basis for Plaintiffs' preemption claim.

25

Section 5.34(e) does not contain any statement of intent to bar the states from regulating operating subsidiaries. Section 5.34(e) simply describes the *federal-law standards* that apply to operating subsidiaries, including (i) the requirement that each operating subsidiary must restrict its activities to those permissible for its parent national bank and (ii) federal supervisory rules for certain "affiliates" of FDIC-insured banks under 12 U.S.C. §§ 1820a & 1831v. Section 7.4000 does not refer to operating subsidiaries at all. It describes the permissible exercise of "visitorial powers" *only* with respect to "national banks."

Section 7.4006 does refer to the issue of state authority over operating subsidiaries. According to Section 7.4006, "[u]nless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." However, when the OCC adopted Section 7.4006 in 2001, the OCC declared that the regulation would *not* preempt state law of its own force. The OCC said:

> [Section 7.4006] itself *does not effect preemption of any State law*; it reflects the conclusion we believe a Federal court would reach, even in the absence of the regulation, pursuant to the Supremacy Clause and applicable Federal judicial precedent.

66 Fed. Reg. 34784, 34790 (July 2, 2001) (emphasis added).

Thus, Section 7.4006 is *not* a rule that has *substantive* preemptive impact. It simply provides the OCC's suggested *interpretation* of federal law on the issue of whether operating subsidiaries of national banks are subject to state law. Given its purely interpretive character, Section 7.4006 "does not have the force and effect of law."[29] Similarly, as indicated by their

---

[29] *Best,* 739 P.2d at 562 (discussing an interpretive rule that expressed the OCC's opinion

26

"interpretive" designation, OCC Interpretive Letters 957 and 958 present the OCC's suggested view on the same question of whether federal law bars the states from regulating operating subsidiaries. Again, these rulings do not have any "self-executing" force of law.[30] Accordingly, court decisions reviewing *substantive* agency rules that were designed to preempt state law of their own force are inapposite to this case.[31]

In view of the interpretive nature of Section 7.4006 and the OCC's two letter rulings, the key question in this case is whether this Court should give deference to the OCC's "interpretation" of federal law. Under the "first step" of the *Chevron* doctrine, a reviewing court must reject an agency interpretation that "flouts Congressional intent" on an issue where "Congress has directly spoken to the precise question." *ATLA v. Clarke*, 968 F.2d at 157, 155 (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984)). *Accord, Hawke*, 211 F.3d at 643-45. As the Supreme Court has explained, "[i]n determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning – or ambiguity – of certain words or phrases may only become evident when placed in context."

---

on a similar preemption issue). *Accord, Perdue*, 702 P.2d at 518-19 (same).

[30] In a speech delivered in 2002, Comptroller of the Currency John D. Hawke, Jr. admitted that "the OCC has *no self-executing power* to preempt state law," while adding that the OCC has "on many occasions *expressed its opinions* about the preemptive effect of federal law." OCC News Release 2002-10, at 7 (emphasis added) (reprinting Mr. Hawke's speech of Feb. 12, 2002) (available on the OCC's website at <www.occ.treas.gov>).

[31] *Compare, e.g., Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 145-47, 154 (1982) (reviewing a substantive agency rule that was expressly intended to preempt state law of its own force); *City of New York v. FCC*, 486 U.S. 57, 59-66 (1988) (same).

27

*FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132 (2000). A reviewing court should also use "traditional rules of statutory construction" in determining whether the relevant statutes, taken together, manifest a clear congressional intent on the question at issue. *Hawke,* 211 F.3d at 643-45 (quote at 643); *see also ATLA v. Clarke,* 968 F.2d at 155-57.

