2003 SEP 25 P 4: 51

DISTRICT C...
NEW HAVEN, CO...

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WACHOVIA BANK NA., and :
WACHOVIA MORTGAGE CORPORATION :
                         :

     *Plaintiffs,*     :    CIVIL ACTION NO.303CV0738(MRK)
                          :

V.                       :

JOHN P. BURKE,          :
In his official capacity as  :
Banking Commissioner of the  :
State of Connecticut       :
                       :

     *Defendant.*     :   SEPTEMBER 25, 2003


## BRIEF OF *AMICUS CURIAE*


    *Amici* American Bankers Association, Consumer Mortgage

Coalition, Consumer Bankers Association, and Electronic

Financial Services Council submit this brief in support of the

motion for summary judgment filed by Plaintiffs Wachovia Bank,

N.A., and Wachovia Mortgage Corporation (collectively,

"Wachovia" or "Plaintiffs" and individually "Wachovia Bank" and

"Wachovia Mortgage") and in support of Plaintiff's Memorandum of

Law in Opposition to Defendant's Motion For Summary Judgment.


LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20262 WACHOVIA V. BURKE\001 AMICI CURIA - CONSUMER MORT. COALITION - MAB\DOCUMENT MAB.DOC    1

## INTEREST OF AMICI

As set forth in the accompanying motion, *amici's* members originate the majority of the home mortgage loans made in the United States today.  Some are national banks with mortgage banking subsidiaries and others are operating subsidiaries of national banks, which have a direct interest in the outcome.  Still others utilize alternative corporate structures to engage in the mortgage banking business, but share the interest of Plaintiffs in a regulatory environment that provides effective protection for the public without duplicative or contradictory regulation.

*Amici* submit this brief to assist the court in understanding the practical consequences of the Defendant's attempt to assert licensing and visitorial authority over the operating subsidiaries of national banks.  *Amici*, each of which is a national trade association, seek to appear in this action because its implications extend far beyond the operations of Wachovia or the borders of the State of Connecticut.  Indeed,

Lynch, Traub, Keefe and Errante, p. c.  Attorneys at Law
52 Trumbull Street  P.O. Box 1612  New Haven, Connecticut 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20292 Wachovia v. Burke\1001 Amici Curia - Consumer Mort. Coalition - MAB\Document MAB.doc

2

were this Court to adopt Defendant's position, it would create substantial uncertainty in the mortgage lending industry, as Defendant's position has been summarily rejected by the federal agency to whom Congress has delegated the regulation of national banks - the Office of the Comptroller of the Currency — and by every other district court that has addressed this issue.  *See, e.g., Wells Fargo Bank v. Boutris,* 252 F. Supp.2d 1065 (preliminary injunction), 2003 WL 21536818 (E.D. Cal. May 9, 2003) (summary judgment); *National City Bank of Indiana v. Boutris,* 2003 WL 21536818 (E.D. Cal. No. 03-655, July 2, 2003) (summary judgment).

*Amici* respectfully suggest that an examination of the realities of today's home mortgage market will assist the Court in understanding why the OCC correctly concluded that a state's assertion of licensing and visitorial authority over the operating subsidiaries of national banks would improperly interfere with a national bank's exercise of its powers under the National Bank Act.  *See,* 12 C.F.R. §7.4000; OCC Advisory Letter 2002-9 (November 25, 2002) (copy attached as Exhibit 1 to

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20252 WADHAM V. BURKE\001 AMICI CURIA - CONSUMER MORT. COALITION - MAB\DOCUMENT MAB.DOC

3

Memorandum *Amicus Curiae* of the Office of the Comptroller of the

Currency in Support of Plaintiffs' Motion for Summary Judgment

("OCC Memorandum")).  Indeed, the inefficiencies created by such

a system of redundant visitorial and inconsistent regulation

would "impair the efficiency of national banks to discharge

their duties,"[1] thereby increasing costs and reducing choices for

the very consumers whom the Commissioner and his counterparts

seek to protect.

Finally, *amici* feel compelled to respond, as an industry,

to those portions of Defendant's brief that would imply that

Wachovia and national banks like it seek to use the OCC's

operating subsidiary rule to avoid state consumer protections.

As this brief will outline, national banks have legitimate

business reasons for lending through operating subsidiaries that

have nothing to do with state consumer protection laws.

