**IN THE UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| WACHOVIA BANK, N.A. and WACHOVIA MORTGAGE CORPORATION., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN P. BURKE, in his official capacity as Banking Commissioner of the State of Connecticut, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civ. Act. No. 3:03CV0738 JCH

**MEMORANDUM *AMICUS CURIAE* OF THE OFFICE OF THE COMPTROLLER OF THE CURRENCY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

JULY 16, 2003

**MEMORANDUM *AMICUS CURIAE* OF**
**THE OFFICE OF THE  COMPTROLLER OF THE CURRENCY**
**IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

The Office of the Comptroller of the Currency ("OCC") respectfully submits this brief *amicus curiae* in support of the plaintiffs' motion for summary judgment on their claims for declaratory and injunctive relief.  As the federal regulator charged with overseeing the national banking system and administering the National Bank Act, the OCC has an institutional interest in ensuring that the requirements of federal law are observed and that plaintiffs may conduct their real estate lending activities to the full extent and in the manner authorized by federal law.  Here, plaintiffs are entitled to relief from the assertion of authority by Defendant Burke, as Banking Commissioner for the state of Connecticut (the "Commissioner"), over plaintiffs' exercise of federally authorized powers to engage in real estate lending under the supervision of the OCC. Federal law precludes the Commissioner's assertion of visitorial authority over a national bank

operating subsidiary, and preempts the state laws on which he relies as applied to national banks and their operating subsidiaries.

**OCC Supervisory Framework**

The OCC is the bureau of the United States Treasury Department charged with the administration of the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, and oversight of the national banking system. The OCC has comprehensive authority over the chartering, supervision, and regulation of virtually every aspect of the operation of banks organized under the National Bank Act. Plaintiff Wachovia Bank, N.A. ("Wachovia" or the "Bank"), is a national bank chartered by the OCC pursuant to federal law, and has received OCC authorization to conduct real estate lending activities through an operating subsidiary – plaintiff Wachovia Mortgage Corporation ("WMC"), a wholly-owned subsidiary of the Bank. As with any national bank operating subsidiary, applicable state and federal laws apply to WMC to the same extent as they apply to the Bank. Both plaintiffs, in accordance with the federal statutes and regulations under which they were chartered and licensed, are subject to the authority of the OCC.

In its capacity as administrator of the national banking system, the OCC regularly conducts extensive examinations of each national bank's business. These examinations evaluate the bank's compliance with principles of safe and sound banking as well as its compliance with federal law and any applicable state laws concerning the bank's activities. 12 U.S.C. § 481. In addition, the OCC conducts targeted examinations that may cover one of more elements of a comprehensive examination, such as compliance with specific laws. Federal law authorizes the OCC to inspect the bank's records and analyze its activities, including the records and activities of any operating subsidiaries through which the bank acts in conducting its banking business.

-2-

The OCC evaluates the adequacy of all elements of the institution's business, including earning, assets, management, liquidity, sensitivity to market risk, and information systems. Congress also has provided the OCC an extensive array of regulatory tools with which to address unsafe or unsound banking practices or violations of law by national banks. *See, e.g.,* 12 U.S.C. §§ 93 (forfeiture of charter, civil money penalties); 1818 (cease and desist orders, restitution; removal of officers and directors; civil money penalties). Through its supervisory, regulatory and enforcement authority, the OCC oversees the activities of national banks and their subsidiaries and takes action to maintain the sound operations of the national banking system.

Pursuant to 12 U.S.C. § 484 and federal regulations, the OCC has exclusive "visitorial" authority over national banks and their operating subsidiaries except where federal law specifically provides otherwise. The term "visitorial" powers as used in section 484 encompasses any examination, inspection of books and records, regulation or supervision of activities authorized or permitted pursuant to federal banking law; and enforcement of compliance with any applicable federal or state laws and with principles of safe and sound banking. 12 C.F.R. § 7.4000(a)(2). When WMC became an operating subsidiary of the Bank on January 1, 2003, it became subject to the exclusive visitorial authority of the OCC under 12 U.S.C. § 484..

National banks chartered by the OCC are authorized to engage in the business of banking and all activities incidental thereto by 12 U.S.C. § 24(Seventh). Other statutory provisions authorize specific powers. These include 12 U.S.C. § 371, in which Congress explicitly granted national banks authority to make, arrange, and deal in loans secured by interests in real estate. Under OCC regulations, national banks also may engage in these activities through operating

-3-

subsidiaries. 12 C.F.R. §§ 5.34; 34.1(b). Thus federal law authorizes national banks, both directly and through OCC-approved operating subsidiaries, to engage in a full range of real estate lending activities. States are not at liberty to constrain or obstruct the exercise of those national bank powers.

### Connecticut Assertions of Authority

WMC became an operating subsidiary of the Bank on January 1, 2003. Compl. ¶ 4. Thereafter, on February 24, 2003, the Commissioner initiated an enforcement action against WMC for operating a first mortgage lending business in Connecticut without a license in violation of Connecticut law. Compl. ¶ 24. The Commissioner withdrew the proceeding after WMC agreed to apply for a license, while reserving its rights to challenge the Commissioner's actions. Compl. ¶¶ 25-27. The Commissioner subsequently called upon WMC to respond to questions about specific mortgage transactions based upon a previous examination of WMC before it became an operating subsidiary, and to undertake "corrective actions." Compl. ¶¶ 28-29.

The Connecticut statutory provisions identified as the basis for the Commissioner's assertions of authority over WMC include: Connecticut General Statute §§ 36a-486(a), 36a-511(a) (forbidding, respectively, first loan and secondary loan mortgage operations without a license); §§ 36a-493(a), 36a-516(a) (requiring, respectively, that first loan and secondary loan licensees maintain records that must be made available to the Commissioner on demand); and §§ 36a-50, 36a-52 (authorizing the Commissioner to pursue various forms of administrative or judicial action to enforce compliance with those state requirements.)

