

Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

**Interpretive Letter #957**
**March 2003**
**12 USC 484**
**12 CFR 7.4006**
**12 CFR 5.34(e)(3)**

January 27, 2003

Scott A. Cammarn, Esq.
Associate General Counsel
Bank of America
NC1-002-29-01
101 South Tryon Street
Charlotte, NC  28255

Dear Mr. Cammarn:

This responds to your letter of January 23, 2003, on behalf of Bank of America, N.A. ("Bank") in which you request a determination (i) whether Federal law prevents the California Department of Corporations (the "Department") from conducting an examination of the Bank's operating subsidiary, BA Mortgage LLC ("Operating Subsidiary"), and (ii) whether the Operating Subsidiary is required to maintain a license under the California Residential Mortgage Lending Act.

You represent that the Operating Subsidiary is a wholly-owned operating subsidiary of the Bank and engages solely in the servicing of residential mortgage loans originated or held by its predecessor, NationsBanc Mortgage Corporation, or by its parent, the Bank.  As an operating subsidiary of a national bank, the Operating Subsidiary is subject to ongoing supervision and examination by the OCC in the same manner and to the same extent as the Bank.[1]  You represent

---

[1] Twelve C.F.R. § 5.34(e)(3) provides that –

> [a]n operating subsidiary conducts activities authorized under this section pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank.  If, upon examination, the OCC determines that the,[1] other provisions of the California Act may be preempted as well operating subsidiary is operating in violation of law, regulation, or written condition, or in an unsafe or unsound manner or otherwise threatens the safety or soundness of the bank, the OCC will direct the bank or operating subsidiary to take appropriate remedial action, which may include requiring the bank to divest or liquidate the operating subsidiary, or discontinue specified activities.  OCC authority under this paragraph is subject to the limitations and requirements of section 45 of the Federal Deposit Insurance Act (12 U.S.C. 1831v) and section 115 of the Gramm-Leach-Bliley Act [GLBA] (12 U.S.C. 1820a).

The provisions of the Federal Deposit Insurance Act and the GLBA referenced in the regulation pertain to the functional regulation of securities, insurance, and commodities firms.  These provisions are not relevant to mortgage lending and servicing activities conducted by The Operating Subsidiary.

that the Operating Subsidiary has maintained a license under the California Residential Mortgage Lending Act ("California Act"). The Bank believes, however, that recent changes to the OCC's regulations clarify that the Operating Subsidiary is not required to maintain a license under the California Act. The Bank further believes that the Department is barred by Federal law from conducting an examination of the Operating Subsidiary. The Bank is requesting a determination that the OCC concurs with the Bank's positions.[2]

As discussed in detail below, pursuant to 12 U.S.C. § 484, and 12 C.F.R. §§ 5.34(e)(3) and 7.4006, the OCC has exclusive visitorial authority over national banks and their operating subsidiaries except where *Federal* law provides otherwise. This authority pertains to activities expressly authorized or recognized as permissible for national banks under Federal law or regulation, or by OCC issuance or interpretation, including the content of those activities and the manner in which, and standards whereby, those activities are conducted. As a result, States are precluded from examining or requiring information[3] from national banks or their operating subsidiaries or otherwise seeking to exercise visitorial powers with respect to national banks or their operating subsidiaries in those respects. Thus, Federal law precludes examination of the Operating Subsidiary by the Department. Moreover, for the reasons discussed below, operating subsidiaries – like their parent national banks – need not obtain the approval of a State to engage in an activity permissible under Federal law. Accordingly, State licensing requirements do not apply to the Bank or the Operating Subsidiary.[4]

Background

The OCC's exclusive visitorial authority over national bank operations is established by 12 U.S.C. § 484.[5] Paragraph (a) of that section states that --

---

[2] OCC Advisory Letter 2002-9 (Nov. 25, 2002) ("AL 2000-9") generally describes the principles that govern the applicability of State law and the OCC's exclusive visitorial authority to national banks and their operating subsidiaries. That advisory letter indicates that national banks should contact the OCC in situations where a State official seeks to assert supervisory authority or enforcement jurisdiction over the bank.

[3] The OCC currently maintains information sharing agreements with 48 States, the District of Columbia, and Puerto Rico. These agreements provide a mechanism through which State regulators may seek and obtain supervisory information from the OCC. Typically, the OCC will make confidential bank examination information available to State bank regulatory agencies if they demonstrate a specific regulatory need for the examination information (*e.g.*, in connection with a merger of a national bank into a State bank, where the State bank regulator must approve the transaction), and if the State agency has entered into an appropriate information sharing/confidentiality agreement with the OCC governing the use of the information. In AL 2002-9, the OCC outlined a procedure to address circumstances when State officials raise issues concerning potential violations of laws by national banks, including when State officials may seek information from a national bank about its compliance with any law or for other purposes. The advisory letter is available on the OCC's website at www.occ.treas.gov/ftp/advisory/2002%2D9.txt.

[4] We note that the California Act already contains an exemption from State licensing requirements for national banks, Cal. Fin. Code § 50003(g), but fails to recognize the status of national bank operating subsidiaries under Federal law and regulations.

[5] "Visitorial powers" generally refers to the power to "visit" a national bank to examine the conduct of its business and to enforce its observance of applicable laws. *See, e.g., Guthrie v. Harkness*, 199 U.S. 148, 158 (1905) (the word "visitation" means "inspection; superintendence; direction; regulation") (internal quotations omitted).

> [n]o national bank shall be subject to any visitorial powers except as authorized
> by Federal law, vested in the courts of justice or such as shall be, or have been
> exercised or directed by Congress or by either House thereof or by any committee
> of Congress or of either House duly authorized.

Paragraph (b) of the statute then permits lawfully authorized State auditors or examiners to review a national bank's records "solely to ensure compliance with applicable State unclaimed property or escheat laws upon reasonable cause to believe that the bank has failed to comply with such laws."

This provision, enacted with the creation of the national banking system in 1863, is integral to the design and structure of the national banking system and fundamental to the character of national banks. Congress enacted the National Currency Act ("Currency Act") in 1863 and the National Bank Act the year after for the purpose of establishing a new national banking system that would operate distinctly and separately from the existing system of State banks. At that time, both proponents and opponents of the new national banking system expected that it would supersede the existing system of State banks.[6] Given this anticipated impact on State banks and the resulting diminution of control by the States over banking in general,[7] proponents of the national banking system were concerned that States would attempt to undermine it.

