UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
Oct 24  2 03 PM '03

U.S. DISTRICT COURT
NEW HAVEN, CONN.

WACHOVIA BANK, N.A., and
WACHOVIA MORTGAGE CORPORATION,

          Plaintiffs,

v.

JOHN P. BURKE, in his official capacity
as Banking Commissioner of the State
of Connecticut,

          Defendant.

Civil Action No. 303CV0738(MRK)

SEPTEMBER 25, 2003

## BRIEF *AMICUS CURIAE* OF THE NEW YORK CLEARING HOUSE ASSOCIATION L.L.C. IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The New York Clearing House Association L.L.C. ("The Clearing House") submits this brief *amicus curiae* in support of Plaintiffs' Motion for Summary Judgment (the "Motion") and in support of Plaintiffs' Opposition to Defendant's Cross-Motion for Summary Judgment (the "Cross-Motion").

The Clearing House is a limited liability company whose members are eleven leading commercial banks in the United States.[1] The Clearing House member banks include both national banking associations, subject to the National Bank Act and, thus, to the supervision and regulation of the Office of the Comptroller of the Currency (the "OCC"), and state member banks,

---

[1] The member banks of The Clearing House are: Bank of America, National Association; The Bank of New York; Bank One, National Association; Citibank, N.A.; Deutsche Bank Trust Company Americas; Fleet National Bank; HSBC Bank USA; JPMorgan Chase Bank; LaSalle Bank National Association; Wachovia Bank, National Association; and Wells Fargo Bank, National Association.

subject to the supervision and regulation of state banking authorities and the Board of Governors of the Federal Reserve System (the "Federal Reserve"). The Clearing House frequently appears as an *amicus curiae* in cases, such as this, raising important questions of banking law.

The Clearing House has a substantial interest in the issues presented by Plaintiffs' Motion because of its member banks' long-standing practice of establishing operating subsidiaries to conduct the business of banking generally, and to engage in the mortgage-lending business that is the specific focus of this case. For over 35 years, the OCC has permitted national banks to establish and conduct their business through operating subsidiaries.[2] In reliance on regulations and authorizations of the OCC and other federal and state banking regulators, Clearing House member banks regularly and extensively utilize operating subsidiaries to offer a wide variety of products and services. More generally, The Clearing House's member banks, which conduct business in multiple states, have a fundamental interest in the establishment of a uniform set of laws and regulations for the nation's banks.

Defendant Commissioner's assertion of licensing and visitorial authority over national banks' operating subsidiaries engaged in real estate lending in Connecticut threatens to eliminate the flexibility, efficiency, and predictability offered to national banks by the operating subsidiary structure. Defendant's assertion of authority to require national bank's operating subsidiaries to obtain a state license in order to engage in mortgage lending directly conflicts with fundamental Constitutional principles and would permit Defendant to foreclose altogether a

---

[2] The Federal Reserve has permitted state member banks to conduct their business through operating subsidiaries for over 30 years.

2

national bank's ability to conduct a core component of business – lending secured by real property – using the operating subsidiary structure that federal law has expressly permitted for decades. Defendant's assertion of visitorial authority over the operating subsidiary in this case directly conflicts with the OCC's assertion of exclusive visitorial authority over national banks and their operating subsidiaries and threatens those operating subsidiaries with inspection and regulation by multiple, potentially conflicting authorities even within a single state.

Because Defendant's actions are contrary to well-established federal law, they are pre-empted. The Clearing House respectfully submits that Plaintiff's Motion should be granted and Defendant's Cross-Motion should be denied..