When Section 484 is read in context with the statutes dealing with "affiliates" of national banks, it becomes clear that Congress has *not* preempted the authority of states to regulate operating subsidiaries of national banks. As shown above, the terms of 12 U.S.C. §§ 221, 221a, 371c, 371c-1 and 481 demonstrate Congress' intent to draw a clear distinction between national banks and their "affiliates" (including operating subsidiaries). A careful comparison of Sections 481 and 484 shows that (i) state officials must file lawsuits instead of administrative complaints to enforce state laws against national banks, but (ii) Congress has *not* restricted the authority of state officials to supervise state-chartered "affiliates" (including operating subsidiaries) of national banks. AMTPA and the first proviso of Section 24(Seventh) provide further evidence that Congress has *not* exempted state-chartered operating subsidiaries from their duty to comply with applicable state laws. The OCC's interpretive rulings should therefore be rejected, because they do not provide a "reasonable" construction of the intent of Congress as clearly revealed by the governing statutes. *See ATLA v. Clarke,* 968 F.2d at 155-57; *Hawke,* 211 F.3d at 643-45; *Perdue,* 702 P.2d at 520-25. Indeed, the OCC's claim of "exclusive jurisdiction" over operating

28

subsidiaries was specifically rejected in *Fleet Mortgage* as being contrary to "unambiguous"

congressional intent.[32]

---

[32]  181 F.Supp.2d at 1000.  A federal district court in California has deferred to the OCC's position in two recent decisions, which held that state officials cannot regulate operating subsidiaries of national banks.  *National City Bank v. Boutris,* 2003 WL 21536818 (E.D. Cal., July 2, 2003) (Burrell, J.); *Wells Fargo Bank, N.A. v. Boutris,* 2003 WL 21277203 (E.D. Cal., May 9, 2003) (Burrell, J.).  However, that court did not consider the clear distinction that Sections 221, 221a, 371c, 371c-1, and 481 draw between "national banks" and their "affiliates" (including operating subsidiaries).  In addition, the court did not consider the relevance of AMTPA and the first proviso of Section 24(Seventh) or discuss the *Fleet Mortgage* decision. For the reasons stated in this brief, *amici* contend that the *Boutris* decisions clearly erred in granting deference to the OCC's claim of "exclusive visitorial powers" over operating subsidiaries.

In *Wells Fargo v. Boutris, supra,* slip op. at *6, the district judge cited *WFS Financial, Inc. v. Dean,* 79 F. Supp. 2d 1024 (W.D. Wis. 1999).  In *Dean,* the court held that an OTS regulation preempted the application of state laws to state-chartered operating subsidiaries of federal savings associations.  *Amici* do *not* concede that *Dean* was correctly decided.  For example, the court in Dean did not even consider the negative impact of the OTS regulation on the states' traditional authority to regulate state-chartered corporations.  In any event, the holding in *Dean* regarding the OTS' authority to preempt state law does *not* provide persuasive support for the *Boutris* decisions.  The courts have repeatedly held that the OTS enjoys a far broader preemptive power under the Home Owners' Loan Act of 1933 ("HOLA") than the OCC is granted under the National Bank Act ("NBA").  For example, in *People v. Coast Federal Savings & Loan Ass'n,* 98 F. Supp. 311 (S.D. Cal. 1951), the court held that HOLA authorized the OTS' predecessor agency to issue "comprehensive rules and regulations concerning the powers and operations of every Federal savings and loan association from its cradle to its corporate grave." Id. at 316.  The court also declared that the preemptive reach of HOLA is far greater than that of the NBA:

> '[A] building and loan association organized under [HOLA] is not a national bank and the powers and duties of the two materially differ.' *As to national banks, Congress expressly left open a field for state regulation and the application of state laws;* but as to federal savings and loan associations, Congress made plenary, preemptive delegation to the [OTS' predecessor] to organize, incorporate, supervise and regulate, leaving no room for state supervision.

Id. at 319 (citation omitted; emphasis added).