Moreover, those operating subsidiaries are subject to the same

comprehensive federal and, where not preempted, state regulation

---

[1]    *Bank of America v. City and County of San Francisco*, 309 F.3d 551, 561 (9th Cir. 2002).

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275   FACSIMILE (203) 782-0278

as the national banks themselves.  Thus, the crucial issue for

national banks is not whether or not they are regulated, but by

whom, and how many different licensing and examination schemes

are applicable to them.  By focusing solely on the isolated

inconsistencies between Connecticut and federal law, Defendant

entirely ignores the inconsistencies of greater magnitude that

would be imposed by the divergent regulations in effect in other

states.  It is due to these burdens that the OCC and every court

that has addressed the issue have correctly, and reasonably,

concluded that federal preemption is necessary to effectuate the

purpose of the National Bank Act.  *See e.g.*, OCC Interpretive

Letter No. 957, from Julie L. Williams, First Senior Deputy

Comptroller and Chief Counsel, to Scott A. Cameron, Esq.,

Associate General Counsel, Bank of America) (January 27, 2003)

(Exhibit 3 to OCC Memorandum); *Wells Fargo Bank,* 252 F. Supp. 2d

at 1170, *National City Bank of Indiana,* 2003 WL 21536818 at 3-4.

### ARGUMENT

Amici submit this brief to address three issues implicated

by the Defendant's summary judgment motion.  First, *amici* seek

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\00000-20499\20262 WACHOVIA V. BLUMENTHAL\AMICI CURIA - CONSUMER MORT. COALITION - MAIN DOCUMENT MAB.DOC

5

to explain why their members' ability to conduct their real estate lending businesses through operating subsidiaries is important in today's mortgage market.  Because of the way that the residential home mortgage market has developed, the establishment of a separate operating subsidiary is the most efficient way for federally-chartered banking institutions to conduct the business of mortgage lending.  Restricting national banks' use of the operating subsidiary structure would frustrate their ability to compete and create greater risk for the bank's depositors and for the government, which ultimately guarantees those deposits through federal deposit insurance.

Second, allowing each state — not only Connecticut — to superimpose its own licensing and regulatory scheme on a national bank's real estate lending program would create duplicative and inconsistent regulation, which was not Congress' intent when it created a national banking system.  Despite the Commissioner's suggestion to the contrary, moreover, multiple layers of oversight are not justified in the interest of consumer protection.  Consumers are adequately protected by the

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20282 WACHOVIA v. BURKE\001 AMICI CURIA - CONSUMER MORT. COALITION - MAB\DOCUMENT MAB.DOC

6

OCC's regulation of national banks and their operating subsidiaries, and allowing the states to exercise redundant regulatory authority only would serve to increase the cost and decrease the availability of home mortgage loans to American consumers.

Finally, contrary to the assertions of the Defendant and the *amici* state officials, this Court need not hold — and neither Plaintiffs nor the parties of the current brief contend — that "national banks enjoy a general exemption from all state laws." Brief of *Amici Curiae*, States and State Banking Officials in Support of Defendant John P. Burke, Banking Commissioner ("State Brief") at 5. *Amici* recognize that national banks are and will remain subject to state regulation where appropriate.[2] The only issue before the Court is the narrow one of whether a state's attempt to assert its licensing

---

[2]    *Amici* and the OCC both recognize that a number of state laws are not preempted by the National Bank Act "in areas such as contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law." *Bank of America v. City and County of San Francisco*, 309 F.3d 551, 559 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 2220 (2003) (footnote omitted). But these laws do not purport to regulate the exercise of banking powers under the National Bank Act.

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.   ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275   FACSIMILE (203) 782-0278

W:\20000-20499-20262 WACHOVIA V. BURKE\001 AMICI CURIA - CONSUMER MORT. COALITION - MAIN\DOCUMENT MAB.DOC

7

and visitorial authority over an operating subsidiary of a
national bank is preempted by federal law.