## ARGUMENT

## FEDERAL LAW PRECLUDES THE COMMISSIONER'S ASSERTIONS OF AUTHORITY OVER WMC, AND PREEMPTS, AS APPLIED, THE CONNECTICUT STATUTES ON WHICH HE RELIES

Federal law authorizes the Bank to conduct real estate lending activities through WMC, an OCC-authorized operating subsidiary, without obtaining a license from the state, and prevents the Commissioner from exercising visitorial powers over the Bank or WMC.   The Commissioner's actions, and the state statutory provisions on which they are based, directly conflict with federal law.  Thus, by operation of the Supremacy Clause, federal law precludes the Commissioner's assertion of visitorial authority over WMC and preempts the state statutes at issue as applied to national banks and their operating subsidiaries.  Accordingly, plaintiffs are entitled to summary judgment on their claim that federal law preempts the state statutes under which the Commissioner asserts authority to license, examine, or take enforcement action against WMC.

These conclusions are supported as to national banks generally by the decision of this Court in *First Union Nat'l Bank v. Burke*, 48 F. Supp. 2d 132, 143-146 (D. Conn.1999).  They are more specifically supported as to national bank operating subsidiaries by recent judgments in favor of national banks challenging state regulation of their operating subsidiaries in related cases in the Eastern District of California.  *Wells Fargo Bank v. Boutris*, 252 F. Supp. 1065 (preliminary injunction), 2003 WL 21536818 (E.D. Cal.May 9,  2003)(summary judgment); *National City Bank of Indiana v. Boutris*, 2003 WL 21536818 (E.D. Cal. No. 03-655, July 2, 2003)(summary judgment).

## I. Federal Law Precludes Connecticut's Assertions of Visitorial Authority Over Plaintiffs.

### A. Exclusive Visitorial Power Over National Banks Is Vested In The OCC Unless Federal Law Directs Otherwise

The National Bank Act prescribes that the OCC's visitorial authority over national bank operations is exclusive:

> No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

12 U.S.C. § 484; *see First Union Nat'l Bank v. Burke*, 48 F. Supp. 2d 132, 143-146 (D. Conn. 1999)(applying section 484 to preclude Connecticut assertion of administrative authority over national banks). The Commissioner's attempt to exercise audit, examination and enforcement authority over WMC is in conflict with this statutory provision and the regulations that OCC has adopted to carry out its responsibilities under the national banking laws.

Section 484, which was part of the National Bank Act enacted in 1864, is integral to the design and structure of the national banking system and reflects the fundamental character of national banks. An essential objective of Congress in authorizing the creation of national banks was the formation of a national banking system that would operate under distinct standards set by federal law, separate from the existing system of state banks.

At the time the National Bank Act was being considered, both proponents and opponents of the creation of a national banking system expected that the legislation would reduce state

control over banking and eventually replace the existing system of state banks.[1] Given the

widely held views of the expected effect of the new national banking legislation on state banks,

proponents of the National Bank Act were concerned that the states would attempt to undermine

the national banking system through hostile regulation aimed at national banks, and took care to

forestall that threat. The Supreme Court recently observed, with respect to one such precaution,

the exclusive federal remedy for usury claims against national banks: "[T]his Court has * * *

recognized the special nature of federally chartered banks. Uniform rules limiting the liability of

national banks and prescribing exclusive remedies for their overcharges are an integral part of a

banking system that needed protection from 'possible unfriendly State legislation'." *Beneficial*

*Nat'l Bank v. Anderson*, 123 S.Ct.. 2058, 2064 (2003), *quoting Tiffany v. National Bank of Mo.*,

18 Wall 409, 412 (1874) (upholding removal jurisdiction over state law usury claims against

national banks).

The same concerns about hostile state interests animated the National Bank Act's

reservation of visitorial powers over national banks to the OCC.  Just as Congress acted to

preclude states the use of usury laws as a tool against national banks, it acted to forbid the more

---

[1]  Representative Samuel Hooper, who reported the bill to the House, stated in support of the legislation that one of its purposes was "to render the law so perfect that the State banks may be induced to organize under it, in preference to continuing under their State charters." Cong. Globe, 38th Cong. 1st Sess. 1256 (March 23, 1864).  Opponents of the legislation believed that it was intended to "take from the States . . . all authority whatsoever over their own State banks, and to vest that authority . . . in Washington . . . ." Cong. Globe, 38th Cong., 1st Sess. 1267 (March 24, 1864) (statement of Rep. Brooks). *See also* statement of Rep. Pruyn (stating that the legislation would "be the greatest blow yet inflicted upon the States . . . .") Cong. Globe, 38th Cong., 1st Sess. 1271 (March 24, 1864); statement of Sen. Sumner ("Clearly, the [national] bank must not be subjected to any local government, State or municipal; it must be kept absolutely and exclusively under that Government from which it derives its functions.") Cong. Globe, 38th Cong., 1st Sess., at 1893 (April 27, 1864).

-7-

direct exercise of power by states by the assertion of visitorial authority. Instead, Congress

established a separate federal regulatory regime to govern national banks and created the OCC to

implement it. To preserve the uniform standards and uniform system of regulation applicable to

national banks, and to protect them from potentially disruptive actions by the states, Congress

vested in the OCC exclusive visitorial authority over these new federal instrumentalities.

In *Guthrie v. Harkness*, 199 U.S. 148 (1905), the Supreme Court explained the

importance of the OCC's exclusive visitorial powers to furthering the objectives of Congress as

follows:

> Congress had in mind, in passing [12 U.S.C. § 484] that in other
> sections of the law it had made full and complete provision for
> investigation by the Comptroller of the Currency and examiners
> appointed by him, and, authorizing the appointment of a receiver,
> to take possession of the business with a view to winding up the
> affairs of the bank. It was the intention that this statute should
> contain a full code of provisions upon the subject, and that no state
> law or enactment should undertake to exercise the right of
> visitation over a national corporation. Except in so far as such
> corporation was liable to control in the courts of justice, this act
> was to be the full measure of visitorial power.