The allocation of any supervisory responsibility for the new national banking system to the States would have been inconsistent with the need to protect national banks from State interference. Congress, accordingly, established a Federal supervisory regime and created a Federal agency within the Department of Treasury—the OCC—to carry it out. Congress granted the OCC the broad authority "to make a thorough examination of all the affairs of [a national]

---

[6] Representative Samuel Hooper, who reported the bill to the House, stated in support of the legislation that one of its purposes was "to render the law [*i.e.*, the Currency Act] so perfect that the State banks may be induced to organize under it, in preference to continuing under their State charters." Cong. Globe, 38th Cong. 1st Sess. 1256 (March 23, 1864). Opponents of the legislation believed that it was intended to "take from the States . . . all authority whatsoever over their own State banks, and to vest that authority . . . in Washington . . . ." Cong. Globe, 38th Cong., 1st Sess. 1267 (March 24,1 864) (statement of Rep. Brooks). *See also* statement of Rep. Pruyn (stating that the legislation would "be the greatest blow yet inflicted upon the States . . . .") Cong. Globe, 38th Cong., 1st Sess. 1271 (March 24, 1864); statement of Sen.Su mner ("Clearly, the [national] bank must not be subjected to any local government, State or municipal; it must be kept absolutely and exclusively under that Government from which it derives its functions.") Cong. Globe, 38th Cong., 1st Sess., at 1893 (April 27, 1864).

[7] *See, e.g., Tiffany v. National Bank of the State of Missouri*, 85 U.S. 409, 412-413 (1874) ("It cannot be doubted, in view of the purpose of Congress in providing for the organization of national banking associations, that it was intended to give them a firm footing in the different states where they might be located. It was expected they would come into competition with state banks, and it was intended to give them at least equal advantages in such competition . . . . National banks have been national favorites. They were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the general government. It could not have been intended, therefore, to expose them to the hazard of unfriendly legislation by the states, or to ruinous competition with state banks."). *See also* B. Hammond, *Banks and Politics in America from the Revolution to the Civil War*, 725-34 (1957); P. Studenski & H. Krooss, *Financial History of the United States*, 155 (1st ed. 1952).

bank,"[8] and solidified this Federal supervisory authority by vesting the OCC with exclusive visitorial powers over national banks. These provisions assured, among other things, that the OCC would have comprehensive authority to examine all the affairs of a national bank and protected national banks from potential State action by establishing that the authority to examine and supervise national banks is vested *only* in the OCC, unless otherwise provided by *Federal law*.[9]

In *Guthrie v. Harkness*, 199 U.S. 148 (1905), the Supreme Court recognized how the National Bank Act was designed to operate:

> Congress had in mind, in passing this section [*i.e.*, section 484] that in other sections of the law it had made full and complete provision for investigation by the Comptroller of the Currency and examiners appointed by him, and, authorizing the appointment of a receiver, to take possession of the business with a view to winding up the affairs of the bank. It was the intention that this statute should contain a full code of provisions upon the subject, and that no state law or enactment should undertake to exercise the right of visitation over a national corporation. Except in so far as such corporation was liable to control in the courts of justice, this act was to be the full measure of visitorial power.

*Id.* at 159. The Supreme Court also has recognized the clear intent on the part of Congress to limit the authority of States over national banks precisely so that the nationwide system of banking that was created in the Currency Act could develop and flourish. For instance, in *Easton v. Iowa*, 188 U.S. 220 (1903), the Court stated that Federal legislation affecting national banks—

> has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States . . . . It thus appears that Congress has provided a symmetrical and complete scheme for the banks to be organized under the provisions of the statute . . . . [W]e are unable to perceive that Congress intended to leave the field open for the States to attempt to promote the welfare and stability of national banks by direct legislation. If they had such power it would have to be exercised and limited by their own discretion, and *confusion would necessarily result from control possessed and exercised by two independent authorities.*

*Id.* at 229, 231-232 (emphasis added). The Court in *Farmers' and Mechanics' Bank*, 91 U.S. 29 (1875), after observing that national banks are means to aid the government, stated—

---

[8] Act of June 3, 1864, c. 106, § 54, 13 Stat. 116, *codified at* 12 U.S.C. § 481.

[9] Writing shortly after the Currency Act and National Bank Act were enacted, then-Secretary of the Treasury, and formerly the first Comptroller of the Currency, Hugh McCulloch observed that "Congress has assumed entire control of the currency of the country, and, to a very considerable extent, of its banking interests, prohibiting the interference of State governments . . . ." Cong. Globe, 39th Cong., 1st Sess., Misc. Doc. No. 100, at 2 (April 23, 1866).

Being such means, brought into existence for this purpose, and intended to be so employed, the States can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit. Any thing beyond this is "an abuse, because it is the usurpation of power which a single State cannot give."

*Id.* at 34 (citation omitted).

Congress recently affirmed the OCC's exclusive visitorial powers with respect to national banks operating on an interstate basis in the Riegle-Neal Interstate Banking Act of 1994 ("Riegle-Neal").[10] Riegle-Neal makes interstate operations of national banks subject to specified types of laws of a "host" State in which the bank has an interstate branch to the same extent as a branch of a State bank of that State, *unless* the State law is preempted by Federal law. For those State laws that are not preempted, the statute makes clear that the authority to enforce the law is vested in the OCC. *See* 12 U.S.C. § 36(f)(1)(B) ("The provisions of any State law to which a branch of a national bank is subject under this paragraph shall be enforced, with respect to such branch, by the Comptroller of the Currency."). This approach is another, and very recent, recognition of the broad scope of the OCC's exclusive visitorial powers with respect to national banks.

The OCC's exclusive visitorial authority complements principles of Federal preemption, to accomplish the objectives of the National Bank Act. The Supremacy Clause of the United States Constitution[11] provides that Federal law prevails over any conflicting State law. An extensive body of judicial precedent has developed over the nearly 140 years of existence of the national banking system, explaining and defining the standards of Federal preemption of State laws as applied to national banks.[12] Visitorial power is a closely related authority, which Congress

---

[10] Pub. L. 103-328, 108 Stat. 2338 (Sept. 29, 1994).