## INTRODUCTION

In *M'Culloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316 (1819), the Supreme Court described as "propositions not to be denied," in the context of a federally established bank, that "the power to tax involves the power to destroy" and "that the power to destroy may defeat and render useless the power to create." *Id.* at 431. Defendant Commissioner asserts here an even greater power over the mortgage-lending operating subsidiaries of national banks: the power to prevent their creation by denying them a license that he contends is necessary to their existence. The OCC has, under a regulation dating to 1966, permitted national banks to conduct the business of banking – including mortgage lending – through operating subsidies. The Commissioner's assertion that he may prevent national banks from availing themselves of that right by requiring that a mortgage-lending operating subsidiary obtain a state license is a restriction that cannot stand under the Supremacy Clause of the Constitution and many decades of pre-emption precedent. If

3

the power to tax involves the power to destroy then the power to license involves the right to strangle in the cradle. Defendant's further claim to visitorial authority over a national bank's operating subsidiary is an additional, impermissible encroachment on the national bank's right under federal law to conduct the business of banking.

Plaintiff Wachovia Bank, N.A. ("Wachovia Bank") is a national banking association organized under the National Bank Act. Complaint ¶ 4. Plaintiff Wachovia Mortgage Corporation ("Wachovia Mortgage"), which is in the business of making mortgage loans, has been a wholly owned operating subsidiary of Wachovia Bank since January 1, 2003. *Id.* Since that time, Defendant Commissioner has sought to require Wachovia Mortgage to obtain licenses from the State of Connecticut before any of its Connecticut offices engage in first or second mortgage lending, *id.* ¶¶ 24-33, notwithstanding *M'Culloch* v. *Maryland* and very recent and directly contrary precedent. *See, e.g., Wells Fargo Bank, N.A.* v. *Boutris*, 265 F. Supp.2d 1162, 1169 (E.D. Cal. 2003). The Commissioner has also asserted the authority to examine and regulate the business of Wachovia Mortgage under Connecticut law. *Id.* ¶¶ 30, 33.

The Commissioner does not, and could not, contend that he could require a national bank, such as Wachovia Bank, to obtain a state license before offering mortgages in Connecticut because such regulation has been clearly established as the exclusive province of the OCC. Likewise, he does not contend that he may exercise visitorial authority over a national bank's mortgage lending practices. The Commissioner does, however, seek to circumvent the federal regulatory scheme that authorizes national banks to conduct their business operations through operating subsidiaries by regulating a part of a national bank – its mortgage-lending operating

4

subsidiary. This attempt must fail. The OCC, the regulator charged by the National Bank Act with regulatory authority over national banks, has promulgated a regulation that provides that operating subsidiaries are subject to the same legal regime as a national bank itself – a regulation that limits the applicability of state law to the same extent as it applies to national banks. *See* 12 C.F.R. § 7.4006. This regulation is a reasonable exercise by the OCC of the regulatory authority that Congress has delegated to it. Because the Commissioner cannot, consistent with that regulation, exercise his purported authority over Wachovia Mortgage any more than he could exercise it over Wachovia Bank, the Connecticut state law that he seeks to enforce is pre-empted as against Wachovia Mortgage.

## ARGUMENT

### A.    The Question Presented.

Contrary to the suggestion of the Commissioner and his *amici* state attorneys general, the question presented is not whether the statutes at issue *could* be interpreted in the manner they suggest. The Commissioner does not enjoy the benefit of working from a clean slate where the relevant federal regulatory authority has already spoken. Here, the OCC, the federal agency charged with interpreting, implementing, and enforcing the National Bank Act and numerous other federal statutes that govern national banks through regulations and otherwise, *see, e.g.*, 12 U.S.C. §§ 21 *et seq.*, has spoken directly to the pre-emptive reach of federal law as against state licensing statutes like Connecticut's. In 2001, the OCC issued a regulation under which only it has the authority to regulate national banks' mortgage-lending operating subsidiaries. 12 C.F.R. § 7.4006.

The Supreme Court has held:

> It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws.

*NationsBank of N.C. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57 (1995). Thus, so long as the OCC has acted reasonably, its conclusion must be sustained and it is irrelevant that any other conclusion could be reached. Consequently, the only question presented is the reasonableness of the OCC's actions in determining that state laws like those the Commissioner seeks to enforce here are pre-empted.