29

## 2. The OCC's Claim of Preemption Violates Core Principles of Corporate Governance and Invades the Sovereign Power of the States to Regulate State-Chartered Corporations

A further reason to deny deference to the OCC's position is that it contravenes

fundamental principles of corporate governance and infringes upon the states' sovereign authority

to regulate state-chartered corporations. The OCC's claim of power both to ignore the legal

separation between a national bank and its operating subsidiary, and to obliterate the subsidiary's

legal obligations under its state corporate charter, is contradicted by federal court decisions that

have insisted on construing federal statutes in harmony with state corporate law doctrines. For

example, in *United States v. Bestfoods,* 524 U.S. 51 (1998), the Supreme Court declared that the

legal separation between a subsidiary and its parent corporation is a "general principle of

corporate law deeply 'ingrained in our economic and legal systems.'" Id. at 61 (citation omitted);

*see also Fleet Mortgage,* 181 F. Supp. 2d at 1000 (observing that "operating subsidiaries hold a

separate incorporated status from their parent banks, and subsidiaries are not chartered as federal

---

Similarly, in *North Arlington National Bank v. Kearny Federal Savings & Loan Ass'n,*
187 F.2d 564 (3d Cir.), *cert. denied,* 342 U.S. 816 (1951), the court held that the NBA could *not*
be used as an "analogy" in discussing the authority granted to the OTS' predecessor agency under
HOLA, because of "the historical reasons back of the establishment of national banks and the
*altogether different type of administrative control exercised over them.*" Id. at 567 (emphasis
added). *See also Long,* 630 F.2d at 989 (stating that "federal regulation of federal savings and
loan associations . . . is distinct from the supervision of national banks by the [OCC] and . . .
federal savings and loan associations do not have the lengthy history of dual regulation that
characterizes the national banking system"); *Bank of America,* 309 F.3d at 558-59 (stating that
"regulation of federal savings associations by the OTS has been so 'pervasive as to leave no room
for state regulatory control'," while, in contrast, "states retain some power to regulate national
banks").

30

banks"). Federal court decisions have repeatedly rejected attempts to interpret federal statutes in a manner that would override longstanding principles of state corporate law, absent clear evidence that Congress intended such a result.[33]

The OCC has itself relied on principles of corporate separation in presenting legislative proposals to Congress. During congressional hearings on GLBA, the OCC invoked the corporate separation doctrine (including the reluctance of courts to "pierc[e] the corporate veil") to support its argument that Congress should *not* be greatly concerned by the possibility that "banks would end up being liable for the debts of their subsidiaries – beyond their own investments and loans." H.R. Rep. No. 106-74, at 101 (1999) (pt. 1) (discussing the OCC's views). Having advised Congress that national banks and their subsidiaries are separate and distinct entities under corporate law, the OCC cannot claim any congressional mandate for its current belief that "an operating subsidiary should be considered a part of the [parent] bank, and thus 'itself a bank' by extension." *See Fleet Mortgage,* 181 F. Supp. 2d at 999 (describing the OCC's position).

---

[33] *E.g., Bestfoods,* 524 U.S. at 62 (rejecting a proposed reading of a pollution control statute ("CERCLA") that would impose automatic liability on a parent corporation for the acts of its subsidiary, because "nothing in CERCLA purports to reject this bedrock principle [of corporate separation], and against this venerable commonlaw backdrop, the congressional silence is audible"); *CTS Corp.,* 481 U.S. at 85, 86 (refusing to construe a federal statute to "pre-empt a variety of state corporate laws of hitherto unquestioned validity," because the "longstanding prevalence of state regulation in this area suggests that, if Congress had intended to pre-empt all [such] state laws . . . it would have said so explicitly"); *Business Roundtable,* 905 F.2d at 412, 415 (invalidating an agency rule that would "overturn or at least impinge severely on the tradition of state regulation of corporate law," because "nothing in the statute and legislative history suggests so broad a [congressional] purpose"). *See also Santa Fe,* 462 U.S. at 479 (quoted supra at note 16).

31