**I.   NATIONAL BANKS CANNOT FULLY EXERCISE THEIR REAL ESTATE
LENDING POWERS IF THEIR MORTGAGE SUBSIDIARIES ARE REGULATED
AS BOTH NATIONAL BANKS AND STATE-LICENSED LENDERS.**

The Defendant acknowledges that Wachovia Bank may, itself,
lawfully make first and secondary mortgage loans without obtaining
the Connecticut licenses and without complying with other
Connecticut regulatory provisions applicable to those activities.
*Defendant's Memorandum of Law in Support of His Cross-Motion for
Summary Judgment and in Opposition to the Plaintiffs' Motion for
Summary Judgment* ("D. Mem.") at 2.[3]  The issue presented by the
Plaintiffs' motion is whether the OCC's regulation, that preempts
state law to allow the bank to lawfully engage in exactly the same
activities through a wholly-owned state-chartered subsidiary

---

[3]    Although the Defendant notes that Connecticut specifically exempts all banks from its
mortgage lending licensure requirements, his argument acknowledges that federal law
prevents the states from exercising "visitorial powers" over national banks themselves.
D. Mem. at 9.

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

specifically approved for that purpose by the OCC is arbitrary and capricious. [4]

The issue is not whether the operating subsidiary is regulated or examined — it is subject to the same comprehensive federal regulatory and supervisory regime as the parent bank.[5] Nor is it whether the operating subsidiary is subject to state law — it is subject to the same Connecticut laws that apply to its parent bank when it engages in business activities in Connecticut. The only question in this case is whether Connecticut can impose its licensing and visitorial authority concurrent with those of the OCC in regulating *banking* activities that a national bank chooses to carry out through an operating subsidiary.

---

[4]     *See Wells Fargo Bank, N.A. v. Boutris*, 265 F. 2d 1162, 1167. n.7 (E.D. Cal. 2003) (*citing* 12 C.F.R. § 5.34(b)) (noting that prior to receiving authorization to conduct banking activities through an operating subsidiary, a bank must file a notice and application as prescribed by the OCC's regulations, which is then reviewed by the OCC to determine if the proposed activities are legally permissible and are consistent with safety and soundness principles).

[5]     Operating subsidiaries of national banks are subject to virtually the same federal and state laws and regulations as the parent bank. The only federal regulation of national banks that does not generally apply to operating subsidiaries is the requirement for notice of and comment on the establishment of a new branch, but the OCC can apply even that

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20009-20499\20252 WACHOVIA v. BURKE\001 AMD CMPA - CONSUMER MORT. COALITION - MAB\DOCUMENT MAB.DOC

9

In order to understand why the OCC's interpretation of the National Bank Act is reasonable, it is important to understand how national banks operate in the modern mortgage lending market.  Indeed, courts have long recognized that "the powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking."  *Bank of America*, 309 F.3d at 563 (citation omitted).

The advantages of conducting mortgage lending activities in an operating subsidiary have their roots in changes in the mortgage market in the 1970's, when the demand for fixed-rate mortgage credit rose sharply, relative to the supply of funds available from traditional lenders.  *See* Kenneth G. Lore and Cameron L. Cowan, *Mortgage-Backed Securities*:  *Developments and Trends in the Secondary Mortgage Market*, ch. 1 (West Group 2003).  Previously, most loans other than those guaranteed by a government agency such as the Federal Housing Administration had been made by savings and loan associations or banks, and funded

---

requirement in appropriate circumstances. 12 C.F.R. § 5.34(e)(5)(ii) (operating subsidiary generally exempt from notice-and-comment requirement); *see id*. §§ 5.8, 5.10, and 5.11.

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20262 WACHOVIA v. BURKE\001 AMICI CURIA - CONSUMER MORT. COALITION - MAB\DOCUMENT MAB.DOC

10

by their deposit liabilities.  To meet the credit gap, the notion of pooling mortgages to sell in the form of mortgage-backed securities ("MBS") to a wider secondary market took hold. *Id*.  Currently, the majority of residential mortgages are packaged by the lender (called a "mortgage banker") and sold to a secondary market "securitizer" — typically Fannie Mae or Freddie Mac or to other financial institutions for loans that do not qualify for sale to those entities.  Although the loan is made in the name of the mortgage banker, the banker holds it for only a short time before selling it into the secondary market. Thus, mortgage loans today are largely funded by a vast secondary market of investors rather than by deposits held in individual financial institutions.