*Id.* at 159. *See also Dietrich v. Greaney*, 309 U.S. 190, 194 (1940) ("The National Bank Act

constitutes 'by itself a complete system for the establishment and government of National

Banks.'") *quoting Cook County Nat'l Bank v. United States*, 107 U.S. 445, 448 (1883)). The

Supreme Court has consistently acknowledged that Congress intended to limit the authority of

states over national banks precisely so that the nationwide system of banking created by the

National Bank Act could flourish. For example, in *Easton v. Iowa*, 188 U.S. 220 (1903) the

Supreme Court explained:

-8-

> [Federal legislation concerning national banks] has in view the erection of a system extending throughout the country, and independent, so far as the powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the states. * * * It thus appears that Congress has provided a symmetrical and complete scheme for the banks to be organized under the provisions of the statute. * * * [W]e are unable to perceive that Congress intended to leave the field open for the states to attempt to promote the welfare and stability of national banks by direct legislation.  If they had such power it would have to be exercised and limited by their own discretion, and confusion would necessarily result from control possessed and exercised by two independent authorities.

*Id. at* 229, 231-232.

The scope of "visitorial" powers is expansive, including any act of the superintending official to inspect, regulate, or control the operations of a bank to enforce the bank's observance of the law.  *First Nat'l Bank of Youngstown v. Hughes*, 6 F. 737, 740 (6th Cir. 1881), *appeal dismissed*, 106 U.S. 523 (1883); *see also Peoples Bank of Danville v. Williams*, 449 F. Supp. 254 (W.D. Va. 1978) (visitorial powers involve the exercise of the right of inspection, superintendence, direction, or regulation over a bank's affairs).  In *Guthrie*, the Supreme Court confirmed the broad meaning of the term "visitorial" as used in section 484, explaining that English common law used the term "visitation" to refer to the authority exercised by a superintending officer who visits a corporation to examine its manner of conducting business and enforce observance of the laws and regulations.  *Guthrie* 199 U.S. at 158 (*citing First Nat'l Bank of Youngstown v. Hughes*, 6 F.  at 740).   "Visitors" of corporations "have power to keep them within the legitimate sphere of their operations, and to correct all abuses of authority, and to nullify all irregular proceedings."  *Id.* (citations omitted).

-9-

As the agency charged with administration of the National Bank Act, the OCC has

promulgated a regulation regarding the exercise of visitorial powers over national banks:

> Only the OCC or an authorized representative of the OCC may
> exercise visitorial powers with respect to national banks, except as
> provided in paragraph (b) of this section. State officials may not
> exercise visitorial powers with respect to national banks, such as
> conducting examinations, inspecting or requiring the production of
> books or records of national banks, or prosecuting enforcement
> actions, except in limited circumstances authorized by federal law.
> However, production of a bank's records (other than non-public
> OCC information under 12 CFR part 4, subpart C) may be required
> under normal judicial procedures.

12 C.F.R. § 7.4000(a)(1).   The regulation explains that the exercise of visitorial powers over a

national bank includes: (i) examination of the bank; (ii) inspection of the bank's books and

records; (iii) regulation and supervision of activities authorized or permitted pursuant to federal

banking law; and (iv) enforcing compliance with any applicable federal or state laws concerning

banking-related activities.  12 C.F.R. § 7.4000(a)(2).  The regulation also addresses some of the

statutory exceptions to the OCC's exclusive visitorial authority.[2/] *See also* OCC Advisory Letter

2002-9 (Nov. 25, 2002) ("AL 2002-9")(explaining effect of section 484)(Exhibit 1).

Section 484 establishes the OCC as the exclusive regulator of the business of national

banks, irrespective of the form that the regulatory action takes, and irrespective of whether the

activities involve state[3/] or federal law, except where federal law specifically provides otherwise.

Congress recently affirmed these exclusive visitorial powers in the Riegle-Neal Interstate

---

[2/] The regulation addresses: obtaining information about shareholders (12 U.S.C. § 62); ensuring compliance with state unclaimed property laws (12 U.S.C. § 484(b)); verifying payroll records for purposes of unemployment compensation (26 U.S.C. § 3305(c)); ascertaining the correctness of federal tax returns (26 U.S.C. § 7602); and enforcing the Fair Labor Standards Act (29 U.S.C. § 211). 12 C.F.R. § 7.4000(b).
    Another exception, the "vested in the courts of justice" exception in 12 U.S.C. § 484(a), is not implicated by this case, since the Commissioner here proceeded administratively. While that exception is not addressed in the OCC's current regulation, the OCC has recently published a proposed rule that, among other things, more fully addresses the meaning of "vested in the courts of justice." *See* 68 Fed. Reg. 6363 (Feb.7, 2003) (explaining that exception does not permit state authorities to inspect, regulate, supervise, direct, or restrict the activities of national banks simply by filing a complaint in a court, but instead simply confirms that courts may use ordinary judicial process to order the production of information and witnesses with respect to national banks, even though that process comes within the meaning of the term "visitorial" powers). A federal district court in California has recently reached a interpretation of section 484 consistent with that in the proposed rule, granting a national bank summary judgment in an action to enjoin a judicial proceeding brought under a "private attorney general" state statute, notwithstanding the argument that the lawsuit came within the "courts of justice" exception. *Bank One, Delaware v. Wilens*, __ F. Supp 2d ___, (C.D. Cal. No. SA CV 03-274 JVS., July 8, 2003)(Exhibit 2).
    While this Court has suggested in dicta that a state might pursue a judicial, as opposed to administrative, enforcement proceeding against a national bank, that issue was not before the court for resolution and was not litigated by the parties. *See First Union Bank v. Burke*, 48 F. Supp.2d 132, 145-146 (D. Ct. 1999) ("The narrow issue presented is whether the Commissioner's pending [administrative] cease and desist order violates the OCC's claimed right of exclusive regulatory authority over these plaintiff national banks."). In any event, as previously stated, the meaning of the "courts of justice" exception is not presented by this litigation.

[3/] Visitorial power over national banks resides solely in the OCC even when the subject is state law that touches upon the banking operations of a national bank. *See National State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 989 (3d Cir. 1980) ("[E]nforcement of the state statute is the responsibility of the Comptroller of the Currency rather than the State Commissioner.").