[11] U.S. Const. Art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

[12] *See, e.g., Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 26, 32, 33 (1996) ("grants of both enumerated and incidental 'powers' to national banks [are] grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." States may not "prevent or significantly interfere with the national bank's exercise of its powers."); *Franklin National Bank*, 347 U.S. at 378-379 (1954) (federal law preempts State law when there is a conflict between the two; "The compact between the states creating the Federal Government resolves them as a matter of supremacy. However wise or needful [the state's] policy, . . . it must give way to contrary federal policy."); *Anderson National Bank v. Luckett*, 321 U.S. 233, 248, 252 (1944) (State law may not "infringe the national banking laws or impose an undue burden on the performance of the banks' functions" or "unlawful[ly] encroac[h] on the rights and privileges of national banks"); *First National Bank v. Missouri*, 263 U.S. 640, 656 (1924) (Federal law preempts State laws that "interfere with the purposes of [national banks'] creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States."); *First National Bank of San Jose v. California*, 262 U.S. 366, 368-369 (1923) ("[National banks] are instrumentalities of the federal government . . . . [A]ny attempt by a state to define their duties or control the conduct of their affairs is void whenever it conflicts with the laws of the United States or frustrates the purposes of the national legislation,

-5-

specifically addressed in section 484 to enable national banks to avoid inconsistent and potentially disruptive application of standards by State authorities. Together, Federal preemption and the OCC's exclusive visitorial authority are defining characteristics of the national bank charter.

## Application of Federal Law to the Operating Subsidiaries

In section 121 of the GLBA, Congress expressly acknowledged that national banks may own subsidiaries that engage "solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks."[13]

Consistent with section 121, the OCC regulations state that "[a]n operating subsidiary conducts activities authorized under [12 C.F.R. § 5.34] pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank."[14] Addressing this point in the context of State laws, our regulations state that "[u]nless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank."[15]

In order for a subsidiary to operate in the manner contemplated by section 121 of GLBA, the subsidiary must be subject to the same regulation and supervision as is its parent national bank. As described at the outset of this letter, our regulations at § 5.34(e)(3) require that result. The terms and conditions governing the conduct of activities in an operating subsidiary include being subject to the same visitorial powers as are exercised with respect to the parent. Accordingly, the OCC's exclusive visitorial authority extends to operating subsidiaries of national banks.

The Operating Subsidiary conducts mortgage servicing activities permissible for a national bank pursuant to 12 U.S.C. § 24(Seventh), 12 U.S.C. § 371, and 12 C.F.R. § 5.34(e)(5)(v). As such, it is subject to the OCC's exclusive visitorial authority, and, pursuant to 12 U.S.C. § 484, State

---

or impairs the efficiency of the bank to discharge the duties for which it was created."); *McClellan v. Chipman*, 164 U.S. 347, 358 (1896) (application to national banks of State statute forbidding certain real estate transfers by insolvent transferees would not "destro[y] or hampe[r]" national bank functions); *First National Bank of Louisville v. Commonwealth of Kentucky*, 76 U.S. (9 Wall.) 353, 362-63 (1870) (national banks subject to State law that does not "interfere with, or impair [national banks'] efficiency in performing the functions by which they are designed to serve [the Federal] Government"); *Bank of America et al. v. City and County of San Francisco et al.*, 309 F.3d 551, 561 (9th Cir. 2002) ("[s]tate attempts to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties.") (citation omitted); *Association of Banks in Insurance, Inc. v. Du ryee*, 270 F.3d 397, 403-404 (6th Cir. 2001) ("The Supremacy Clause 'invalidates state laws that "interfere with, or are contrary to," federal law' . . . . A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal.") (citations omitted).

[13] Pub. L. No. 106-102, § 121, 113 Stat. at 1378, *codified at* 12 U.S.C. § 24a(g)(3).

[14] 12 C.F.R. § 5.34(e)(3).

[15] 12 C.F.R. § 7.4006.

regulatory authorities do not have the right to exercise visitorial powers over the Bank or the Operating Subsidiary in the conduct of these activities, except where that visitorial authority is specifically granted by *Federal* law, which is not the case here.

It is relevant to observe that while State authorities may not examine and supervise the Operating Subsidiary, the Operating Subsidiary is subject to an extensive regime of Federal law and regulations and the Bank and the Operating Subsidiary are subject to comprehensive and continuous supervision by the OCC. Since the Bank is part of the OCC's Large Bank Program, its activities and those of its subsidiaries are examined on a continuous basis by teams of examiners specifically assigned to, and in most cases physically present at the facilities of, the Bank and its subsidiaries.

Finally, a State may not condition a national bank's exercise of a permissible Federal power on obtaining the State's prior approval. It is well established that a national bank's exercise of its Federally authorized powers is not subject to conditions or restrictions imposed by State law,[16] including State licensing requirements.[17] Accordingly, pursuant to 12 C.F.R. § 7.4006, the Operating Subsidiary also is not subject to State or local licensing requirements and is not required to obtain a license from the State of California in order to conduct business in that State.

This conclusion that the OCC's exclusive visitorial powers preclude the State of California from asserting supervisory authority or enforcement jurisdiction over the Operating Subsidiary is not intended to imply that any of the substantive provisions of the California Act apply to the Operating Subsidiary. Instead, under Federal law[18] and principles of preemption established by the courts,[19] provisions of the California Act may well be preempted. This opinion, however, addresses only the issues of licensing and visitorial authority.

---

[16] *See Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 34 (1996); *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373, 378 (1954); *Bank of America National Trust & Savings Association v. Lima*, 103 F. Supp. 916, 918, 920 (D. Mass. 1952); Letter from Julie L. Williams, First Senior Deputy Comptroller and Chief Counsel, to Thomas A. Plant and Daniel W. Morton ("To the extent that a state asserts the right to restrict or condition a national bank's exercise of . . . Federally granted powers, that state's law will be preempted."). 66 Fed. Reg. 28593 (May 23, 2001).