**B.    The Relevant Regulations.**

In a regulation promulgated in 1966, the OCC permitted national banks to establish operating subsidiaries by which national banks could conduct the business of banking. *See* 12 C.F.R. §§ 5.34; 34.1(b). There appears to be no dispute that the OCC's "Operating Subsidiary Rule" was an appropriate exercise of its regulatory authority. *See, e.g., Wells Fargo Bank*, 265 F. Supp.2d at 1169 ("The OCC's regulation authorizing national banks to conduct permissible banking business activities through operating subsidiaries is within its discretionary authority delegated to it by Congress and is a reasonable interpretation of the [National Bank Act]."). A similar operating subsidiary rule promulgated by the Federal Reserve applies to state member banks.

The OCC subsequently adopted a regulation concerning the exercise of visitorial authority over national banks. 12 C.F.R. § 7.4000(a)(1). That regulation provides, with limited

6

exceptions not applicable here, that "[o]nly the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to national banks." *Id.*

In 2001, the OCC adopted 12 C.F.R. § 7.4006 (the "Regulation"), which provides that "[u]nless otherwise provided by federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." *See* 66 Fed. Reg. 34784, 34792 (Jul. 2, 2001). As the release proposing this regulation made clear, the phrase "to the extent" is synonymous with "*only* to the extent." 66 Fed. Reg. 8178, 8181 (2001). This regulatory approach is simply a reaffirmation, in a specific context, of the basic approach to operating subsidiaries, which are subject to the same rules as national banks.

Since promulgating the Regulation, in a series of interpretive letters and decisions, the OCC has specifically determined that national bank operating subsidiaries are not subject to state licensing laws or visitorial authority of the very sort asserted by Defendant any more than national banks are, and state laws that purport to impose licensing requirements or to permit the exercise of visitorial authority over national banks' operating subsidiaries are pre-empted. *See, e.g.*, OCC Advisory Letter 2002-9 (Nov. 25, 2002) (attached to Memorandum *Amicus Curiae* of the Office of the Comptroller of the Currency in Support of Plaintiffs' Motion for Summary Judgment ("OCC *Amicus* Br.") as Ex. 1); Interpretive Letter No. 957 (Jan. 27, 2003) (OCC *Amicus* Br. Ex. 3); letter from Julie L. Williams, First Senior Deputy Comptroller and Chief Counsel, OCC, to Demetrios A. Boutris, Commissioner, California Department of Corporations (Feb. 11, 2003) (OCC Amicus Br. Ex. 4); letter from Julie L. Williams, First Senior Deputy Comptroller and Chief Counsel, OCC, to Reginald S. Evans, Chief Counsel, Pennsylvania Dept. of Banking

(Jan.16, 2003) (OCC Amicus Br. Ex. 5).

So long as the Regulation is a reasonable exercise of the OCC's regulatory authority, state law has no greater reach as to national bank operating subsidiaries than as to the national banks themselves. Accordingly, Connecticut state law, as Defendant seeks to apply it against Wachovia Mortgage, must be pre-empted.

### C. The OCC Was Authorized to Promulgate the Regulation.

Under the well-established legal principle of judicial deference to expert administrative action, the OCC's promulgation of the Regulation must be given "controlling weight" if the OCC's action is "reasonable." *See NationsBank*, 513 U.S. at 256; *see also Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403-04 (1987). Defendant and his *amici*'s assertions to the contrary notwithstanding, the OCC's determination to issue the Regulation clearly satisfies the "reasonableness" standard.[3]

---

[3] Under the settled rule set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), "when we confront an expert administrator's statutory exposition, we inquire first whether 'the intent of Congress is clear' as to 'the *precise question* at issue." *NationsBank*, 513 U.S. at 257 (quoting *Chevron*, 467 U.S. at 842) (emphasis added). If the statute "is silent or ambiguous with respect to the specific issue," then the second step of the *Chevron* analysis obtains and "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (quoting *Chevron*, 467 U.S. at 843). Although both Defendant and the state attorneys general assert that the question presented must be decided under *Chevron*'s step one, Opp. at 15; Brief of *Amicus Curiae*, States and State Banking Officials in Support of Defendant John P. Burke, Banking Commissioner ("State *Amici* Br.") at 27-28), this is manifestly incorrect. Congress has never directly addressed the question whether or how state licensing law or visitorial authority may be applied to national bank operating subsidiaries and neither Defendant nor his *amici* cite a single authority holding otherwise. Rather, the National Bank Act is "silent or ambiguous" with respect to that issue and the only question for this Court is whether the OCC's action is based on a "permissible construction of the statute." *NationsBank*, 513 U.S. at 257. Indeed, as discussed below, Congress' only reference to operating subsidiaries, in the Gramm-Leach-Bliley Act, strongly supports Plaintiffs' position.