The transition to the secondary market has had enormous benefits for both the mortgage market and the banking system as a whole.  A geographical area that is experiencing an influx of population can finance new construction with investments from around the country (and, indeed, around the world) rather than out of its own limited deposit base.  Loan instruments are

standardized, providing liquidity in the market for MBS despite
the extreme illiquidity of the market for the asset secured by
each mortgage — a home.  By selling the loans they originate
into the secondary market, banks engaged in mortgage lending can
avoid the risks of holding mortgage assets in portfolio —
including, among other things, interest-rate risk caused by the
mismatch between short-term deposits and long-term mortgage
loans, concentration risk caused by lending only in a limited
geographic area, and credit risk caused by having too small a
base of loans to be able to use statistical methods to estimate
the risk of default.  Banks can, and often do, then invest in
MBS — completing the circle that began when the bank originated
the loan, but at lower risk.[6]  The transition to a housing
finance system driven by the secondary mortgage market also has
led to a proliferation of national mortgage lenders that offer
their products in all or most of the 50 states.  These national

---

[6]      *Id.* National banks and their operating subsidiaries have specific authority to invest in
MBS.  *See* 12 U.S.C. §§ 24 (Seventh) (authority of national bank to invest in MBS); 12
C.F.R. § 5.34(e)(1) (operating subsidiary of national bank may conduct activities
permissible for national bank).

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\22000-20499\20252 WACHOVIA v. Burke\001 AMICI CURIA - CONSUMER\MGT. COALITION - MABI\DOCUMENT.MAB.DOC

12

lenders have fueled competition in markets around the country,

resulting in lower costs for consumers.

The evolution towards lending through operating

subsidiaries is a rational response to these new lending

realities.  Because most mortgage lenders only hold their loans

in the short term until they can be sold for new capital on the

secondary market, a mortgage banker need not maintain the level

of funds required (in the form of deposits) when a bank holds

such loans as investments.  Indeed, even the funds necessary to

close the loans can be and often are borrowed on the security of

the loans themselves through a "warehouse credit line." [7]  Thus,

in today's marketplace, the mortgage banker's primary capital

need is to maintain adequate capital to satisfy investors that

it can honor the representations and warranties it makes in

selling the loans — *i.e.*, if necessary, repurchase loans in

which those representations and warranties were breached.

---

[7]    *See* U.S. Department of Housing and Urban Development, Office of Policy
Development and Research, *Economic Analysis and Initial Regulatory Flexibility Analysis for
RESPA Proposed Rule to Simplify and Improve the Process of Obtaining Mortgages to*

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20282 WACHOVIA V. BURKE\001 AMICI CURIA - CONSUMERS MORT. COALITION - MAB\DOCUMENT MAB.DOC

13

The OCC's regulations recognize the value to national banks of establishing operating subsidiaries as a vehicle to limit the portion of their capital exposed by their mortgage operations to what is necessary to satisfy the requirements of the secondary market.  This protects the assets backing up the bank's entire deposit base (and ultimately the federal deposit insurance funds) from being exposed to claims arising from the mortgage lending activities, as they would be if those activities were conducted directly in the bank.[8]  In addition, in the eyes of the FDIC, a financially viable operating subsidiary can help support the soundness of the overall bank.  As the former Chairman of the Federal Deposit Insurance Corporation ("FDIC") noted:

> [F]rom the standpoint of benefits that
> accrue to the insured depository
> institution, or to the deposit insurer in
> the case of a bank failure, there are
> advantages to a direct subsidiary
> relationship with the bank.  The properly
> insulated operating subsidiary structure and

---

[8]    *Reduce Settlement Costs to Consumers*, at 10 n. 16 (July 2002), available at http://www.namb.org/government_affairs/front/2003-02_economic_analysis.pdf.
    *See* Constance Z. Wagner, *Structuring the Financial Service Conglomerates of the Future:  Does the Choice of Corporate Form to House New Financial Activities of National Banks Matter?*, 19 Ann. Rev. Banking L. 329, 399 (2000).

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

14

> the holding company structure can provide
> similar safety-and-soundness protection when
> the bank is sound and the
> affiliate/subsidiary is financially
> troubled.  However, when it is the bank that
> is financially troubled and the
> affiliate/subsidiary is sound, the value of
> the subsidiary serves to directly reduce the
> exposure of the FDIC.  If the firm is a non-
> bank subsidiary of the parent holding
> company, none of these values is available
> to insured bank subsidiaries, or to the FDIC
> if the bank should fail.  Thus, the
> subsidiary structure can provide superior
> safety-and-soundness protection.[9]

Thus, the ability to conduct the mortgage business through

an operating subsidiary offers important benefits to national

banks and to the public that would be compromised if the bank

had to comply with both the federal and state licensing and

regulatory schemes.  As a result, the Connecticut banking

statutes that the Commissioner seeks to enforce here do

"significantly impair" the ability of a national bank to

discharge its federally-granted authority, and there is no

question that the statutes are preempted and that the OCC's

---

[9]    *Financial Services Modernization Act of 1999:  Testimony before the Committee on
Banking, Housing, and Urban Affairs, United States Senate*, 106th Cong., 1st Sess.