Banking Act of 1994 ("Riegle-Neal"), Pub. L. 103-328, 108 Stat. 2338 (Sept. 29, 1994).  Under

Riegle-Neal, interstate branches of national banks are subject to particular laws of a "host" state

in which the bank has an interstate branch to the same extent as a branch of a state bank of that

state, *except* when federal law preempts the application of such state laws to national banks.  12

U.S.C. § 36(f)(1)(A).  But, even where state law is applicable to national banks, the statute

specifies that authority to enforce the law is vested in the OCC: "The provisions of any State law

to which a branch of a national bank is subject under this paragraph shall be enforced, with

respect to such branch, by the Comptroller of the Currency."  12 U.S.C. § 36(f)(1)(B)

Thus, based on express statutory text, OCC regulations, and judicial precedents –

including a recent ruling of this Court – it is clear that the Commissioner has no authority to

exercise any visitorial powers over the activities of national banks.

### B.    The OCC's Exclusive Visitorial Authority Extends to Activities Conducted By National Banks Through Their Operating Subsidiaries

Pursuant to their authority under 12 U.S.C. § 24(Seventh) to exercise "all such incidental

powers as shall be necessary to carry on the business of banking," national banks have long used

separately incorporated entities to engage in activities that the bank itself is authorized to

conduct.  This authority to operate through such subsidiaries has been expressly recognized for

nearly 40 years.

In 1966, the OCC issued rules codifying and regulating the authority of national banks to

engage in activities through operating subsidiaries.  *See* 31 Fed. Reg. 11,459 (Aug. 31, 1966)

("Operating Subsidiary Rule").[4]  The current version of the Operating Subsidiary Rule, codified

---

[4]  The OCC addressed the authority of national banks to acquire or establish operating
subsidiaries in interpretative letters that predated the regulation.  *See, e.g.,* Letter from Comptroller

at 12 C.F.R. § 5.34, specifies the licensing process through which national banks seek OCC

permission to conduct business by means of an operating subsidiary: 12 C.F.R. § 5.34(b).[5/] "[a]

national bank may conduct in an operating subsidiary activities that are permissible for a national

bank to engage in directly either as part of, or incidental to, the business of banking as

determined by the OCC, or otherwise under other statutory authority." 12 C.F.R. § 5.34(e)(1).

Moreover, the regulation makes clear that in conducting permissible activities on behalf of its

parent bank, the operating subsidiary is acting "pursuant to the same authorization, terms and

conditions that apply to the conduct of such activities by its parent national bank." 12 C.F.R.

§ 5.34(e)(3).   In recent legislation, Congress expressly recognized that national banks may own

subsidiaries that engage "solely in activities that national banks are permitted to engage in

directly and are conducted subject to the same terms and conditions that govern the conduct of

such activities by national banks." Gramm-Leach-Bliley Act ("GLBA"), Section 21,  Pub. L. No.

102-102, § 121, 113 Stat. 1378, *codified at* 12 U.S.C. § 24a(g)(3).

When established in accordance with the procedures mandated by the OCC Operating

Subsidiary Rule and approved by the OCC, the operating subsidiary is a federally-authorized

---

Saxon July 30, 1965 (unpublished) (authorizing Atlantic National Bank of Jacksonville, Florida to
acquire the Atlantic Trust Company), summarized in National Banking Review, vol.3, no.2 at 268
(Dec. 1965).

[5/] The licensing procedures require a national bank to file an application with the OCC and
receive OCC approval to acquire or establish the operating subsidiary.  12 C.F.R. § 5.34(e)(5)(i).
An adequately or well capitalized national bank, as defined in OCC regulations, need not file a new
notice, however,  if the OCC has already permitted the bank to carry out the same activity in a prior
operating subsidiary application.  12 C.F.R. § 5.34(e)(vi).  In addition, a well-capitalized and well-
managed bank may obtain OCC approval to engage in certain activities specified by regulation by
providing notice to the OCC within ten days of establishing or acquiring the operating subsidiary.
12 C.F.R. § 5.34(e)(iv).

means by which a national bank may conduct federally-authorized activities. Recognizing this status, courts have consistently treated the operating subsidiary and the national bank as equivalents, unless federal law requires otherwise, in considering whether a particular activity was permissible for a national bank. *See, e.g., NationsBank of North Carolina, N.A. v. Variable Annuity Life Insurance Company*, 513 U.S. 251 (1995) (sale of annuities by operating subsidiary); *Clarke v. Securities Industry Ass'n*, 479 U.S. 388 (1987) (securities brokerage operating subsidiaries); *Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299 (1978) (credit card subsidiary); *American Insurance Ass'n, v. Clarke*, 865 F.2d 278 (D.C. Cir. 1988) (bond insurance subsidiary); *M & M Leasing Corp. v. Seattle First National Bank*, 563 F.2d 1377 (9th Cir. 1977) (auto leasing subsidiary); *Valley National Bank v. Lavecchia*, 59 F.Supp.2d 432 (D. N.J. 1999) (title insurance subsidiary).

In accordance with this longstanding regulatory and judicial recognition of operating subsidiaries as corporate extensions of the parent bank, OCC regulations specifically address the application of the state law to national bank operating subsidiaries. That regulation provides:

> Unless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank.

12 C.F.R. § 7.4006; *see also* 12 C.F.R. §§ 34.1(b); 34.4(b) (authorizing national bank operating subsidiaries to conduct real estate lending operations). A federal district court in California has recently upheld the promulgation of section 7.4006 against challenge, stating that: "It is plain that the [National Bank] Act delegated the OCC the authority to promulgate § 7.4006 and § 7.4006 reflects a reasonable construction of the Act." *Wells Fargo Bank v. Boutris*, *supra*, 2003 WL

-14-

21277203 at *6; *National City Bank of Indiana v. Boutris, supra*, 2003 WL 21536818 at *6-7 (same).

Because federal law prohibits the Commissioner from exercising visitorial powers over a national bank engaged in real estate lending pursuant to federal law, the Commissioner may not exercise visitorial power over the OCC-authorized conduct of those activities through an operating subsidiary, absent federal law dictating a contrary result. *See Wells Fargo* at *6 (Commissioner of California Department of Corporations has no visitorial powers over national bank mortgage operating subsidiary); *National City Bank of Indiana at *6-7*(same).