[17] *See First National Bank of Eastern Arkansas v. Taylor*, 907 F.2d 775, 780 (8th Cir. 1990) (the National Bank Act precludes a State regulator from prohibiting a national bank, through either enforcement action or a license requirement, from conducting an activity that the Comptroller has reasonably determined is authorized by the National Bank Act); *Ass'n. of Banks in Insurance, Inc. v. Duryee*, 55 F. Supp. 2d 799, 812 (S.D. Ohio 1999), *aff'd*, 270 F.3d 397 (6th Cir. 2001) (even the most limited aspects of State licensing requirements such as the payment of a licensing fee are preempted because they "constitute impermissible conditions upon the authority of a national bank to do business within the state"). The OCC also has opined previously that State laws purporting to require the licensing of activities authorized for national banks under Federal law are preempted. *See* OCC Interpr. Ltr. No. 749 (Sept. 13, 1996) *reprinted in* [1996-1997 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 81-114 (State law requiring national banks to be licensed by the State to sell annuities would be preempted); OCC Interpr. Ltr. No. 644 (March 24, 1994), reprinted in [1994 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 83,553 (State registration and fee requirements imposed on mortgage lenders would be preempted).

[18] *See, e.g.*, 12 U.S.C. §§ 371, 1735f-7, 1735f-7a, and 3801 *et. seq.*

[19] *See, e.g.*, the cases cited in note 12, *supra*.

I hope the foregoing is helpful in explaining the applicability of the OCC's exclusive visitorial powers and the inapplicability of State licensing laws to the Operating Subsidiary. Please do not hesitate to contact my office at (202) 874-5200 or MaryAnn Nash, Counsel, in our Law Department at (202) 874-5090 if you have any questions or if you need any additional information.

Sincerely,

/s/ Julie L. Williams

Julie L. Williams
First Senior Deputy Comptroller and Chief Counsel

-8-

Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

February 11, 2003

Demetrios A. Boutris
Commissioner
California Department of Corporations
1515 K Street, Suite 200
Sacramento, California 95814-4052

Dear Mr. Boutris:

It has come to the attention of the Office of the Comptroller of the Currency ("OCC") that the California Department of Corporations ("Department") has sent its agents into one of the offices of Wells Fargo Home Mortgage, Incorporated ("WFHMI"), in order to conduct an examination of its mortgage operations. For the reasons set forth below, I urge you to suspend these efforts so that we may constructively discuss the status of, and OCC's authority with respect to, WFHMI.

It appears that the examination is being conducted pursuant to licensing provisions under California's Residential Mortgage Lending Act ("California Act") and other provisions of California law. Such an examination violates Federal law.[1] WFHMI is a wholly-owned operating subsidiary of Wells Fargo Bank, N.A. ("Bank"), a national bank chartered by the OCC. Pursuant to federal regulations, the OCC has authorized the Bank to conduct the mortgage banking business through WFHMI and has licensed WFHMI as an operating subsidiary of the Bank for that purpose. As an operating subsidiary of a national bank, WFHMI is subject to ongoing supervision and examination by the OCC in the same manner and to the same extent as the Bank.[2]

---

[1] Wells Fargo Bank, N.A., and WFHMI recently filed suit in the United States District Court for the Eastern District of California to obtain a judicial determination confirming that WFHMI is not subject to licensing by the Department or to the Department's supervisory, regulatory or enforcement authority and seeking injunctive relief. That case is *Wells Fargo Bank, N.A. v. Demetrios A. Boutris*, No. S 03-0157 GEB JFM, *filed* January 27, 2003.

[2] Twelve C.F.R. § 5.34(e)(3) provides that –

[a]n operating subsidiary conducts activities authorized under this section pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank. If, upon examination, the OCC determines that the operating subsidiary is operating in violation of law, regulation, or written condition, or in an unsafe or unsound manner or otherwise threatens the safety or soundness of the bank, the OCC will direct the bank or operating subsidiary to take appropriate remedial action, which may include requiring the bank to divest or liquidate the operating subsidiary, or discontinue specified activities. OCC authority

As discussed in detail below, pursuant to 12 U.S.C. § 484, and 12 C.F.R. §§ 5.34(e)(3) and 7.4006, the OCC has exclusive visitorial authority over national banks and their operating subsidiaries except where *Federal* law provides otherwise. This authority pertains to activities expressly authorized or recognized as permissible for national banks under Federal law or regulation, or by OCC issuance or interpretation, including the content of those activities and the manner in which, and standards whereby, those activities are conducted. As a result, States are precluded from examining or requiring information[3] from national banks or their operating subsidiaries or otherwise seeking to exercise visitorial powers with respect to national banks or their operating subsidiaries in those respects. Thus, Federal law precludes examination of WFHMI by the Department. Moreover, for the reasons discussed below, operating subsidiaries – like their parent national banks – need not obtain the approval of a State to engage in an activity that they have been licensed to conduct under Federal law. Accordingly, any State licensing requirements upon which the Department relies to assert jurisdiction do not apply to the Bank or WFHMI.[4]

Background

The OCC's exclusive visitorial authority over national bank operations is established by 12 U.S.C. § 484.[5] Paragraph (a) of that section states that --

> [n]o national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been

under this paragraph is subject to the limitations and requirements of section 45 of the Federal Deposit Insurance Act (12 U.S.C. 1831v) and section 115 of the Gramm-Leach-Bliley Act [GLBA] (12 U.S.C. 1820a).

The provisions of the Federal Deposit Insurance Act and the GLBA referenced in the regulation pertain to the functional regulation of securities, insurance, and commodities firms. These provisions are not relevant to mortgage lending and servicing activities conducted by WFHMI.

[3] The OCC currently maintains information sharing agreements with 48 States, the District of Columbia, and Puerto Rico. These agreements provide a mechanism through which State regulators may seek and obtain supervisory information from the OCC. Typically, the OCC will make confidential bank examination information available to State bank regulatory agencies if they demonstrate a specific regulatory need for the examination information (*e.g.*, in connection with a merger of a national bank into a State bank, where the State bank regulator must approve the transaction), and if the State agency has entered into an appropriate information sharing/confidentiality agreement with the OCC governing the use of the information. In OCC Advisory Letter 2002-9 (Nov. 25, 2002) ("AL 2002-9"), the OCC outlined a procedure to address circumstances when State officials raise issues concerning potential violations of laws by national banks, including when State officials may seek information from a national bank about its compliance with any law or for other purposes. The advisory letter is available on the OCC's website at www.occ.treas.gov/ftp/advisory/2002%2D9.txt.

[4] We note that the California Act already contains an exemption from State licensing requirements for national banks, Cal. Fin. Code § 50003(g), but fails to recognize the status of national bank operating subsidiaries as entities through which national banks operate pursuant to a federal license granted by the OCC.