8

*First*, the Regulation is supported by the basic concept under which operating subsidiaries are established. In view of the general prohibition in 12 U.S.C. § 24, paragraph seventh, against national bank ownership of stock, the Operating Subsidiary Rule, 12 C.F.R. § 5.34, was based on the premise that such a subsidiary was a separately incorporated department or division of a national bank that would allow a national bank additional convenience and flexibility in arranging the manner in which it does business. *See* 66 Fed. Reg. 34784, 34788; 61 Fed. Reg. 60342-01, 60352 (1996); letter from Joe Shelby, Acting Comptroller of the Currency, to Hoyle Robinson, Executive Secretary, Federal Deposit Insurance Corporation (July 22, 1985); letter from C.T. Conover, Comptroller of the Currency, to William Wiles, Secretary, Board of Governors of the Federal Reserve System (Mar. 29, 1985). As such, operating subsidiaries had only the same powers, and were subject to the same legal regime, as national banks themselves. *See* 12 C.F.R. § 5.34(e)(3); OCC Priv. Ltr. Rul. (Sept. 13, 1989).

*Second*, in Section 121 of the Gramm-Leach-Bliley Act ("GLBA"), Congress recognized the use by national banks of operating subsidiaries, and confirmed that these subsidiaries are subject to the same legal regime as their parents. 113 Stat. 1383 (reprinted in 15 U.S.C.A. § 41). Entitled "Subsidiaries of National Banks," this section describes three types of subsidiaries: (i) subsidiaries "engage[d] solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks" – the traditional definition of operating subsidiaries; (ii) subsidiaries "specifically authorized by the express terms of a Federal statute"; and (iii) newly authorized "financial subsidiaries" that are authorized by GLBA to engage in certain activities in

9

which national banks cannot engage. Although Congress placed special restrictions on financial subsidiaries (such as capital deductions and classification as "affiliates" for various purposes), it placed none on operating subsidiaries. This is consistent with the view that the entire legal and regulatory regime for operating subsidiaries was already in place, namely that the activities of such subsidiaries are subject to the same terms and conditions as those to which national banks themselves are subject. Because one of the most critical terms and conditions by which a national bank conducts its activities is freedom from certain state laws that are pre-empted by the Supremacy Clause, its operating subsidiary must likewise be able to conduct its activities free from the application of those same state laws.

*Third*, the concept of a national bank subsidiary as an incorporated division of the bank is reflected in Section 23A of the Federal Reserve Act. 12 U.S.C. § 371c. For purposes of the Section 23A restrictions on transactions with affiliates, an operating subsidiary is treated as part of the bank. There is no limitation on transactions between a bank and its operating subsidiaries, and transactions between the operating subsidiary and other bank affiliates are treated as if they were between the bank itself and the affiliates. *Id.*[4]

*Fourth*, in *NationsBank*, the Supreme Court upheld the OCC's determination as to

---

[4] *See* Federal Reserve Regulation W adapted under Section 23A: "[A]n operating subsidiary of a member bank is treated as part of the member bank." 12 C.F.R. §223.3(w). The Federal Reserve's implementing release for Regulation W states: "Congress adopted this approach on the premise that subsidiaries of a member bank generally are consolidated with the bank and engage only in those activities that the bank itself could engage in directly, and hence that such a subsidiary was more like a department of the bank than a separate company." 67 Fed. Reg. 76,562 (December 12, 2002).

the permissible activities of an operating subsidiary of a national bank under the National Bank Act. 513 U.S. at 259-60. If the OCC is authorized to make that determination, it should also be authorized to determine whether state law that would restrict those activities is pre-empted by the National Bank Act.