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

15

interpretation of the National Bank Act is reasonable. *See Bank of America*, 309 F.3d at 561 ("State attempts to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties").

## II.   The OCC Extensively Regulates The Practices Of National Bank Operating Subsidiaries And State Licensing And Visitorial Would Impede The Business of National Banks And Conflict With Or Duplicate Federal Regulation.

In large part, the Defendant's and the State briefs seek to suggest that granting Plaintiffs' motion will hurt consumers by allowing federally-authorized operating subsidiaries to evade state consumer protections.[10] Although that argument is entirely

---

(February 24, 1999) (Testimony of Donna Tanoue, Chairman, FDIC).

[10]    In this respect, the Defendant's brief is reminiscent of the State of Wisconsin's position in an analogous case involving the Office of Thrift Supervision's authority to preempt state regulation of the operating subsidiaries of federal savings banks. *WFS Financial Inc.* v. *Dean*, 79 F. Supp 2d 1024 (W.D. Wis 1999). In its opinion, the district court aptly observed:

> To read defendants' brief, one might think that the scheme
> envisioned by the Office of Thrift Supervision is nothing but a
> ploy to permit corporate subsidiaries of federal savings and loan
> associations to bilk the public with impunity, free from all laws
> and regulation, while giving the parent complete protection
> from any liability resulting from the actions of its unregulated
> offspring. The truth is that the subsidiary is exempt from only
> those laws and regulations that preemption principles would bar
> the state from applying to the savings and loan association that

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20262 WACHOVIA v. BURKE\001 AMICI CURIA - CONSUMER MORT. COALITION - MAB\DOCUMENT MAB.DOC

irrelevant to the issue before this Court – which is the

reasonableness of the OCC's interpretation of the National Bank

Act – it is also factually inaccurate.  The rationale behind

Congress' scheme of federal preemption and the necessary

extension of that scheme to the operating subsidiaries of

national banks has nothing to do with evading the protections

afforded by Connecticut law.  It has to do with the imposition

on national banks' federal real estate lending powers that would

be created by the cumulative effect of applying *all* state

regulations to the lending activities of a national bank, thus

frustrating the purpose of the National Bank Act, which "was

---

> engaged in the same acts.  It cannot exist as an operating
> subsidiary without the prior approval of the Office of Thrift
> Supervision.  It is not exempt from federal laws and regulations
> that govern loans, consumer loan disclosures, loan fees and
> interest rates, any more than its parent is.  Furthermore, it is
> subject to the same kind of regulation and monitoring as its
> parent to insure that it is operated in a way that will maintain
> the viability of its parent and the solvency of the federal deposit
> insurance system.

*Id.* at 1028.  These observations are equally applicable to national banks
and the OCC.

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06508-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20282 WACHOVIA V. BURKE\001 AMICICURIA - CONSUMER MORT. COALITION- MAB\DOCUMENT MAB.DOC

17

enacted to facilitate 'a national banking system.'" *Boutris*, 265 F. Supp. 2d at 1166.

Although the Defendant is careful to highlight the differences between Connecticut's regulatory scheme and the OCC's, its brief is conspicuously silent as to the very real differences between Connecticut's scheme and the laws of its sister states. Forcing national banks to choose between complying with each state's licensing and examination requirements various laws or losing the efficiencies provided by the operating subsidiary structure undermines their ability to compete effectively, bringing about the very evils that the national banking system was intended to eliminate.[11] For example, an increasing number of states — not (so far) including Connecticut — now require loan officers to obtain individual licenses to solicit and negotiate mortgage loans in addition to

---

[11] *See Easton v. Iowa*, 188 U.S. 220, 229 (1903):
> [The National Bank Act] has in view the erection of a
> system extending throughout the country, and
> independent, so far as powers conferred are concerned, of
> state legislation which, if permitted to be applicable, might

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

the mortgage company's corporate license.[12]    If Defendant's
position were adopted, a national bank operating subsidiary with
a nationwide call center would have to obtain an individual
license for each employee who arranges a mortgage loan with a
consumer in one of those states.   This type of requirement could
easily make national real estate lending operations untenable
for national banks, in clear contravention of Congress's intent
in enacting the National Bank Act.