**C.    The Commissioner's Assertion of Authority To Exercise Visitorial Powers Over Plaintiffs Under State Law Conflicts with Federal Law and Is Preempted**

The Connecticut statutes here at issue purport to require that nondepository financial institutions, including operating subsidiaries of national bank, maintain records and make them available to the Commissioner in order to engage in the business of making first or secondary mortgage loans. Connecticut General Statutes §§ 36a-493(a), 36a-516(a). The Connecticut banking statutes also purport to authorize the Commissioner to pursue various forms of administrative or judicial action to enforce compliance with those state requirements. Connecticut General Statutes §§ 36a-50, 36a-52. The Commissioner's initiation of an enforcement proceeding against WMC, and his call for corrective actions plainly constitute an assertion of visitorial authority over WMC, and by extension the Bank. As such, those assertions of authority are precluded by the exclusive visitorial power vested in the OCC by section 484. Under the Constitution's Supremacy Clause, when the federal government acts within the sphere of its authority, federal law is paramount over, and preempts, inconsistent state law. *See, e.g.,*

-15-

*M'Culloch v. Maryland*, 17 U.S. (4 Wheat) 316 (1819); *Bank of America v. City and County of San Francisco*, 309 F.3d 551 (9th Cir. 2002).

Pursuant to its explicit rulemaking authority under the National Bank Act, 12 U.S.C. § 93, and in accordance with notice and comment procedures under the Administrative Procedure Act, 5 U.S.C. § 553, the OCC has issued rules that address: (1) the scope of visitorial powers under section 484, 12 C.F.R. § 7.4000; (2) the authority of national banks to engage in activities through separately incorporated operating subsidiaries, 12 C.F.R. § 5.34, specifically including real estate lending activities, 12 C.F.R. § 34.1(b); and (3) the application of state law to national bank operating subsidiaries, 12 C.F.R. § 7.4006. These "[f]ederal regulations have no less preemptive effect than federal statutes." *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).[6/] Congress has made plaintiffs subject to the regulatory and enforcement

---

[6/] The Supreme Court has made it clear that it is appropriate for federal courts to defer to OCC's construction of the National Bank Act, explaining: "It our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering. * * * [T]hat practice extends to the judgments of the Comptroller of the Currency with regard to the meaning of the banking laws." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 739 (1996) (internal quotes and citations omitted) (deferring to OCC regulation construing 12 U.S.C. § 85 contained in a regulation promulgated by the OCC). Moreover, the Supreme Court has specifically identified OCC opinion letters as entitled to such deference, even when they are not preceded by notice and comment. *United States v. Mead Corp.*, 533 U.S. 218, 231 & n.13 (2001). Accordingly, it is appropriate for this Court to defer to the construction of the National Bank Act contained in opinion letters that OCC has issued specifically addressing the application of section 484 to national bank operating subsidiaries. *See, e.g.*, Interpretive Letter #957 (January 27, 2003, from Julie L. Williams, First Senior Deputy Comptroller and Chief Counsel, to Scott A. Cammarn, Esq., Associate General Counsel, Bank of America)(Exhibit 3); Letter dated February 11, 2003, from Julie L. Williams, First Senior Deputy Comptroller and Chief Counsel, to Demetrios A. Boutris, Commissioner, California Department of Corporations (Exhibit 4); Letter dated January 16, 2003, from Julie L. Williams, First Senior Deputy Comptroller and Chief Counsel, to Reginald S. Evans, Chief Counsel, Pennsylvania Department of Banking; *see also* OCC Advisory Letter 2002-9 (November 25, 2002)(Exhibit 5).

authority of the OCC and has explicitly reserved to OCC alone the authority to exercise any form of visitorial power over plaintiffs absent specific authorization by federal law for another federal (or state) regulator to act.  Under these circumstances, the state statutes that purport to give the Commissioner authority to audit, examine, direct the conduct of, or take enforcement action against plaintiffs are preempted.

## II.   Connecticut Cannot Require Plaintiffs to Obtain a State License to Engage in Real Estate Lending Activities Authorized by Federal Law.

As states may not condition a national bank's exercise of a permissible federal power on the state's prior approval, they may not impose state licensing requirements as a predicate to national bank operations.  *See, e.g., First National Bank of Eastern Arkansas v. Taylor*, 907 F.2d 775, 780 (8th Cir.1990)(the National Bank Act precludes a state regulator from prohibiting a national bank, through either enforcement action or a license requirement, from conducting an activity that the Comptroller has reasonably determined is authorized by the National Bank Act); *Association of Banks in Insurance, Inc. v. Duryee*, 55 F. Supp. 2d 799, 812 (S.D. Ohio 1999), *aff'd*, 270 F.3d 397 (6th Cir. 2001) (even the most limited aspects of state licensing requirements such as the payment of a licensing fee are preempted because they "constitute impermissible conditions upon the authority of a national bank to do business within the state").  The OCC also has opined previously that state laws purporting to require the licensing of activities authorized for national banks under federal law are preempted.  *See, e.g.,* OCC Interpr. Ltr. No. 749 (Sept. 13, 1996) *reprinted in* [1996-1997 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 81,114 (state law requiring national banks to be licensed by the state to sell annuities would be preempted); OCC Interpr. Ltr. No. 644 (March 24, 1994), *reprinted in* [1994 Transfer Binder] Fed. Banking

-17-

L. Rep. (CCH) ¶ 83,553 (state registration and fee requirements imposed on mortgage lenders would be preempted).

When the OCC charters a national bank, it grants the bank a license to commence the banking business under 12 U.S.C. § 27. When a national bank acquires or establishes an operating subsidiary through which the bank will conduct bank-permissible activities, the OCC grants approval for the national bank to conduct those activities through the operating subsidiary pursuant to 12 C.F.R. § 5.34. An OCC regulation specifically authorizes the conduct of real estate lending activities through an operating subsidiary. 12 C.F.R. § 34.1(b). Accordingly, WMC's status as an operating subsidiary reflects that it has been authorized by the OCC as an entity through which the Bank may conduct its mortgage lending business.[2]  Because they act under federal authority granted by the OCC in accordance with federal law, neither the Bank nor WMC can be required to obtain a state-issued license to engage in mortgage lending activities in Connecticut. Section 7.4006 confirms that state licensing requirements are equally inapplicable to federally-authorized national bank activities conducted directly and those conducted through a federally-licensed operating subsidiary. Accordingly, Connecticut statutes that purport to apply Connecticut licensing requirements to the real estate lending activities of the Bank conducted