[5] "Visitorial powers" generally refers to the power to "visit" a national bank to examine the conduct of its business and to enforce its observance of applicable laws. *See, e.g., Guthrie v. Harkness*, 199 U.S. 148, 158 (1905) (the word "visitation" means "inspection; superintendence; direction; regulation") (internal quotations omitted).

-2-

exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

Paragraph (b) of the statute then permits lawfully authorized State auditors or examiners to review a national bank's records "solely to ensure compliance with applicable State unclaimed property or escheat laws upon reasonable cause to believe that the bank has failed to comply with such laws."

This provision, enacted with the creation of the national banking system in 1863, is integral to the design and structure of the national banking system and fundamental to the character of national banks. Congress enacted the National Currency Act ("Currency Act") in 1863 and the National Bank Act the year after for the purpose of establishing a new national banking system that would operate distinctly and separately from the existing system of State banks. At that time, both proponents and opponents of the new national banking system expected that it would supersede the existing system of State banks.[6] Given this anticipated impact on State banks and the resulting diminution of control by the States over banking in general,[7] proponents of the national banking system were concerned that States would attempt to undermine it.

The allocation of any supervisory responsibility for the new national banking system to the States would have been inconsistent with the need to protect national banks from State interference. Congress, accordingly, established a Federal supervisory regime and created a Federal agency within the Department of Treasury—the OCC—to carry it out. Congress granted the OCC the broad authority "to make a thorough examination of all the affairs of [a national] bank,"[8] and solidified this Federal supervisory authority by vesting the OCC with exclusive

---

[6] Representative Samuel Hooper, who reported the bill to the House, stated in support of the legislation that one of its purposes was "to render the law [*i.e.*, the Currency Act] so perfect that the State banks may be induced to organize under it, in preference to continuing under their State charters." Cong. Globe, 38th Cong. 1st Sess. 1256 (March 23, 1864). Opponents of the legislation believed that it was intended to "take from the States . . . all authority whatsoever over their own State banks, and to vest that authority . . . in Washington . . . ." Cong. Globe, 38th Cong., 1st Sess. 1267 (March 24, 1864) (statement of Rep. Brooks). *See also* statement of Rep. Pruyn (stating that the legislation would "be the greatest blow yet inflicted upon the States . . . .") Cong. Globe, 38th Cong., 1st Sess. 1271 (March 24, 1864); statement of Sen. Sumner ("Clearly, the [national] bank must not be subjected to any local government, State or municipal; it must be kept absolutely and exclusively under that Government from which it derives its functions.") Cong. Globe, 38th Cong., 1st Sess., at 1893 (April 27, 1864).

[7] *See, e.g., Tiffany v. National Bank of the State of Missouri*, 85 U.S. 409, 412-413 (1874) ("It cannot be doubted, in view of the purpose of Congress in providing for the organization of national banking associations, that it was intended to give them a firm footing in the different states where they might be located. It was expected they would come into competition with state banks, and it was intended to give them at least equal advantages in such competition . . . . National banks have been national favorites. They were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the general government. It could not have been intended, therefore, to expose them to the hazard of unfriendly legislation by the states, or to ruinous competition with state banks."). *See also* B. Hammond, *Banks and Politics in America from the Revolution to the Civil War*, 725-34 (1957); P. Studenski & H. Krooss, *Financial History of the United States*, 155 (1st ed. 1952).

[8] Act of June 3, 1864, c. 106, § 54, 13 Stat. 116, *codified at* 12 U.S.C. § 481.

-3-

visitorial powers over national banks. These provisions assured, among other things, that the OCC would have comprehensive authority to examine all the affairs of a national bank and protected national banks from potential State action by establishing that the authority to examine and supervise national banks is vested *only* in the OCC, unless otherwise provided by *Federal law*.[9]

In *Guthrie v. Harkness*, 199 U.S. 148 (1905), the Supreme Court recognized how the National Bank Act was designed to operate:

> Congress had in mind, in passing this section [*i.e.*, section 484] that in other sections of the law it had made full and complete provision for investigation by the Comptroller of the Currency and examiners appointed by him, and, authorizing the appointment of a receiver, to take possession of the business with a view to winding up the affairs of the bank. It was the intention that this statute should contain a full code of provisions upon the subject, and that no state law or enactment should undertake to exercise the right of visitation over a national corporation. Except in so far as such corporation was liable to control in the courts of justice, this act was to be the full measure of visitorial power.

*Id.* at 159. The Supreme Court also has recognized the clear intent on the part of Congress to limit the authority of States over national banks precisely so that the nationwide system of banking that was created in the Currency Act could develop and flourish. For instance, in *Easton v. Iowa*, 188 U.S. 220 (1903), the Court stated that Federal legislation affecting national banks—

> has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States . . . . It thus appears that Congress has provided a symmetrical and complete scheme for the banks to be organized under the provisions of the statute . . . . [W]e are unable to perceive that Congress intended to leave the field open for the States to attempt to promote the welfare and stability of national banks by direct legislation. If they had such power it would have to be exercised and limited by their own discretion, and *confusion would necessarily result from control possessed and exercised by two independent authorities.*

*Id.* at 229, 231-232 (emphasis added). The Court in *Farmers' and Mechanics' Bank*, 91 U.S. 29 (1875), after observing that national banks are means to aid the government, stated—

---

[9] Writing shortly after the Currency Act and National Bank Act were enacted, then-Secretary of the Treasury, and formerly the first Comptroller of the Currency, Hugh McCulloch observed that "Congress has assumed entire control of the currency of the country, and, to a very considerable extent, of its banking interests, prohibiting the interference of State governments . . . ." Cong. Globe, 39th Cong., 1st Sess., Misc. Doc. No. 100, at 2 (April 23, 1866).

Being such means, brought into existence for this purpose, and intended to be so employed, the States can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit. Any thing beyond this is "an abuse, because it is the usurpation of power which a single State cannot give."

*Id.* at 34 (citation omitted).