*Finally*, the Regulation has already been held to be a reasonable exercise of the OCC's rule-making authority by the only court to consider the issue. In *National City Bank of Indiana v. Boutris*, 2003 WL 21536818 (E.D. Cal. July 2, 2003), and *Wells Fargo Bank, N.A. v. Boutris*, 265 F. Supp.2d 1162 (E.D. Cal. 2003), the Commissioner of the California Department of Corporations twice attempted to exercise authority over operating subsidiaries of national banks engaged in mortgage lending. The California Commissioner's attempts to enforce California statutes requiring mortgage lenders in California to be licensed by the Commissioner were twice rebuffed. In *Wells Fargo*, the court specifically addressed the issue "whether the OCC was empowered under the [National Bank] Act to enact [the Regulation]." *Wells Fargo*, 265 F. Supp2d at 1169. Noting that "[s]ince the OCC is the regulator of national banks and administrator of the Act, its position on its authority to enact [the Regulation] is entitled to 'great weight,'" the court concluded that "[i]t is plain that the Act delegated to the OCC the authority to promulgate [the Regulation] and [the Regulation] reflects a reasonable construction of the Act." *Id.* at 1170 (quoting *Bank of America v. City & County of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002)).[5]

---

[5] In both *National City Bank of Indiana* and *Wells Fargo*, the court relied on *WFS Financial Inc. v. Dean*, 79 F. Supp.2d 1024, 1028 (D. Wis. 1999), a case construing the Office of Thrift Supervision's ("OTS") operating subsidiary rule, which is essentially identical to the Regulation. *See* 12 C.F.R. § 559.3(n) ("State law applies to operating subsidiaries only to the extent it applies to you [a federally chartered savings association]"); *see National City Bank of*

11

In brief, there can be no reasonable dispute that the OCC's adoption of the Regulation was squarely within the authority delegated to the OCC by Congress. No other court has ever held to the contrary. The question whether the Regulation pre-empts the Connecticut laws at issue here is equally straightforward.

### D.     The Regulation Pre-Empts the Challenged Connecticut Laws.

"[I]t is well established that 'Federal regulations have no less preemptive effect than federal statutes.' *Fidelity Savings and Loan Association* v. *de la Cuesta*, 458 U.S. 141, 153 (1982)." *Donmar Enterprises* v. *Southern Nat'l Bank*, 828 F. Supp. 1230, 1234 (W.D.N.C. 1993). The OCC has already determined that state laws like those at issue in this case are pre-empted by federal statute and regulation. The OCC's determination is entitled to deference as the agency whose interpretations of the National Bank Act are entitled to deference. *See, e.g., NationsBank*, 513 U.S. at 256-57.[6] The argument for deference in this case is even more compelling because of

---

*Indiana*, 2003 WL 21536818, *3 (quoting discussion of *WFS Financial* in *Wells Fargo Bank*, 265 F. Supp.2d at 1169-70). *WFS Financial* involved the application of a Wisconsin statute that required companies that engaged in certain consumer lending activities to acquire a license from, and be registered with, the State. WFS Financial argued that the licensing and registration requirements were pre-empted by federal law. The court agreed and held that the OTS acted "non-arbitrarily and well within its delegated authority" when it promulgated the operating subsidiary rule, which the court held pre-empted the Wisconsin law. 79 F. Supp.2d at 1025. It was reasonable, the court noted, for the OTS to conclude that "to the extent the operating subsidiaries are restricted by state regulation" they could not fill their statutory purpose. *Id.* at 1027. While the respective statutory schemes for federally chartered national banks and federally chartered savings associations are not identical, the basic pre-emption principles are the same. Both national banks and federal savings associations have federal charters and both were created by Congress for a federal purpose; in both cases, their powers are a function of federal law.