   *Amici* also note that increasingly mortgage lenders are
offering loan products over the Internet, a borderless medium
that offers great convenience, a wide array of options, and
enhanced shopping opportunity to consumers.   If each state were
allowed to impose its own regulation scheme on mortgage banking
subsidiaries of national banks, the resulting patchwork of
regulation could well hobble the advancement of this very
consumer-friendly electronic medium.

---

[12]      impose limitations and restrictions as various and as
numerous as the states.
*See, e.g.,* Cal. Bus. & Prof. Code § 10131(d) and (e); Fla. Stat. § 494.001; Ind. Code
§ 23-2-5-5(a)(5) and (6); N.J. Admin. Code §§ 3:15-1.2 and 3.15-2.13.

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.   ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612   NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275   FACSIMILE (203) 782-0278

And, despite Defendant's implications to the contrary, maintaining federal preemption hardly leaves national bank operating subsidiaries unregulated.  As discussed in the OCC Memorandum, the OCC has an extensive and sophisticated examination program that applies to both national banks and their operating subsidiaries.  The OCC not only comprehensively examines banks and their subsidiaries for safety and soundness, but also for compliance with applicable law, including the Fair Housing Act and other fair lending and consumer protection laws. Even where a state law is not preempted, responsibility for enforcement of that law can rest with the OCC.[13]  Moreover, the OCC considers the operating subsidiary's practices in the context of the national bank's overall risk-management program and may devise solutions that apply to the entire bank, not just the operating subsidiary alone.  Individual state examinations of a national bank's operating subsidiary conflict with this

---

[13]     *See* 12 U.S.C. § 36(f)(1)(A) (the provisions of certain non-preempted state laws to which a branch of a national bank is subject, shall be enforced, with respect to such branch, by the OCC); s*ee also National State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 989 (3d Cir. 1980). ("Thus while the substantive law of New Jersey prohibiting red-lining is

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20262 WACHOVIA V. BLAVIN\1001 AMICI CURIA - CONSUMER\MOTE. COALITION - MAB\DOCUMENT MAB.DOC

20

program and are clearly antithetical to Congress's intent to establish a national banking system.[14]  States will have different requirements and interpretations of their patchwork of laws and rules and may view the activities conducted by a national bank's operating subsidiaries in a much different light than the holistic approach available to the OCC.

In recent years, the OCC also has taken a leading role in developing detailed regulatory guidance on both predatory lending and unfair and deceptive acts and practices.[15]  The OCC's guidance includes certain issues not generally addressed by similar state laws, such as a requirement to perform appropriate due diligence on both the loan documents and on third-party

---

not preempted, the enforcement of the state statute is the responsibility of the Comptroller of the Currency rather than the State Commissioner").

[14]    *Marquette National Bank of Minneapolis v. First of Omaha Service Corp*. 439 U.S. 299, 314-15 ("[t]he National Bank Act was enacted to facilitate . . . 'a national banking system[']").

[15]    OCC, Notice of Proposed Rulemaking: Bank Activities and Operations, Real Estate Lending and Appraisals, 68 Fed. Reg. 46119, 46126-27 (guidance on unfair and deceptive practices); OCC Advisory Letter, 2003-2, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices (Feb. 21, 2003); OCC Advisory Letter 2003-3, Avoiding Predatory and Abusive Lending Practices in Brokered and Purchased Loans (Feb. 21, 2003).

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

21

originators and other parties involved in the process (such as appraisers), to assure that consumers are fully protected.

Subjecting a national bank's operating subsidiary to individual state licensing and examinations, in addition to being in conflict with the OCC's comprehensive supervisory scheme, can represent a significant burden on the bank's resources.  Obtaining and maintaining licenses and paying for examinations in multiple states can easily result in hundreds of thousands of dollars of costs.  While this cost flows from what one court described as an "unnecessary and wasteful duplication of effort on the part of the bank and the state agency,"[16] it also represents an unwarranted and unnecessary interference of its federally authorized function.  Accordingly, the OCC's interpretation of the National Bank Act's application to operating subsidiaries should be upheld.