---

[2] National banks engage in real estate lending activities pursuant to 12 U.S.C. § 371, which provides that "[a]ny national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interest in real estate, subject to [section 1820(o) of title 12, concerning safety and soundness requirements] and such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order." 12 U.S.C. § 371(a). The OCC's Operating Subsidiary Rule specifically recognizes "[m]aking loans or other extensions of credit," 12 C.F.R. § 5.34(e)(5)(v)(B), and "[p]urchasing, selling, servicing, or warehousing loans or other extensions of credit, or interests therein," 12 C.F.R. § 5.34(e)(5)(v)(D), as activities in which national banks may engage through operating subsidiaries licensed by the OCC.

through WMC conflict with federal law and are therefore nullified as applied by the Supremacy Clause of the United States Constitution.

## CONCLUSION

For the reasons set forth above, the visitorial actions of the Commissioner are contrary to federal law, and the state statutes to which the Commissioner looks for its authority to impose its requirements on plaintiffs are preempted as applied. Accordingly, on the basis of the undisputed facts, plaintiffs are entitled to judgment as a matter of law.

Respectfully submitted,


JULIE L. WILLIAMS
First Senior Deputy Comptroller
 and Chief Counsel


DANIEL P. STIPANO
Deputy Chief Counsel

L. ROBERT GRIFFIN
Director of Litigation

JULY 2003                          DOUGLAS B. JORDAN (DC Bar 364398)
                                   Senior Counsel

Attorneys for *Amicus Curiae*
Office of the Comptroller
  of the Currency
250 E Street, S.W.
Washington, D.C. 20219
Telephone: (202) 874-5280
Facsimile: (202) 874-5279



**AL 2002 - 9**

# OCC ADVISORY LETTER

Comptroller of the Currency
Administrator of National Banks

| Subject: | Questions Concerning Applicability and Enforcement of State Laws: Contacts From State Officials |
| --- | --- |

**TO:**   Chief Executive Officers of all National Banks, Department and Division Heads, and All Examining Personnel

**PURPOSE**

This advisory letter describes the general principles that apply in determining whether a state law is applicable to a national bank. It also describes the statutory authority of the OCC to regulate national banks, to examine national banks for compliance with federal and applicable state laws, and to enforce these laws. Finally, it advises national banks to consult with the OCC if state officials contact them concerning the potential application of a state law, or if these officials seek information concerning a national bank's operations.

**BACKGROUND**

Recently, we have been asked for guidance on the role of state officials in the enforcement of state laws that may affect national bank operations. The applicability of state laws to national banks and their operating subsidiaries -- and the authority to enforce those laws -- raise complex issues of both federal preemption and the statutory authority of the OCC as the supervisor and regulator of national banks.[1] Due to the often complex nature of the determinations regarding the application and enforcement of state law in a particular instance, this advisory letter notifies national banks to consult with the OCC on such matters. In addition, it encourages state officials to contact the OCC when they have information that would be relevant to the OCC in its supervision of national banks and their compliance with applicable laws, or if they seek information from national banks. We appreciate the interest of state officials in these issues, and this advisory is designed to summarize the standards that are applicable in this area.

---

[1] In most instances, the OCC is responsible for enforcing federal laws that apply to national banks or to their operating subsidiaries. However, some federal statutes also specifically give enforcement authority to state attorneys general. *See, e.g.,* 15 USC 1681s(c) (Fair Credit Reporting Act). Even in these instances, issues may arise as to the appropriate role of a state official with respect to a national bank's activities. Thus, the procedures discussed in this advisory letter should also be followed by national banks in instances involving any state attorney general enforcement action under federal law.

---

*Applicability of State Laws to National Banks*

The National Bank Act was enacted in 1864 to create a new system of nationally chartered banks that would operate independently of state regulation.[2]  Since that time, courts have recognized the essentially federal character of national banks,[3] and the Supreme Court has repeatedly held that subjecting national banks' federally authorized activities to state regulation and supervision would conflict with their federally derived powers and with the purposes for which the national banking system was established.[4]  In one such decision, the Court noted that national banks are "instrumentalities" of the federal government and stated that "any attempt by a State to define [the] duties [of a national bank] or control the conduct of [the] affairs [of the national bank] is void whenever it conflicts with the laws of the United States or frustrates the purposes of the national legislation or impairs the efficiency of the bank to discharge the duties for which it was created."[5]

Essential to the character of national banks and the national banking system is the uniform and consistent regulation of national banks by *federal* standards.[6]  To that end, Congress vested in the OCC broad authority to regulate the conduct of national banks except where the authority to issue such regulations has been "expressly and exclusively" given to another federal regulatory agency.  12 USC 93a.  State law could be applicable to national banks, however, in limited circumstances when it does not conflict or interfere with the national bank's exercise of its powers.  Thus, for instance, one federal court recently noted that states retain some power to regulate national banks in areas such as "contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law."[7]

---

[2] *Bank of Am. v. City and County of San Francisco*, 309 F.3d 551, 561 (9th Cir. 2002) (citing Cong. Globe, 38th Cong., 1st Sess., 1451 (1864)).

[3] *See, e.g., Davis v. Elmira Savings Bank*, 161 U.S. 275, 283 (1896) ("[n]ational banks are instrumentalities of the Federal government").

[4] *See Easton v. Iowa*, 188 U.S. 220, 229, 231-32 (1903), in which the Supreme Court explained:

> [Federal legislation concerning national banks] has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and numerous as the states. ... [W]e are unable to perceive that Congress intended to leave the field open for the states to attempt to promote the welfare and stability of national banks by direct legislation.  If they had such power it would have to be exercised and limited by their own discretion, and confusion would necessarily result from control possessed and exercised by two independent authorities.

*See also Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996) (the powers of national banks are "grants of authority not normally limited by, but rather ordinarily pre-empting contrary state law").