Congress recently affirmed the OCC's exclusive visitorial powers with respect to national banks operating on an interstate basis in the Riegle-Neal Interstate Banking Act of 1994 ("Riegle-Neal").[10]  Riegle-Neal makes interstate operations of national banks subject to specified types of laws of a "host" State in which the bank has an interstate branch to the same extent as a branch of a State bank of that State, *unless* the State law is preempted by Federal law.  For those State laws that are not preempted, the statute makes clear that the authority to enforce the law is vested in the OCC.  *See* 12 U.S.C. § 36(f)(1)(B) ("The provisions of any State law to which a branch of a national bank is subject under this paragraph shall be enforced, with respect to such branch, by the Comptroller of the Currency.").  This approach is another, and very recent, recognition of the broad scope of the OCC's exclusive visitorial powers with respect to national banks.

## Application of Federal Law to the Operating Subsidiaries

In section 121 of the Gramm-Leach-Bliley Act ("GLBA"), Congress expressly acknowledged that national banks may own subsidiaries that engage "solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks."[11]

Consistent with section 121, the OCC regulations state that "[a]n operating subsidiary conducts activities authorized under [12 C.F.R. § 5.34] pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank."[12]  Addressing this point in the context of State laws, section 7.4006 of our regulations specifically states that "[u]nless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank."[13]

In order for a subsidiary to operate in the manner contemplated by section 121 of GLBA, the subsidiary must be subject to the same regulation and supervision as is its parent national bank. As described at the outset of this letter, our regulations at § 5.34(e)(3) require that result, which

---

[10] Pub. L. 103-328, 108 Stat. 2338 (Sept. 29, 1994).

[11] Pub. L. No. 106-102, § 121, 113 Stat. at 1378, *codified at* 12 U.S.C. § 24a(g)(3).

[12] 12 C.F.R. § 5.34(e)(3).

[13] 12 C.F.R. § 7.4006.

-5-

is entirely consistent with the concept of an operating subsidiary as an OCC-licensed entity through which national banks conduct bank-permissible activities. The terms and conditions governing the conduct of activities in an operating subsidiary include being subject to the same visitorial powers as are exercised with respect to the parent. Accordingly, just as 12 U.S.C. § 484 prevents the Department from exercising visitorial powers over the Bank, so too does section 484 and OCC regulations prevent the Department from exercising visitorial powers over WFHMI, an OCC-licensed operating subsidiary through which the Bank conducts authorized mortgage banking activities.

It is important in this context to understand that while the Department may not examine and supervise WFHMI, the operating subsidiary is subject to an extensive regime of Federal law and regulations and the Bank and WFHMI are subject to comprehensive and continuous supervision by the OCC. The Bank is part of the OCC's Large Bank Program. This means that its activities and those of its subsidiaries are examined on a continuous basis by teams of examiners specifically assigned to, and in most cases physically present at the facilities of, the Bank and its subsidiaries.

With regard to the application of State licensing requirements, it is well established that a State may not condition a national bank's exercise of a permissible Federal power on obtaining the State's prior approval, including the imposition of State licensing requirements as a predicate to the exercise of that power.[14]   The result is the same whether the national bank exercises the power directly, or through an operating subsidiary that has been licensed by the OCC. In both cases, the bank, or the operating subsidiary, has obtained a *Federal* license to conduct its business.

When the OCC charters a national bank, it grants the bank a license to commence the banking business under 12 U.S.C. § 27. When a national bank acquires or establishes an operating subsidiary through which the bank will conduct bank-permissible activities, the OCC grants a license for the operating subsidiary to conduct those activities pursuant to 12 C.F.R. § 5.34. Requirements for establishing or acquiring an operating subsidiary are expressly described in OCC regulations as "Licensing requirements."[15]   Accordingly, when WFHMI was established as an operating subsidiary of the Bank and was licensed by the OCC as an entity through which the Bank was authorized to conduct its mortgage lending business, WFHMI did not then, and does

---

[14] *See First National Bank of Eastern Arkansas v. Taylor*, 907 F.2d 775, 780 (8th Cir. 1990) (the National Bank Act precludes a State regulator from prohibiting a national bank, through either enforcement action or a license requirement, from conducting an activity that the Comptroller has reasonably determined is authorized by the National Bank Act); *Ass'n. of Banks in Insurance, Inc. v. Duryee*, 55 F. Supp. 2d 799, 812 (S.D. Ohio 1999), *aff'd*, 270 F.3d 397 (6th Cir. 2001) (even the most limited aspects of State licensing requirements such as the payment of a licensing fee are preempted because they "constitute impermissible conditions upon the authority of a national bank to do business within the state"). The OCC also has opined previously that State laws purporting to require the licensing of activities authorized for national banks under Federal law are preempted. *See* OCC Interpr. Ltr. No. 749 (Sept. 13, 1996) *reprinted in* [1996-1997 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 81-114 (State law requiring national banks to be licensed by the State to sell annuities would be preempted); OCC Interpr. Ltr. No. 644 (March 24, 1994), reprinted in [1994 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 83,553 (State registration and fee requirements imposed on mortgage lenders would be preempted).

[15] 12 C.F.R. § 5.34(b).

-6-

not now, also need a State-issued license to do that business. Just as the Bank has a Federal license to conduct the banking business and needs no additional State license, so too does WFHMI have a federal license for the Bank to conduct its mortgage lending business through WFHMI and needs no additional State-granted permit to do so. Section 7.4006 similarly confirms that State licensing requirements are equally inapplicable to Federally-authorized activities conducted by a national bank directly or through a federally-licensed operating subsidiary. In practical effect, therefore, your actions would have the effect of depriving the Bank and WFHMI of the right to conduct mortgage lending business they have been authorized to conduct under a license issued under Federal law.

I must also note that these conclusions that the OCC's exclusive visitorial powers preclude the Department from examining and asserting supervisory authority over, or applying state licensing requirements to WFHMI are not intended to imply that any of the substantive provisions of the California Act apply to WFHMI. Instead, under Federal law[16] and principles of preemption established by the courts,[17] provisions of the California Act may well be preempted. This letter, however, addresses only the issues of whether the Department may conduct an examination of WFHMI and whether WFHMI is required to obtain a State license in order to conduct mortgage banking activities that it is authorized to conduct under a Federally-granted license.

I hope the foregoing helps to clarify our concerns with regard to the Department's recent actions. I urge you to suspend the Department's efforts to examine and regulate WFHMI so that we may the opportunity to have a more constructive discussion of our relative roles.

If you have any questions regarding this letter, please do not hesitate to contact Horace G. Sneed, Assistant Director, Litigation Division, at (202) 874-5280.