[6]     Defendant asserts that the OCC does not have "exclusive regulatory authority" under federal banking law, which he asserts reduces the deference to which the OCC's regulation is due. Opp. at 14. As the Supreme Court has recognized, however, the OCC is the regulatory

12

the consistency of the OCC's position on this issue. *See, e.g., Gray v. Office of Workers Comp. Progs.*, 943 F.2d 513, 517 (4th Cir. 1991). In numerous interpretive letters issued subsequently to the adoption of the Regulation, the OCC has consistently reached the reasoned conclusion that the Regulation applied to state laws just like the Connecticut laws at issue here and that they are accordingly pre-empted as against operating subsidiaries of national banks. *See, e.g.,* OCC *Amicus* Br., Exs 1, 3, 4, 5.[7]

As discussed, the OCC's interpretation has already been upheld and found to pre-empt state laws materially identical to those challenged in this action. The California Commissioner of Corporations' attempts to enforce – by means of visitorial authority – California's "per diem" statutes against mortgage-lending operating subsidiaries of national banks have been held pre-empted by the Regulation. *See National City Bank of Indiana*, 2003 WL 21536818, *4; *Wells Fargo*, 265 F. Supp.2d at 1170.

The identical result should obtain here. Both specific decisions regarding state

---

agency charged with administering the National Bank Act. *NationsBank*, 513 U.S. at 256-57. Even were that not the case, the fact that more than one regulatory agency administers a given statute does not render any of those agency's interpretations of that statute entitled to less deference under *Chevron*. *See, e.g., National Home Equity Mortgage Ass'n v. Office of Thrift Supervision*, ___ F. Supp.2d ___, 2003 WL 21663983, *7-8 (D.D.C. July 14, 2003).

[7]     Defendant and his *amici* rely on the "Federalism Summary Impact Statement" that accompanied the promulgation of the Regulation to argue that the Regulation has no pre-emptive effect. Opp. at 14; State *Amici* Br. 26. That section simply reaffirms the basic legal framework for operating subsidiaries – that they are regulated as part of the national bank itself. Any doubt as to the potentially pre-emptive effect of the Regulation is dispelled in the specific discussion of the Regulation in the same release, where the OCC concluded that "unless otherwise provided by Federal law or OCC regulation, State laws, *such as licensing requirements*, are applicable to a national bank operating subsidiary *only to the extent that they are applicable to national banks*." *Id.* at 34788 (emphases added).

13

licensing laws and general pre-emption principles compel the conclusion that the Connecticut laws challenged in this action are pre-empted as applied to national banks. Because the Regulation is a legitimate exercise of the OCC's regulatory authority, these laws are also pre-empted as applied to operating subsidiaries.

Numerous judicial decisions, as well as a series of OCC rulings, specifically hold that a state licensing law is pre-empted as applied to a national bank or federal thrift. *See, e.g., WFS Financial Inc. v. Dean*, 79 F. Supp.2d 1024, 1028 (D. Wis. 1999); *Association of Banks in Ins. v. Duryee*, 55 F. Supp.2d 799, 812 (S.D. Ohio 1999) (holding licensing requirements – including requirements to provide certain information, to pay a $100 licensing fee, to appoint an agent for service of process – pre-empted because they "constitute impermissible conditions upon the ability of a national bank to do business within the state"); *Federal Deposit Ins. Corp. v. Gates*, 594 F. Supp. 36, 43 (D. Kan. 1984) (relying on *M'Culloch v. Maryland*); *Bank of Am. Nat'l Trust and Savs. Ass'n v. Lima*, 103 F. Supp. 916, 918 (D. Mass. 1952) ("It would [] seem that any attempt by the state to block [a national bank's] entry until it complied with certain conditions would violate the constitution and laws of the United States."); *Thompson v. FDIC*, 241 Kan. 328, 736 P. 2d 914 (1987); 66 Fed. Reg. 28593 (May 23, 2001) (OCC letter pre-empting state law regarding financing of motor vehicles); 65 Fed. Reg. 15037 (Mar. 20, 2000) (OCC letter pre-empting state law that requires licensing of auctioneers); OCC Interp. Ltr. 644 (Mar. 24, 1994) (state registration and fee requirements imposed on mortgage lenders pre-empted).[8]