III.    **The Court Need Not Hold That National Banks Are Exempt From State Law But Simply That States May Not Regulate National Banks In Their Banking Activities, Except As Provided By Federal Law.**

---

[16]    *Boutris*, 265 F. Supp.2d at 1170 (citation omitted).

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.    ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20262 WACHOVIA V. BURKE\001 AMICI CURIA - CONSUMER MORT. COALITION - MAB\DOCUMENT MAB.DOC

22

Finally, it is important to recognize that neither
Plaintiffs nor *Amici* seek the preemption of all state
regulations.  The Plaintiffs are not asking this Court to hold
that state regulation does not apply to national banks or their
operating subsidiaries.  *Amici* recognize that certain state laws
*do* apply to national banks.  But there is a significant
difference between laws such as corporate law (the laws
applicable to an operating subsidiary on incorporation, merger,
dissolution, directors, and other corporate matters) and
commercial and property law, on the one hand, and state
regulation of lending and other core banking activities that are
specifically the subject of the National Bank Act on the other.[17]

---

[17]    In its pending proposal to clarify the applicability of state law to national banks and
their subsidiaries, the OCC lists those state laws that apply, as follows:

(d)    Except where made applicable for Federal law, state laws on the following
subjects apply to national banks to the extent that they only incidentally affect the real
estate lending powers of national bank:

| | |
|---|---|
| 1. | Contracts; |
| 2. | Torts; |
| 3. | Criminal law [applicable to all persons]; |
| 4. | Homestead laws specified in 12 U.S.C. 1462a(f); |
| 5. | Debt collection; |
| 6. | Acquisition and transfer of real property; |
| 7. | Taxation; |
| 8. | Zoning; and |

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

W:\20000-20499\20282 WACHOVIA V. BURKE\001 AMICI CURIA - CONSUMER MORT. COALITION - MAB\DOCUMENT MAB.DOC

The first group of laws clearly applies to national bank operating subsidiaries, and *amici* do not contend otherwise. What *amici* vigorously contest is the Defendant's claim that the states may prohibit or restrict a national bank's federally-approved operating subsidiary from engaging in *banking* activities in which the national bank is permitted to engage.[18]

The submissions of the Defendant and the states reflect a fundamental misconception about the nature of the preemption created by the National Bank Act. Although the National Bank Act authorizes the OCC to issue charters for national banks, its preemptive effect does not depend on the fact that national banks are *chartered* by a federal agency. Rather, the National Bank Act preempts state regulation of the banking activities of

---

9.    Any other law that the OCC, upon review, determines to have only an incidental effect on the real estate lending powers of national banks or is otherwise consistent with the purposes set out in δ34.3(a).

OCC Notice of Proposed Rulemaking: "Bank Activities and Operations, Real Estate Lending and Appraisals: 68 Fed Reg. 46,119, Aug 5, 2003.

[18]    "Thus, while the substantive law of New Jersey prohibiting redlining is not preempted, enforcement of the state statute is the responsibility of the Comptroller of the Currency rather than the State Commissioner." *See National State Bank, Elizabeth, N.J.*, 79 F. Supp.2d at 989.

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.   ATTORNEYS AT LAW
52 TRUMBULL STREET   P.O. BOX 1612   NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275   FACSIMILE (203) 782-0278

national banks and their operating subsidiaries of the type at issue here because the state laws prevent national banks from exercising the *powers* granted to them under federal law.  *See generally*, Boutris, 265 F.Supp.2d at 1170.

If a state could undo the federal preemption created by the National Bank Act for national banks simply because the bank exercises its powers through an entity created by state law rather than directly, then it could effectively annul the bank's federally-granted powers both to engage in real-estate lending and to own a federally-approved operating subsidiary.  Because it is uncontested that the Plaintiffs' actions were fully consistent with the OCC's duly promulgated regulations, the question before this court is whether the court should defer to the OCC's interpretations of the National Bank Act under the standards set forth in *NationsBank of N.C., N. A. v. Variable Annuity Life Ins. Company*, 513 U.S. 251, 256 (1995):

> The Comptroller of the Currency is charged
> with the enforcement of banking laws to an
> extent that warrants the invocation of [the
> rule of deference] with respect to his

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

25

deliberative conclusions as to the meaning
of these laws.[19]

Amici respectfully suggest that such deference is due.  For
the reasons cited herein, amici, American Bankers Association,
Consumer Bankers Association, Consumer Mortgage Coalition, and
the Electronic Financial Services Council, believe that the
Court should uphold the OCC's exclusive vistorial power over
operating subsidiaries of national bank, grant Plaintiff's
Motion for Summary Judgment, and deny the Defendant's Cross-
Motion for Summary Judgment.