[5] *First Nat'l Bank of San Jose v. California*, 262 U.S. 366, 368, 369 (1923).  *See also Bank of Am.*, 309 F.3d at 561 (state attempts "to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties").

[6] Such standards may be embodied explicitly in OCC regulations, or in other federal law, including various federal consumer protection laws, such as the Truth in Lending Act, the Truth in Savings Act, the Electronic Fund Transfer Act, the Real Estate Settlement Procedures Act, the Equal Credit Opportunity Act, and the Federal Trade Commission Act.  *See* 15 USC 1601 *et seq.*; 12 USC 4301 *et seq.*; 15 USC 1693 *et seq.*; 12 USC 2601 *et seq.*; 15 USC 1691 *et seq.*; 15 USC 45.  However, whether or not the OCC has specifically addressed a national bank activity in a regulation, all national bank operations must be conducted in a safe and sound manner, in accordance with the OCC's supervisory standards.

[7] *Bank of Am.*, 309 F.3d at 559.

---

*Supervision of National Banks and Enforcement of Applicable Laws*

In addition to uniform federal standards for regulation of national banks, Congress provided for a complementary system of uniform federal oversight of the activities of national banks as an integral component of the national banking system. Exclusive federal oversight, uniform federal regulation, and state law preemption constitute three essential and distinctive elements of the national bank charter.[8]

Congress provided that the uniform federal standards that would govern national banks – and state laws, where federal law makes them applicable – would be enforced by a single, federal supervisor, the OCC. By statute, national banks generally are not subject to any visitorial powers except as authorized by federal law:

> No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.[9]

12 USC 484(a). The OCC is specifically authorized under the National Bank Act to "examine every national bank as often as the Comptroller of the Currency shall deem necessary," and OCC examiners have the power to "make a thorough examination of all the affairs of the bank." 12 USC 481. Thus, except in specialized instances where federal law makes provision for another regulator to have a role, the OCC's visitorial powers are exclusive with respect to activities that are authorized or permitted for national banks under federal law or regulation, or by OCC issuance or interpretation.

Congress reaffirmed the OCC's exclusive visitorial powers in the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994. Pub. L. 103-328, 108 Stat. 2338 (1994). Congress provided in that legislation that specified types of laws of the "host" state in which a national bank has an interstate branch are applicable, *unless* federal law preempts their application to national banks. However, Congress stated that "[t]he provisions of any State law to which a branch of a national bank is subject under this paragraph shall be enforced, with respect to such branch, by the Comptroller of the Currency." 12 USC 36(f)(1)(B).[10]

---

[8] Moreover, OCC regulations provide for comparable treatment of national bank operating subsidiaries. The OCC's regulations state: "Unless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." 12 CFR 7.4006. In addition, 12 CFR 5.34(e)(3) provides that "[a]n operating subsidiary conducts activities authorized under this section pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank."

[9] "Visitorial" powers generally refer to the power to "visit" a national bank to examine the conduct of its business and to enforce its observance of applicable laws. *See, e.g., Guthrie v. Harkness*, 199 U.S. 148, 158 (1905) (the word "visitation" means "inspection; superintendence; direction; regulation") (internal quotations omitted). Section 484 provides an exception to the OCC's exclusive visitorial authority for state examiners inspecting for compliance with state unclaimed property or escheat laws upon reasonable cause to believe the bank has failed to comply with those laws. 12 USC 484(b).

[10] *See also National State Bank v. Long*, 630 F.2d 981, 989 (3rd Cir. 1980) ("[E]nforcement of the state statute is the responsibility of the Comptroller of the Currency rather than the State Commissioner.")

---

Date: November 25, 2002

The OCC's regulations also set forth the agency's exclusive visitorial authority, providing that, subject to limited exceptions, only the OCC may exercise visitorial powers with respect to national banks. 12 CFR 7.4000(a)(1). These exclusive visitorial powers include:

1. examination of a bank,
2. inspection of a bank's books and records,
3. regulation and supervision of activities authorized or permitted pursuant to federal banking law, and
4. enforcing compliance with any applicable federal or state laws concerning those activities.

12 CFR 7.4000(a)(2)(i - iv).

## PROCEDURE

The OCC recognizes that state officials may from time to time possess information that would be valuable to the OCC in connection with its oversight of national banks, or may seek to obtain information from national banks concerning their operations. Given the complexity of issues that can arise with respect to whether a state law is applicable to national bank operations, the enforcement of any such laws, or the propriety of disclosure of information concerning a national bank's operations, the OCC has established the following procedure to address circumstances when state officials raise issues concerning potential violations of laws by national banks, including when state officials may seek information from a national bank about its compliance with any law or for other purposes:

- **State officials are urged to contact the OCC** if they have any information to indicate that a national bank may be violating federal or an applicable state law or if they seek information concerning a national bank's operations. The OCC will review any such information and, if appropriate, take supervisory action, which may include an enforcement action, if it concludes that a national bank has violated an applicable law.

- **National banks should contact the OCC** if they are contacted by a state official seeking information from the bank that may constitute an attempt to exercise visitation or enforcement power over the bank. National banks are encouraged to consult with the OCC as soon as possible following the initial contact by a state official on whether such request may conflict with the federal standards applicable to the regulation and supervision of national banks. Following such consultation, the OCC may want to contact the state official directly to discuss the state's inquiry and to obtain any information that the state might possess that may be relevant to the OCC's supervision of the bank.