Sincerely,

Julie L. Williams
First Senior Deputy Comptroller and Chief Counsel

Cc:    Stanley S. Stroup, Executive Vice President, General Counsel

---

[16] *See, e.g.*, 12 U.S.C. §§ 371, 1735f-7, 1735f-7a, and 3801 *et. seq.*

[17] *See, e.g.*, the cases cited in note 12, *supra.*

Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

January 16, 2003

Reginald S. Evans, Esq.
Chief Counsel
Pennsylvania Department of Banking
333 Market Street, 16th Floor
Harrisburg, PA 17101-2290

Subject:    Homeowners Loan Corporation

Dear Mr. Evans:

This letter responds to your letter dated September 17, 2002, in which you ask a number of questions concerning the manner in which the Office of the Comptroller of the Currency ("OCC") supervises operating subsidiaries of national banks. Many of these questions relate specifically to the OCC's supervision of Homeowners Loan Corporation ("Homeowners"), an operating subsidiary of The Laredo National Bank, Laredo, Texas ("the Bank"). Homeowners is incorporated in Delaware.

The tenor of your questions suggests that Pennsylvania has the authority to supervise the activities of Homeowners and, by implication, other operating subsidiaries of national banks. However, federal law and OCC regulations vest the OCC with exclusive "visitorial" powers over national banks and their operating subsidiaries.[1] Those powers include examining national banks, inspecting their books and records, regulating and supervising their activities pursuant to federal banking law, and enforcing compliance with federal or any applicable state law concerning those activities.[2] Federal law thus limits the extent to which any other governmental entity may exercise visitorial powers over national banks and their operating subsidiaries. Our response to your letter is provided to further the state's understanding of the OCC's supervision of national bank subsidiaries, but does not alter the jurisdiction established by federal law.

The OCC has urged state officials to contact the OCC if they have any information regarding allegations of violation of particular state laws by national banks or their subsidiaries.[3] In addition, any consumer complaints concerning any part of the operations of any national bank or

---

[1] 12 U.S.C. § 484(a); 12 C.F.R. § 7.4006.

[2] Advisory Letter No. 2002-9 (Nov. 25, 2002); 12 C.F.R. § 7.4000(a)(2).

[3] Advisory Letter No. 2002-9 at 4.

operating subsidiary, including the Bank and Homeowners, are referred to the OCC Customer Assistance Group ("CAG"), which is located in Houston, Texas. The CAG investigates the complaint, with the assistance of other OCC units where appropriate,[4] and recommends appropriate action.

## The Nature and Scope of OCC Examinations

Many of your questions relate to the OCC's examination policies and procedures. For example, you ask questions concerning the scope of OCC examinations and the laws with which national banks and their operating subsidiaries must comply. The OCC conducts comprehensive examinations of a national bank's business, including its compliance with principles of safe and sound banking and its compliance with applicable laws. In addition, the OCC conducts targeted examinations that may cover one or more elements of a comprehensive examination, such as compliance with specific laws. The OCC has issued substantial guidance, which should provide more detailed answers to your questions. Copies of those materials are enclosed.

National banks have express authority to create operating subsidiaries, which may engage in any activity permissible to the parent bank itself.[5] Generally, an operating subsidiary is a corporation or similar entity, in which a national bank owns more than 50 percent of the voting interest, or otherwise maintains a controlling interest.[6] Because the activities of an operating subsidiary are limited to activities in which the parent bank could engage directly, an operating subsidiary is in practice a separately incorporated division or department of the parent bank. Thus, the OCC's standards in examining Homeowners are the same standards that apply to OCC examinations of the Bank. Consistent with the guidance enclosed with this letter, the OCC's examination of Homeowners addresses compliance with applicable laws, such as consumer protection laws, as well as compliance with standards of safe and sound banking.

Homeowners engages in subprime mortgage lending. Because of the safety and soundness and compliance risks posed by these lending programs, the OCC has published additional guidance relating to subprime lending activities. The OCC relies on this guidance in examining Homeowners and other subprime lenders and, therefore, applies the same standards to Homeowners as it would to any national bank or operating subsidiary engaged in subprime lending activities. Copies of this guidance are enclosed for your reference.

In examining the lending function of a national bank or an operating subsidiary, the OCC typically reviews a sample of loans owned by the institution. This sample generally will include larger loans and loans that the institution has previously identified as problem loans. Through this review, the OCC will determine the quality of the loans (*e.g.*, the likelihood of repayment), the adequacy and completeness of the information concerning the loan and the borrower, and

---

[4] For example, attorneys in the Law Department may provide legal advice if the matter involves questions of law.

[5] *See* generally 12 C.F.R. § 5.34.

[6] 12 C.F.R. § 5.34(e)(2).

-2-

whether the lending function is being carried out in compliance with applicable laws. The OCC evaluates the adequacy of all elements of the institution's business, including earnings, assets, management, liquidity, sensitivity to market risk, and information systems, as well as specialty areas such as any trust operations that may exist. The examination process is intended to provide a high level of assurance that each aspect of an institution's business is conducted on a safe and sound basis and in compliance with applicable laws.

Homeowners generally does not retain the loans that it originates, but instead sells them in the secondary market shortly after origination. Based on those activities, the OCC reviews Homeowners' lending function to determine compliance with all applicable laws and principles of safety and soundness.

Applicability of State Law

Some of your questions relate to the applicability of state (and federal) law to operating subsidiaries. For example, you ask whether state consumer protection laws apply to national bank operating subsidiaries. The OCC's regulations provide that state law applies to the operating subsidiary of a national bank "to the same extent that those laws apply to the parent national bank."[7] Questions about the applicability of state laws to national banks may be addressed in a variety of ways. In some cases, our regulations contain express provisions that address the applicability of state law to a national bank.[8] From time to time, the OCC also provides legal opinions that respond to specific requests and express our views about the applicability of particular state laws to national banks.[9] Preemption issues also may be resolved through litigation over the applicability of particular state laws to national banks.[10]

For example, courts have repeatedly recognized the essentially federal character of national banks,[11] and the Supreme Court has held that subjecting national banks' federally authorized activities to state regulation and supervision would conflict with their federally derived powers and with the purposes for which the national banking system was established.[12] In one such

---

[7] 12 C.F.R. § 7.4006.

[8] *E.g.*, 12 C.F.R. §§ 7.5002(c) (furnishing products and services by electronic means), 34.4 (real estate lending), and 37.1(c) (debt cancellation contracts).