---

[8] In addition to these banking cases, numerous other Supreme Court decisions hold that various other kinds of state licensing requirements violate the Supremacy Clause. As noted in *First Iowa Hydro-Electric Coop. v. Federal Power Commission*, 328 U.S. 152, 164 (1946), a state

14

This widely held conclusion as to the pre-emption of state laws like those challenged here is entailed by the general principles of pre-emption utilized by the Supreme Court in the case of national banks. Beginning with *M'Culloch* v. *Maryland*, a series of Supreme Court decisions repeatedly hold that state laws that interfere with the operations of a federally chartered bank are pre-empted under the Supremacy Clause. *See, e.g., Barnett Bank of Marion County* v. *Nelson*, 517 U.S. 25 (1996); *Franklin Nat'l Bank* v. *New York*, 347 U.S. 373 (1954); *Easton* v. *Iowa*, 188 U.S. 220 (1903).

In order to conclude that state law is pre-empted, it is not necessary that federal law contain explicit pre-emption language. *Barnett*, 517 U.S. at 31. Rather, the question is whether there is a "clear, but implicit, pre-emptive intent." *Id.* This clear pre-emptive intent can be derived either "from a scheme of federal regulations 'so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it'" or a situation where "the state law may 'stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (internal citations omitted).

State licensing laws, like those challenged here, undoubtedly meet the second prong of the test – an obstacle to the accomplishment of Congress' objectives. The National Bank Act

---

licensing requirement is pre-empted for an activity authorized by federal law because the requirement gives the state a "veto power." A state licensing requirement is invalid even if the relevant factors are similar to those in the federal statute. *Leslie Miller* v. *Arkansas*, 352 U.S. 187, 189-90 (1956). A state licensing requirement is also pre-empted if it gives "the State's licensing board a virtual power of review over the federal determination that a person or agency is qualified and entitled to perform certain functions," or if the state requirement would "impose upon the performance of an activity sanctioned by federal license additional conditions not contemplated by Congress." *Sperry* v. *Florida*, 373 U.S. 379, 385 (1963).

15

authorizes a national bank and its operating subsidiaries to engage in certain activities. A licensing requirement empowers Connecticut to deny a national bank the right to engage in the very activity the National Bank Act authorizes. *See WFS Financial*, 79 F. Supp.2d at 1027; *FDIC v. Gates*, 594 F. Supp. at 43. Moreover, a state requirement need not be prohibitory of a national bank's exercise of its powers to be pre-empted; it is sufficient if the state attempts to confine or condition the exercise. As the Court held in *Barnett*:

> [W]here Congress has not expressly conditioned the grant of 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies.

*Barnett*, 517 U.S. at 34; *see also Duryee*, 55 F. Supp.2d at 811; *New York Bankers Ass'n v. Levin*, 999 F. Supp. 716 (W.D.N.Y. 1998); *Donmar*, 828 F. Supp. at 1236 (state statute can be pre-empted even if compatible with federal law).

The Supreme Court ruled in *M'Culloch v. Maryland* that "the power to tax involves the power to destroy" and "the power to destroy may defeat and render useless the power to create." 17 U.S. (Wheat.) at 431. Likewise, the power to license involves the power to prevent and render useless the power to create. As the Court concluded in *M'Culloch v. Maryland*, it is a "proposition not to be denied . . . that there is a plain repugnance, in conferring on one government [the state] a power to control the constitutional measures of another [the federal government]." *Id.* Defendant Commissioner's efforts to defend Connecticut's licensing requirement on the basis that it will not, in fact, be used to prevent or destroy run directly contrary to *M'Culloch v. Maryland*. The State of Maryland in *M'Culloch v. Maryland* also argued that its taxation power would represent a constitutional abuse only if it were used in a way that would arbitrarily destroy. The

Supreme Court unequivocally rejected that argument, holding that it is possession of the power to destroy, and not the exercise of the power, that is constitutionally repugnant. *Id.* at 431-32.