---

[19]    The one case, *Minnesota v. Fleet Mortgage Corp.*, 181 F. Supp.2d 995, cited by the
states, that recognized state regulatory authority over a national bank operating subsidiary
— as opposed to the authority to enforce state laws of general application — is easily
distinguished.  In the *Fleet* case, the Minnesota Attorney General sought to enforce the
Federal Trade Commission's ("FTC's") Telemarketing Sales Rule ("TSR"), which implements
the Telemarketing and Consuemr Fraud and Abuse Prevention Act ("TFA"), 15 U.S.C.
§§ 6103(a) and 6105(a), against an operating subsidiary of a national bank.  The court held
that the state Attorney General could enforce the TSR against the national bank on the basis
of two specific statutory provisions.  First, Section 133 of the Gramm-Leach-Bliley Act, 15
U.S.C. § 41 note, provides that the FTC may have jurisdiction over an operating subsidiary
of a bank, even though it does not have jurisdiction over the parent bank.
        Second, a provision of the TFA specifically authorizes enforcement of that law by
state Attorneys General.  15 U.S.C. § 6103(a).  The *Fleet* court read these provisions as,
together, granting the states the power to enforce the federal law.  We believe that a better
reading of the federal TFA would have been that the state Attorneys General may enforce
the TFA to the extent that they otherwise have jurisdiction over a company (thus precluding
enforcement against a national bank operating subsidiary).  In any case, however, the *Fleet*
case has no bearing on the instant matter because it involves a specific grant in a federal

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.  ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

RESPECTFULLY SUBMITTED,

AMERICAN BANKERS ASSOCIATION,
THE CONSUMER BANKERS ASSOCIATION,
THE CONSUMER MORTGAGE COALITION,
and THE ELECTRONIC FINANCIAL
SERVICES COUNSEL,

*AMICI CURIAE*

BY:     *Eric Smith* / MAB
    ERIC P. SMITH, ESQ.
    Lynch, Traub, Keefe & Errante, P.C.
    52 Trumbull Street
    New Haven, CT 06510
    Telephone: (203)787-0275
    Fax: (203)782-0278
    Federal Bar No. ct16141

        -and-

    JEREMIAH S. BUCKLEY, ESQ.
    Federal Bar No. ct25205
    JOSEPH M. KOLAR, ESQ.
    Goodwin Procter, LLP
    1717 Pennsylvania Avenue, NW
    Suite 500
    Washington, DC 20006
    Telephone:  (202) 974-1000
    Fax:  (202) 331-9330

---

law of enforcement authority to the states, and such authority does not exist in the instant case.

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.   ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612   NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275   FACSIMILE (203) 782-0278

W:20000-20499\20262 Wachovia v. Burke\001 Amici Curia - Consumer Mort. Coalition - MAB\Document MAB.doc

27

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed on September 25, 2003 to all counsel and *pro se* parties of record via the United States Postal Service, postage prepaid, as follows:

Daniel L. FitzMaurice
Jason S. Weathers
Day, Berry & Howard, LLP
City Place I, 185 Asylum Street
Hartford, CT 06103-3449

Mark F. Kohl
Lorrie Lewis Adeyemi
Attorney General's Office
55 Elm Street, P.O. Box 120
Hartford, CT 06101-0120

John G. Haines
Rupal Shah Palanki
Attorney General's Office
55 Elm Street, P.O. Box 120
Hartford, CT 06101-0120

Douglas B. Jordan
Office of the Comptroller of the Currency
250 East Street, S.W.
Washington, D.C. 20219

Margaret E. Haering
Hurwitz & Sagarin
147 North Broad Street
P.O. Box 112
Milford, CT 06460-0112

Eric P. Smith

LYNCH, TRAUB, KEEFE AND ERRANTE, P. C.   ATTORNEYS AT LAW
52 TRUMBULL STREET  P.O. BOX 1612  NEW HAVEN, CONNECTICUT 06506-1612
TELEPHONE (203) 787-0275  FACSIMILE (203) 782-0278

28