**OCC Contacts:**

- Director, Enforcement and Compliance Division, at (202) 874-4800 (for inquiries by state officials and questions about this Advisory Letter)

- Director, Community and Consumer Law Division, at (202) 874-5750 (for inquiries by state officials and questions about this Advisory Letter)

- The OCC District Counsel for the district in which the bank is headquartered (for inquiries by state officials)

- Director, Legislative and Regulatory Activities Division, at (202) 874-5090 (for questions about preemption and visitorial powers generally)

Julie L. Williams
First Senior Deputy Comptroller and Chief Counsel

USDC          7/11/03 3:46  PAGE  2/4   RightFAX

SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES -- GENERAL**

Case No. SACV 03-274-JVS(ANx)                    Dated: July 7, 2003

Title:   BANK ONE DELAWARE NA -v- THERESA WILENS
PRESENT:   HONORABLE JAMES V. SELNA, UNITED STATES DISTRICT JUDGE

Karla J. Tunis                        Katherine Jones
Courtroom Deputy                      Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS

Laurence J. Hutt                      Jeffrey Wilens
Howard N. Cayne

ENTER ON JS-CMS    JUL 11 2003

PROCEEDINGS:    **Plaintiff's motion for summary judgement (Filed 5-19-03)**

        Cause called and counsel make their appearances. The Court's tentative ruling is issued.  Counsel make their arguments.  The Court **grants** the plaintiff's motion for summary judgement and rules in accordance with the tentative ruling as follows:

        On November 25, 2002, Defendant Theresa Wilens ("Wilens") filed an action in Orange County Superior Court to enforce Cal. Civ. Code § 1748.9. Wilens' Request for Judicial Notice Ex.1. Wilens' claim against Bank One Corporation was brought as a "private attorney general," asserting the rights of the general public as opposed to alleging any personal harm. Wilens' Request for Judicial Notice Ex. 1 at 1-2 (¶1). Plaintiff Bank One Delaware was not named in the complaint. Bank One Delaware filed a declaratory relief action in this Court on March 13, 2003 and served Wilens with the Complaint on March 18, 2003. Complaint. On March 20, 2003, Wilens amended her state court complaint by substituting Bank One Delaware as a "Doe" defendant. Wilens' Request for Judicial Notice Ex. 2. Bank One Delaware seeks injunctive and declaratory relief preventing Wilens' from proceeding with the state court action and moves for summary judgment.

I.    **Standard of Review**

        Summary judgement is properly granted when a party fails to make a showing sufficient to establish the existence of a genuinely disputed issue of material fact. It is the burden of the non-moving party to go beyond the pleadings, admissions, declarations, and other evidence on file and designate specific facts showing a genuine disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323-34 (1986). In this case, Wilens does not argue that a genuine dispute exists as to a material fact, but asserts that summary judgment is not appropriate because Wilens may prosecute the underlying state action against Bank One Delaware as a matter of law.

MINUTES FORM 90                                              Initials of Deputy Clerk
CIVIL - GEN                          21

## II.    Analysis

Plaintiffs are entitled to summary judgment if Wilen's state court lawsuit constitutes an exercise of visitorial powers within the meaning of 12 C.F.R. § 7.4000(a)(2) and that exercise is impermissible under 12 U.S.C. §484 (a) and  12 C.F.R. § 7.4000(a)(1).

### A.    Exercise of Visitorial Powers

Wilens' complaint concedes that this action is brought in her capacity as a "private attorney general . . . on behalf of the general public." Plaintiff's Request for Judicial Notice, Ex. A at 4-5. Wilens has requested materials regarding what convenience check offers were made, how many offers were made, and how much revenue was generated.  Plaintiff's Request for Judicial Notice, Ex. C at 27-29.

The Visitorial Statute states that "Only the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to national banks .... State officials may not exercise visitorial powers with respect to national banks, such as conducting examinations, inspecting or requiring the production of books or records of national banks, or prosecuting enforcement actions, except in limited circumstances authorized by federal law." 12 C.F.R. § 7.4000(a)(1).

Wilens' state suit is an action enforcing compliance with Cal. Civ. Code § 1748.9 seeking to force national banks to comply with state law through the exercise of what are clearly "visitorial powers."

### B.    12 U.S.C § 484 (a) and 12 CFR § 7.4000 (a)(I) Give the Sole Right to Enforce Visitorial Powers to the OCC or Authorized Representatives

The *Exclusive Visitorial Powers Regulation* states that "Only the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to national banks." 12 C.F.R. § 7.4000(a)(1). Wilens' is, by her own admission, acting to enforce the California law on the "as a private attorney general . . . on behalf of the general public."  Plaintiff's Request for Judicial Notice, Ex. A at 4-5. A private party acting in the capacity of a "private attorney general" under a state statute conferring such power may not enforce state or federal laws against banks concerning core banking activities such as lending. The enforcement of such laws may be undertaken solely by the OCC or its authorized represenatatives. 12 C.F.R. § 7.4000(a)(1), (a)(2).[1]

Wilens also argues that her suit is not barred by the Visitorial Statute because it falls within the "vested in the courts of justice" exception in the statute. Wilens contends that this exception has historically given private plaintiffs the right to file individual and class action lawsuits against national banks for violation of state laws. Opposition, at 3.  Rather, the "vested in the courts of justice" exception was a reservation of the right to enforce the court's procedural rules through contempt proceedings in connection with an authorized action against a bank. The OCC itself has concluded that Congress did not intend that phrase to confer any visitorial authority on state officials or their delagates. See 68 Fed. Reg. 6363, 6370 (Feb. 7, 2003).  The suit does not fall within the "vested in the courts of justice" exception.

---

[1]The cases cited by Wilens refer to individual or class action lawsuits against national banks and satisfy justiciability requirements because the plaintiffs have been personally injured. Wilens does not claim such injury here but rather to vindicate injury to the general public.

MINUTES FORM 90                                             Initials of Deputy Clerk
CIVIL - GEN

**III.   Relief**

The Court grants Bank One Delaware's request for declaratory relief.  The Court also grants Bank One Delaware's prayer for injunctive relief.[2]

---

[2]The state court proceeding would violate the federal law authorizing only the OCC to engage in those listed activities and therefore, the Court does have the power to enjoin the proceeding.  Sycuan Band of Mission Indians v. Roache, 54 F.3d 535, 540-41 (9th Cir. 1994), cert. denied, 516 U.S. 912 (1995).  Wilens' renewed contention that the Anti-Injunction Act applies is rejected and guided by the same reasoning as explained in denying Wilens' Motion to Dismiss.  Wilens warns of the possibility that granting this injunction will have no effect because another one of the 30 million Californians could step in to sue Bank One Delaware and urges Bank One Delaware to press its preemption arguments in state court.  Opposition, at 23-24.  The Court does not find this warning sufficient justification for withholding the relief sought by Bank One Delaware.

MINUTES FORM 90                                         Initials of Deputy Clerk _____
CIVIL - GEN