[9] *E.g.*, 66 Fed. Reg. 28,593 (May 23, 2001) (Michigan statute concerning motor vehicle loans); 65 Fed. Reg. 15,037 (March 20, 2000) (Pennsylvania statute concerning auctions and auctioneers).

[10] *The Bank of America v. City and County of San Francisco*, 309 F.3d 551 (9th Cir. 2002); *Bank One Utah, N.A. v. Guttau*, 109 F.3d 844 (8th Cir. 1999).

[11] *See, e.g., Davis v. Elmira Savings Bank*, 161 U.S. 275, 283 (1896) ("[n]ational banks are instrumentalities of the Federal government").

[12] *See Easton v. Iowa*, 188 U.S. 220, 229, 231-32 (1903), in which the Supreme Court explained:

> [Federal legislation concerning national banks] has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and numerous as the states.

-3-

decision, the Court noted that national banks are "instrumentalities" of the federal government and stated that "any attempt by a State to define [the] duties [of a national bank] or control the conduct of [the] affairs [of the national bank] is void whenever it conflicts with the laws of the United States or frustrates the purposes of the national legislation or impairs the efficiency of the bank to discharge the duties for which it was created."[13]

Essential to the character of national banks and the national banking system is the uniform and consistent regulation of national banks by *federal* standards.[14]  To that end, Congress vested in the OCC broad authority to regulate the conduct of national banks except where the authority to issue such regulations has been "expressly and exclusively" given to another federal regulatory agency.  12 USC 93a.  State law could be applicable to national banks, however, in limited circumstances when it does not conflict or interfere with the national bank's exercise of its powers.  Thus, for instance, one federal court recently noted that states retain some power to regulate national banks in areas such as "contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law."[15]

You also ask whether a litigant in a lawsuit against Homeowners could pierce the corporate veil to recover damages from the Bank.  This question would be more appropriately discussed in the context of litigation between Homeowners and a customer or other third party involving a specific factual situation.  In general, though, mere ownership of a subsidiary corporation does not result in liability on the part of the parent for acts of its subsidiary.

---

    ... [W]e are unable to perceive that Congress intended to leave the field open for the states to attempt to promote the welfare and stability of national banks by direct legislation.  If they had such power it would have to be exercised and limited by their own discretion, and confusion would necessarily result from control possessed and exercised by two independent authorities.

*See also Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996) (the powers of national banks are "grants of authority not normally limited by, but rather ordinarily pre-empting contrary state law").

[13] *First Nat'l Bank of San Jose v. California*, 262 U.S. 366, 368, 369 (1923).  *See also Bank of America*, 309 F.3d at 561 (state attempts "to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties").

[14] Such standards may be embodied explicitly in OCC regulations, or in other federal law, including various federal consumer protection laws, such as the Truth in Lending Act, the Truth in Savings Act, the Electronic Fund Transfer Act, the Real Estate Settlement Procedures Act, the Equal Credit Opportunity Act, and the Federal Trade Commission Act.  *See* 15 USC 1601 *et seq.*; 12 USC 4301 *et seq.*; 15 USC 1693 *et seq.*; 12 USC 2601 *et seq.*; 15 USC 1691 *et seq.*; 15 USC 45.  However, whether or not the OCC has specifically addressed a national bank activity in a regulation, all national bank operations must be conducted in a safe and sound manner, in accordance with the OCC's supervisory standards.

[15] *Bank of America*, 309 F.3d at 559.

OCC Supervision of Homeowners

The OCC examines national banks and their operating subsidiaries on a regular basis. Federal law requires that the OCC examine national banks, such as the Bank, at least once every 12 months.[16] However, the OCC may examine an institution more frequently if warranted by the institution's asset size, condition, or other factors. For example, the largest national banks have on-site examination teams conducting continuous examinations. Thus, while it is impossible to predict the exact timing of OCC examinations of Homeowners in the future, it appears very likely that the OCC will continue to conduct an examination of Homeowners at least every 12 months, consistent with the federal statutory schedule for examining the Bank.

The OCC generally prepares letters transmitting the examination findings to Homeowners and the Bank. Those letters are the equivalent of examination reports and, therefore, are considered confidential. Examination reports, along with other bank examination information, are exempt from disclosure under the Freedom of Information Act.[17] This information is also subject to a limited privilege from discovery in third-party litigation.[18] These protections reflect the sensitive nature of bank examination information and support the longstanding policy of the OCC not to provide examination reports to third parties. Typically, the OCC will make confidential bank examination information available to state bank regulatory agencies if they demonstrate a specific regulatory need for the examination information (*e.g.*, merger of a national bank into a state bank, where the state bank regulator must approve the transaction), and if the state agency has entered into an appropriate information sharing/confidentiality agreement with the OCC governing use of the information.

I hope the foregoing has been of assistance to you in understanding the nature of the OCC's supervision of Homeowners. If you have any questions concerning this letter, please contact Frederick Petrick, Counsel, Litigation Division, at 202-874-5280, or Mary Ann Nash, Counsel, Legislative & Regulatory Activities Division, at 202-874-5090.

Sincerely,

Julie L. Williams
First Senior Deputy Comptroller and Chief Counsel

Enclosures

---

[16] 12 U.S.C. § 1820(d)(1). If a bank has less than $250,000,000 in assets and is in good condition, the OCC need only examine it at least once every 18 months. 12 U.S.C. § 1820(d)(4).

[17] 5 U.S.C. § 552(b)(8).

[18] *In re Subpoena Duces Tecum Served Upon the Comptroller of the Currency and the Secretary of the Board of Governors of the Federal Reserve System*, 967 F.2d 630 (D.C. Cir. 1992).

-5-

## CERTIFICATE OF SERVICE

I certify that on the 15th day of July, 2003, I served copies of the foregoing Memorandum

Amicus Curiae of the Office of the Comptroller of the Currency In Support of Plaintiffs upon the

following by causing a copy to be delivered by UPS overnight mail to:

Mark F. Kohler
Assistant Attorney General
State of Connecticut
55 Elm Street
P.O. Box 120
Hartford, CT 06106
Counsel for Defendant

Daniel L. FitzMaurice
Jason S. Weathers
Day, Berry & Howard, LLP
CityPlace I
Hartford, CT 06103
Counsel for Plaintiffs

Douglas B. Jordan