Any suggestion that a state licensing law is rescued from pre-emption because of a consumer protection objective, *see* Opp. at 5-6; State *Amici* Br. at 10-12, has no support in the Supremacy Clause itself and is inconsistent with the relevant precedent. "[F]ederal pre-emption principles apply equally to state laws which were enacted to protect the public." *Duryee*, 55 F. Supp.2d at 811. Nor will pre-emption deprive the public of the benefit of consumer protection legislation.

> [The operating subsidiary] is not exempt from federal laws and regulations that govern loans, consumer loans disclosures, loan fees and interest rates, any more than its parent is. Furthermore, it is subject to the same kind of regulation and monitoring as its parent to insure that it is operated in a way that will maintain the viability of its parent and the solvency of the federal deposit insurance system.

*WFS Financial*, 79 F. Supp.2d at 1028.[9]

Similarly, the assertion that the state law pre-empted is in an area of "traditional state regulation," Opp. at 7-8; State *Amici* Br. at 30-33, does not affect the pre-emption analysis. The argument fails first as a matter of undisputed fact. If the subject Connecticut law purported to regulate an entity that was incorporated in Connecticut, that law could conceivably be said to implicate the traditional deference afforded "States' authority to regulate *domestic* corporations." Opposition at 8 (emphasis added). Wachovia Mortgage, however, is not incorporated in

---

[9]  In the release adopting the Regulation, the OCC rejected commenters= argument that the Regulation would adversely affect the oversight of operating subsidiaries from a "consumer protection . . . standpoint." 66 Fed. Reg. at 34789.

17

Connecticut – it is organized under the laws of North Carolina. Opp. at 2.

The argument fails legally as well. As the Supreme Court has noted, where state law conflicts with federal law, it is pre-empted no matter what its subject matter.

> These principles are not inapplicable here simply because real property law is a matter of special concern to the States. "The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail." *Free* v. *Bland*, 369 U.S. 663, 666 (1962).

*Fidelity Fed. Sav. & Loan Ass'n*, 458 U.S. at 152.

## CONCLUSION

The Clearing House respectfully submits that the Commissioner's attempt to assert licensing and visitorial authority over an operating subsidiary of a national bank is precluded by the Supremacy Clause of the United States Constitution. Accordingly, The Clearing House requests that Plaintiffs' Motion be granted and the Commissioner's Cross-Motion be denied.

Dated: September 25, 2003

Respectfully Submitted,

John W. Cannavino (06051 CT)
Robert J. Sickinger (18425 CT)
Cummings & Lockwood LLC
Four Stamford Plaza
107 Elm Street
Stamford, Connecticut 06902
(203) 327-1700

Of Counsel:

H. Rodgin Cohen
Michael M. Wiseman
Sullivan & Cromwell LLP

125 Broad Street
New York, New York   10004-2498

Brendan P. Cullen
Sullivan & Cromwell LLP
1888 Century Park East, Suite 2100
Los Angeles, California  90049

Counsel for *Amicus Curiae* The New York
Clearing House Association L.L.C.

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been mailed postage prepaid on this 25th day of September, by first class mail to all counsel and pro se parties as follows:

Daniel L. FitzMaurice, Esq.
Jason S. Weathers, Esq.
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103

Mark F. Kohler, Esq.
Rupal Shah Palanki, Esq.
Attorney General's Office
55 Elm Street, P.O. Box 120
Hartford, CT 06106

Douglas B. Jordan
Senior Counsel
Office of the Comptroller of the Currency
250 E. Street, S.W.
Washington, DC 20219

Margaret E. Haering, Esq.
Hurwitz & Sagarain, LLC
147 North Broad Street
Milford, CT 06460

Arthur E. Wilmarth, Jr.
Professor of Law
George Washington University Law School
720 - 20th Street, N.W.
Washington, DC 20052

John W. Cannavino

.StmLib1:1032512.1 09/25/03

20