UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WACHOVIA BANK, N.A., and | : | |
| WACHOVIA MORTGAGE | : | |
| CORPORATION, | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:03-cv-0738(JCH) |
| | : | |
| v. | : | |
| | : | |
| JOHN P. BURKE, BANKING | : | MAY 25, 2004 |
| COMMISSIONER, | : | |
| Defendant. | : | |

**RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
[DKT. NOS. 11, 23]**

Wachovia Bank, N.A., and its wholly-owned subsidiary, Wachovia Mortgage

Corporation, (collectively "plaintiffs") bring this suit against John P. Burke, Banking

Commissioner of the State of Connecticut ("the Commissioner"), in his official capacity,

seeking to enjoin his enforcement of certain Connecticut statutes that require businesses

engaged in the making of first and second mortgage loans to obtain and maintain a

Connecticut state license.  The plaintiffs argue that the National Bank Act ("Act"), 12

U.S.C. § 21 et seq., and regulations promulgated by the Office of the Comptroller of the

Currency ("OCC") preempt this licencing scheme as applied to Wachovia Mortgage.  They

seek a declaratory judgment and relief pursuant to 42 U.S.C. § 1983.[1]  Both the plaintiffs

---

[1]  Briefs amici curiae have been filed by: the OCC; the American Bankers Association,
Consumer Mortgage Coalition, Consumer Bankers Association, and Electronic Financial Services
Council ("American Bankers Association"); The New York Clearing House Association, L.L.C.
("The Clearing House"); and Forty-Three States and State Banking Officials ("State Banking

1

and the Commissioner have moved for summary judgment.

## I.     BACKGROUND

Congress enacted the National Bank Act in 1864.  The Act was designed to "facilitate . . . a national banking system."  Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp., 439 U.S. 299, 314-15 (1978) (internal quotation omitted).  It was further intended to "protect national banks against intrusive regulation by the States."  Bank of Am. v. City and County of San Francisco, 309 F.3d 551, 561 (9th Cir. 2002).

In furtherance of these goals, the Act created a system by which so-called "national" banks would receive a federal charter and would be free from state "visitorial" power except as permitted by law or court order.  See 12 U.S.C. § 484.  These national banks are regulated by a federal agency, the OCC, which is charged with the supervision and regulation of national banks and the administration of the Act.  12 U.S.C. § 1 et seq.  The Supreme Court has noted that this establishment of "[u]niform rules limiting the liability of national banks and prescribing exclusive remedies for their overcharges" is "an integral part of a banking system that needed protection from 'possible unfriendly State legislation.'" Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 10 (2003) (quoting Tiffany v. Nat'l Bank of Missouri, 18 Wall 409, 412 (1874)).

Wachovia Bank is a national banking association organized under the National Bank Act.  Wachovia Mortgage is a North Carolina corporation, initially engaged in the business

_____

Officials").

2

of making first mortgage loans in, among other places, the state of Connecticut, and has been licensed to do so since March 5, 1987.  Wachovia Mortgage became a wholly-owned subsidiary of Wachovia Bank on January 1, 2003.  It is currently engaged in the business of making both first and secondary mortgage loans.

Connecticut has delegated authority to enforce banking laws to its Banking Commissioner.  Six Connecticut banking statutes are at issue here.  Two require licenses for first and secondary mortgage lenders (Conn. Gen. Stat. §§ 36a-486(a) and 36a-511(a)); two require mortgage lenders to maintain certain records and make them available for inspection by the Banking Commissioner (Conn. Gen. Stat. §§ 36a-493 and 36a-516); one permits the Commissioner to conduct enforcement proceedings (Conn. Gen. Stat. § 36a-50); and one allows the Commissioner to issue cease and desist orders for violation of Connecticut banking laws (Conn. Gen. Stat. § 36a-52).

After it became a wholly-owned subsidiary of Wachovia Bank on January 1, 2003, Wachovia Mortgage declined to renew its mortgage-lending licence with the Commissioner.  On February 24, 2003, the Commissioner issued a Notice of Intent to Issue a Cease and Desist Order ("Notice") against Wachovia Mortgage for engaging in the first mortgage lending business in Connecticut without a lending license since January 1, 2003.  Wachovia Mortgage and the Commissioner eventually entered into a Stipulation and Agreement, dated March 31, 2003, whereby the Commissioner withdrew the Notice and Wachovia Mortgage agreed to apply for relicensing, while reserving its right to seek judicial

review or otherwise challenge the Commissioner's determination that it was subject to the

licencing requirements.  Wachovia Mortgage also applied for a Secondary Mortgage Lender

License, because it desired to engage in the business of secondary mortgage lending in

Connecticut.

The plaintiffs filed this suit on April 25, 2003, requesting injunctive and declaratory

relief, on the grounds that the state's action is preempted by federal law under the

Supremacy Clause of the United States Constitution,[2] and that the state's action deprives

the plaintiffs of federal rights granted by the Act and OCC regulations, which rights are

actionable pursuant to 42 U.S.C. § 1983.  The parties have filed cross-motions for

summary judgment.

## II.    DISCUSSION

### A.    Standard

In a motion for summary judgment, the burden is on the moving party to establish

that there are no genuine issues of material fact in dispute and that it is entitled to judgment

as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986); Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).  The

---

[2] "'The primary function of the Supremacy Clause is to define the relationship between state and federal law. It is essentially a power-conferring provision, one that allocates authority between the national and state governments . . . .'" Western Air Lines, Inc. v. Port Auth. of New York and New Jersey, 817 F.2d 222, 226 (2d Cir. 1987) (quoting White Mountain Apache Tribe v. Williams, 810 F.2d 844, 848 (9th Cir. 1987)). The Supremacy Clause supports an action to enjoin enforcement of a state statute that "runs afoul of a federal legislative scheme." Id.

parties agree that there are no issues of material facts in dispute.  Thus, the court must

determine whether plaintiffs or defendant are entitled to summary judgment as a matter of

law.

      **B.**     **The Statutes and Regulations at Issue**

The court begins by surveying the scheme of laws and regulations that forms the

basis of the this suit.  Section 484(a) of the Act provides: "No national bank shall be subject

to any visitorial powers except as authorized by Federal law, vested in the courts of justice

or such as shall be, or have been exercised or directed by Congress or by either House

thereof or by any committee of Congress or of either House duly authorized."  This

provision, on its face, evidences a broad intent to preempt state law as to national banks.

Case law has established, however, that Congress did not intend to deprive the States of all

of their power to regulate national banks.  States may regulate "where . . . doing so does not

prevent or significantly interfere with the national bank's exercise of its powers."  Barnett

Bank of Marion County, N.A., v. Nelson, 517 U.S. 25, 33 (1996) (citing cases).

The general powers granted to a national bank are delineated in 12 U.S.C. §

24(Seventh).  Section 24(Seventh) gives national banks the power to exercise "all such

incidental powers as shall be necessary to carry on the business of banking."  The Supreme

Court has recognized that the powers "incidental" to the business of banking authorized by

12 U.S.C. § 24(Seventh) are not limited to those enumerated in section 24(Seventh).

Instead, "the Comptroller therefore has discretion to authorize activities beyond those

specifically enumerated." <u>NationsBank of North Carolina, N.A., v. Variable Annuity Life Ins. Co.</u>, 513 U.S. 251, 258 n.2 (1995).

More specifically, national banks also have the authority to conduct their activities through operating subsidiaries. The OCC first codified this power in 1966. <u>See</u> <u>Wells Fargo Bank, N.A., v. Boutris</u>, 265 F. Supp. 2d 1162, 1168 (E.D. Cal. 2003) (quoting Acquisition of Controlling Stock Interest in Subsidiary Operations Corporation, 31 Fed. Reg. 11,459, 11,459-60 (Aug. 31, 1966)). At that time, the OCC explained that the power to operate through a subsidiary "may properly be found among such 'incidental powers' of the bank 'as shall be necessary to carry on the business of banking' within the meaning of 12 U.S.C. § 24(Seventh), or as incidental to another Federal banking statute . . . ." <u>Id.</u>

Today, a national bank's authority to operate through a subsidiary is embodied in 12 C.F.R. § 5.34. That section outlines the guidelines for establishing operating subsidiaries and authorizes national banks to "conduct in an operating subsidiary activities that are permissible for a national bank to engage in directly either as part of, or incidental to, the business of banking, as determined by the OCC or otherwise under statutory authority." 12 C.F.R. § 5.34(e)(1). In order to establish an operating subsidiary, a national bank must comply with the OCC's licensing requirements under section 5.34(b). <u>See</u> <u>Wells Fargo</u>, 265 F. Supp. 2d at 1167.

Congress itself has implicitly recognized the ability of a national bank to conduct its

authorized activities through an operating subsidiary in the Graham-Leach-Biley Act

("GLBA"), Pub. L. No. 106-102, 113 Stat. 1338 (1999), codified, among other places, at

12 U.S.C. § 24a.  That section does not mention operating subsidiaries, but expressly

contemplates that national banks use "financial subsidiaries" to conduct banking business

and further authorizes them to use such subsidiaries to conduct types of business, like

securities underwriting, in which national banks themselves could not otherwise engage.  See

id. at § 24a(g)(3).

Unlike the non-banking business authorized by the GLBA, the mortgage-lending

activities at issue here could be conducted directly by Wachovia Bank itself.  A national

bank's authority to engage in real estate transactions is found in 12 U.S.C. § 371(a), which

"authorizes national banks to make real estate and other types of loans, and specifies security

requirements for various forms of financing."  Huntington Towers, Ltd., v. Franklin Nat'l

Bank, 559 F.2d 863, 871 (2d Cir. 1977).  Section 371 expressly delegates responsibility to

the OCC for defining those powers.  12 U.S.C. § 371(a).  The OCC does so in 12 C.F.R.

§ 34.1, which explicitly applies to "national banks and their operating subsidiaries," and sets

forth standards for real estate lending and associated activities by national banks.

Finally, section 7.4006, which is the crux of the current controversy, specifies

"[u]nless otherwise provided by Federal law or OCC regulation, State laws apply to

national bank operating subsidiaries to the same extent that those laws apply to the parent

national bank."

C.     Standing

As a preliminary matter, the Commissioner argues briefly that Wachovia Bank does not have standing to maintain this action.  In essence, the standing inquiry focuses on whether the plaintiff is the proper party to bring suit.  See Baur v. Veneman, 352 F.3d 625, 632 (2d Cir. 2003).  In order to have constitutional standing to pursue a claim, a plaintiff must demonstrate: (1) an injury in fact; (2) caused by the conduct complained of; (3) and that such injury is likely to be redressed by a favorable judicial decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); see also Lerman, 232 F.3d at 142.

The Commissioner argues that Wachovia Bank has no "injury" of its own.  See Franchise Tax Bd. of Calif. v. Alcan Aluminum Ltd., 493 U.S. 331, 336 (1990) (parent must demonstrate some injury to itself, independent of the injury to its subsidiary).  However, Wachovia Bank claims that the Commissioner's attempted enforcement against Wachovia Bank of the Connecticut statutes at issue impinges upon one of the Bank's right to be subject to the visitation of the OCC alone, except as otherwise authorized by federal law, and its power to conduct business "incidental to the business of banking" as authorized by 12 U.S.C. 24(Seventh).  For this reason, and as discussed more fully below, in relation to the reasonableness of the OCC's promulgation of section 7.4006 and Wachovia Bank's section 1983 claim, the Bank has clearly alleged an "injury" of its own and has standing to pursue its claims.  See, e.g., Baur, 352 F.3d at 632 (injury must be "concrete and particularized," as well as "actual or imminent, not conjectural or hypothetical") (quoting

Lujan, 504 U.S. at 560).

### D.     Preemption Claim

Plaintiffs, and the OCC appearing as amicus on their behalf, argue that 12 C.F.R. §

7.4006, which  makes state law applicable to a subsidiary in the same manner as to its

parent, preempts the Commissioner's enforcement of Connecticut General Statutes §§ 36a-

486, 36a-511, 36a-493, 36a-516, and of 36a-50 and 36a-52 when applied to the mortgage

business of Wachovia Mortgage.

Preemption can occur in different ways.  See Barnett Bank, 517 U.S. at 31. The

plaintiffs here rely on "conflict" preemption.  See Pls.' Opp. At 2.  They argue that, under

Section 7.4006, because the Commissioner cannot enforce the statutes at issue against

Wachovia Bank, neither can he enforce them against Wachovia Mortgage.

### 1.     Conflict

The primary conflict at issue here is that between the Commissioner's threatened

enforcement of the Connecticut statutes as to Wachovia Mortgage, and section 7.4006.

The Commissioner concedes that he could not enforce the statutes against Wachovia Bank

itself, which, as discussed above, has been authorized by Congress to engage in real estate

lending pursuant to 12 U.S.C. § 371 and which is subject exclusively to OCC "visitation"

with regard to that banking activity.  The Commissioner thus, in effect, concedes that the

enforcement at issue is "visitation," but asserts his authority to regulate on the ground that

Wachovia Mortgage is a subsidiary of, not itself, a "national bank" as specified in 12 U.S.C. § 484. This enforcement as to Wachovia Mortgage, but not as to Wachovia Bank, seemingly creates a direct conflict with section 7.4006, which requires that "State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank."

The Commissioner first argues that section 7.4006 is not a preemptive regulation. In theory, the parties agree that federal regulations "have no less pre-emptive effect than federal statutes," Fidelity Federal Savings and Loan Assn. v. de la Cuesta, 458 U.S. 141, 153 (1982), and that federal agencies "may promulgate regulations that preempt state law." WFS Financial, Inc., v. Dean, 79 F. Supp. 2d 1024, 1026 (W.D. Wis. 1999). However, in the notes accompanying its promulgation of section 7.4006, the Commissioner notes that the OCC itself stated that the regulation "itself does not effect a preemption of any State law; it reflects the conclusion we believe a Federal court would reach, even in the absence of the regulation, pursuant to the Supremacy Clause and applicable federal judicial precedent." 66 Fed. Reg. § 34784, 34790 (July 2, 2001). The Commissioner thus argues that the OCC itself has expressly disclaimed the regulation's preemptive force.[3]

_____

[3] The OCC emphasizes that it nonetheless complied with all of the procedures required for promulgating a preemptive regulation. 66 Fed. Reg. at 34790. It should be noted, however, that the Supreme Court, in United States v. Mead Corp., 533 U.S. 218 (2001), suggested that where administration of the Act is concerned, the OCC need not in all circumstances comply with the requirements for issuing a preemptive regulation. Id. at 231.

This statement does not constitute a waiver by the OCC of any claim that the state laws at issue are preempted by federal law, or more specifically, of a claim that section 7.4006 itself may conflict with state law so as to spark a conflict preemption analysis. Rather, the OCC's statement mirrors the same position it took in its brief and at oral argument: that the regulation "clarifies" the preemption that the OCC already understood to exist from a combination of pre-existing statutes – section 484, section 24(Seventh), and section 371 – and case law interpreting those existing provisions. In sum, OCC contends, not that there is no preemption, but that the preemption existed prior to the enactment of section 7.4006, which merely codifies it.

This type of interpretation and extrapolation is precisely the type of interpretation with which an administrative agency is charged. <u>See, e.g.</u>, <u>Food and Drug Admin. v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 133 (2000). Thus, for purposes of conflict analysis, the court highlights section 7.4006 as the relevant conflicting regulation and treats the OCC's statement that this regulation "clarifies" and codifies preexisting law as a statement of the regulation's reasonableness, assessed in relation to the second step of the <u>Chevron</u> analysis, below.[4]

       2.    **<u>Chevron</u> Analysis**

---

[4] The plaintiffs and the OCC have specifically disclaimed at oral argument that any preemption at issue here stems from any of the OCC's interpretive letters. <u>See, e.g.</u>, OCC Interpretive Letter #957 (March 2003), Ex. 3, Mem. Amicus Curiae of OCC [Dkt. No. 43].

Where the legitimacy of an agency regulation is in question, the court follows the two-prong analysis found in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). There, the Supreme Court instructed a court addressing a preemption claim to determine, first, whether Congress has spoken directly on the precise question at issue; if the intent of Congress is clear, it is dispositive and the inquiry ends. If, however, the statute is silent or ambiguous as to the specific issue, the court must next examine whether the agency's action is "based on a permissible construction of the statute." Id. at 843. The regulations of an agency charged with administering a statute will stand as long as its interpretation of the statute is "reasonable." Bell v. Reno, 218 F.3d 86, 90 (2d Cir. 2000).

The plaintiffs argue that Congress is silent as to the specific issue here – namely, whether state real estate licencing schemes are preempted as to a mortgage-lending, operating subsidiary of a national bank – and that the OCC's application of the law to subsidiaries in the same way as to their parents is reasonable. They argue that section 7.4006 is in effect the codification of the logical implication of case law interpreting the statutory preemption effected by Congress's broad prohibition of state visitation over national banks, 12 U.S.C. § 484, and of the OCC's authority to oversee the activities of national banks undertaken pursuant to 12 U.S.C. § 24 (Seventh).

The Commissioner argues the opposite. He contends that Congressional intent is

12

clear on the question presented here; specifically, that Congress made an express choice to preempt only as to national banks, not to related entities. He further contends that, even if that intent to preempt is unclear, the OCC's promulgation of section 7.4006 was outside its authority and is thus entitled to no deference, and in any case is unreasonable.

### a. Congressional Intent.

In conducting a so-called "Chevron" analysis, the first question to be addressed is whether Congress has spoken to the "precise question at issue." Chevron, 467 U.S. at 842. In determining Congressional intent, the court employs the "traditional tools of statutory construction." Bell, 218 F.3d at 90 (quoting Chevron, 467 U.S. at 843 n.9). As such, the court "should not confine itself to examining a particular statutory provision in isolation" but, in keeping with the basics of statutory construction, should instead place words or phrases "in context." Brown & Williamson, 529 U.S. at 132-33.

Here, the "precise question at issue" is whether state law should apply to a subsidiary of a national bank in the same way as it applies to the national bank itself. The Act's preemption is anchored in section 484, in which Congress explicitly provided that no "national bank" would be subject to any visitorial powers "except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized." 12 U.S.C. § 484(a). This provision does not speak expressly to

13

subsidiaries of national banks.  Indeed, as both sides conceded at oral argument,
"subsidiaries" as they exist today were unknown at the time the Act was passed in the mid-
nineteenth century.

As discussed above, Congress has since then implicitly recognized a national bank's
authority to conduct its business through a subsidiary.  See supra at 6-7.  However, despite
this implicit recognition of the use of subsidiaries to conduct banking business, Congress
has nowhere spoken to the issue of state regulation of those subsidiaries.  As a result, there
is no explicit evidence of Congressional intent to preempt state regulation of those entities.

The Commissioner contends, however, that Congress has explicitly spoken to the
issue through its treatment of national bank "affiliates."  A portion of the Act added in 1933
by the Glass-Steagall Act, 48 Stat. 162, defines an affiliate as including a corporation owned
or controlled by a national bank, 12 U.S.C. § 221a(b), and gives the OCC authority to
supervise those affiliates, 12 U.S.C. § 481.

That Act, however, but did not amend the preemption language of section 484 to
include affiliates.  The Commissioner argues that Wachovia Mortgage is "plainly" an affiliate
of a national bank, and that, equally as plainly, Congress by omission intentionally declined
to extend section 484 preemption to national bank affiliates.

While this argument has some superficial appeal, a closer look reveals that "affiliate"
covers a much broader type of bank-related corporate entity than the operating subsidiaries

14

at issue in this action, and further that an "operating subsidiary" like Wachovia Mortgage does not fit within that category.

The Glass-Steagall Act was one of several pieces of related legislation that provided for the protection of bank depositors in a number of ways.  See also, e.g., Securities Act of 1933, 48 Stat. 74 (1933), 15 U.S.C. § 77a et seq; Securities Exchange Act of 1934, 48 Stat. 881 (1934), 15 U.S.C. § 78a et seq.  It targeted specific abuses that Congress felt had led to the bank panics and closures that precipitated and characterized the Great Depression, especially the commingling of commercial and investment banks.  See Indus. Assn. v. Bd. of Gov. of the Fed. Reserve Sys., 716 F.2d 92, 97-98 (2d Cir. 1983), aff'd, Sec. Indus. Assn. v. Bd. of Gov. of the Fed. Reserve Sys., 468 U.S. 137, 147 (1984) (Act's "design reflects the Congressional perception that certain investment banking activities are fundamentally incompatible with commercial banking").

One such abuse was the widespread use of bank deposits to underwrite "one security issue after another." United States v. Morgan, 118 F. Supp. 621, 645 (S.D.N.Y. 1953). Congress was also concerned about the "indirect pressure" that the affiliation of commercial banks with investment banks could cause, since "the pressure to sell a particular investment and to make the affiliate successful might create a risk that the bank would make its credit facilities more freely available to those companies in whose stock or securities the affiliate has invested or become otherwise involved." Investment Co. Inst. v. Camp, 401 U.S. 617,

15

631 (1971).  As further assurance against improper transactions with associated firms of all types, the Glass-Steagall Act also amended the Federal Reserve Act, adding a requirement that loans to affiliates be "secured by collateral."  Fitzpatrick v. Fed. Dep. Ins. Co., 765 F.2d 569, 573 (6th Cir. 1985).

Because of the Act, national banks were required to divest themselves of many affiliates.  Morgan, 118 F. Supp. at 656 (discussing effect of the Act on J.P. Morgan & Co.).  Despite these restrictions, however, the National Bank Act has continued to allow affiliates to conduct a range of business not permitted for a national bank itself.  See, e.g., Sec. Indus. Assn. v. Bd. of Gov. of the Fed. Reserve Sys., 847 F.2d 890, 891-92 (D.C. Cir. 1988).

Congress's amendment of the National Bank Act to cover "affiliates" was thus directed at bank-related firms engaged in what Congress considered to be non-commercial bank functions, see, e.g., Blackfeet Nat'l Bank v. Nelson, 171 F.3d 1237, 1243 (11th Cir. 1999), not at operating subsidiaries conducting "the business of banking."  First, both sides agree that modern subsidiaries, and more particularly, "operating subsidiaries" like Wachovia Mortgage, did not exist in 1933 and are thus different entities than the affiliates contemplated by Congress in the Glass-Steagall Act.  Nor have operating subsidiaries been historically treated as "affiliates" of their parent banks under section 23A of the Federal Reserve Act, 12 U.S.C. § 371c, 371c-1, which are the key federal banking law provisions

16

governing transactions between banks and thrift institutions and their non-bank affiliates.

See, e.g., Ronald R. Glancz, Financial Services Modernization 2003: Implementation of the

Gramm-Leach-Bliley Act (Am. Law Inst. 2003).  Finally, in the GLBA, Congress singled

out only financial subsidiaries, not operating subsidiaries, for treatment as national bank

affiliates in certain situations.  12 U.S.C. § 371c(e)(2).  Since the GLBA authorizes

financial subsidiaries to conduct certain non-national bank functions formerly forbidden,

Congress's decision to treat those financial entities as "affiliates" subject to state regulation is

consistent with Congress's decision in the Glass-Steagall Act to designate certain bank-

related entities engaged, to some extent, in non-commercial bank functions as "affiliates."

This does not support the Commissioner's suggested inference that "affiliates"

includes operating subsidiaries engaged in the business of banking.  The Commissioner thus

cannot successfully categorize such operating subsidiaries as national bank affiliates sufficient

to support a determination under the first step of Chevron that Congress clearly intended to

include national bank operating subsidiaries under the "affiliate" umbrella.[5]

---

[5]  The Commissioner also argues more generally that Congressional silence in section 484 as to all entities but "national banks" equates to a prohibition; in other words, that Congress definitively intended to limit preemption to "national banks" themselves.  While this silence might have been significant to the court were it to interpret the statute de novo, it does not answer the question asked by the first step of Chevron – namely, whether Congress has "unambiguously expressed [its] intent."  Chevron, 467 U.S. at 843.  Silence does not equate to a prohibition.  Instead, for Chevron purposes, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Id. at 843.

17

Congress thus has not addressed the manner in which state law should apply to a national bank operating subsidiary. As a result, this is a situation where "Congress has not directly addressed the precise question at issue." <u>Chevron</u>, 467 U.S. at 843.

### b.    Agency Interpretation.

Once the court has determined that Congress's intent on the "precise question at issue" is not clear or that the statute is silent, it "does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." <u>Chevron</u>, 467 U.S. at 843. Instead, it must address whether "the agency's answer is based on a permissible construction of the statute." <u>Id.</u> "Considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." <u>Id.</u> at 844. This deference is appropriate because of the "agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." <u>Brown & Williamson</u>, 529 U.S. at 132.

(i)    *OCC's Authority*.    The Commissioner first argues that, because section 7.4006 is not within the OCC's authority, it is entitled to no deference. This argument is unavailing. Though the OCC is not explicitly referenced in section 484, its authority is established in 12 U.S.C. § 1,[6] and it is charged with the administration of

---

[6] "The Comptroller of the Currency shall have the same authority over matters within the jurisdiction of the Comptroller as the Director of the Office of Thrift Supervision has over matters within the Director's jurisdiction under section 1462a(b)(3) of this title." 12 U.S.C. § 1.

the Act and bears "primary responsibility for surveillance of 'the business of banking' authorized by 12 U.S.C. 24(Seventh)," NationsBank of North Carolina, 513 U.S. at 256.[7]

Here, the OCC clearly has authority under section 24(Seventh) to regulate the establishment of subsidiaries by national banks, as outlined in the regulations guiding subsidiary establishment.  See 12 C.F.R. § 5.34.  The Supreme Court has consistently accorded deference to the OCC's decisions regarding a national bank subsidiary.  See NationsBank of North Carolina, 573 U.S. at 254 (brokerage subsidiary); Clarke v. Sec. Indus. Ass'n, 479 U.S. 388 (1987) (deferring to the OCC with regard to a securities subsidiary); Marquette Nat'l Bank v. First of Omaha Serv. Corp., 439 U.S. 299 (1978) (credit card subsidiary).

Moreover, given Congress's charge to the OCC in 12 U.S.C. § 1818 to conduct surveillance of a national bank's compliance with any "law, rule, or regulation, or any condition imposed in writing by the agency," and to prevent any "unsafe or unsound practice" on the part of the bank, it is reasonable for the OCC to regulate the activities of national bank subsidiaries.  As another court has observed, "it is plain that the Act delegated

---

[7]  Further, it has administrative power pursuant to 12 U.S.C. § 1818 to issue cease and desist orders related to any national bank's violations of "law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request by the bank," or to prevent any "unsafe or unsound practice."  First Union Nat'l Bank v. Burke, 48 F. Supp.2d 132, 137 (D. Conn. 1999).

the OCC authority to promulgate 7.4006." <u>Wells Fargo Bank</u>, 265 F. Supp. 2d at 1170. The OCC has the authority to enact section 7.4006.

(ii)     *Reasonableness of § 7.4006.*  The question for the court under the second step of <u>Chevron</u> is whether it was reasonable for the OCC to conclude, as it did in section 7.4006, that this OCC surveillance, as it applies to the activities here, should be <u>exclusive</u> and <u>preemptive</u>.  This court concludes that it was.

An administrative agency's power to administer a congressionally created program "necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." <u>Chevron</u>, 467 U.S. at 843.  "The Comptroller of the Currency is charged with the enforcement of the banking laws to an extent that warrants the invocation of [deference] with respect to his deliberative conclusions as to the meaning of these laws." <u>Camp</u>,  401 U.S. at 627.

Congress explicitly granted national banks the authority to engage in real estate lending in 12 U.S.C. § 371.  It implicitly recognized their power to create operating subsidiaries engaged in the "business of banking" in the GLBA. 12 U.S.C. § 24a(g)(3).  It further explicitly subjected financial subsidiaries to "affiliate" requirements, while omitting operating subsidiaries from those requirements.  12 U.S.C. § 371c(e)(2).  National banks thus have explicit Congressional authorization to engage in real estate activities, and implicit authorization to conduct national bank business through operating subsidiaries.  Finally, the

20

Commissioner concedes that the state would have no authority to enforce the statutes at issue against Wachovia Bank itself.

It is long-established that a state cannot regulate a national bank where doing so would "prevent or significantly interfere with the national bank's exercise of its powers." Barnett Bank, 517 U.S. at 33-34. Similarly, state regulations that "interfere[] with a power which national banks are authorized to exercise" irreconcilably conflict with the federal statute and are preempted by operation of the Supremacy Clause. Wells Fargo Bank of Texas, N.A. v. James, 321 F.3d 488, 491-92 (5th Cir. 2003). Thus, if a state regulation interferes with a national bank's operation of the business of banking through an operating subsidiary, a "power which national banks are authorized to exercise," that regulation is preempted.

State regulation of national bank wholly-owned subsidiaries could reasonably be conceived to have the same obstructive effect on national bank operations as they would if they were directed at the bank itself. If the state could regulate national bank subsidiaries like Wachovia Mortgage, it could, merely because of differences in corporate form, enforce regulations on activities which it could not regulate were they conducted through the bank itself. If, because of such regulation, the bank declined to utilize its ability to conduct its activity through the subsidiary, it would thus be hindered in its exercise of a recognized section 24(Seventh) "incidental" power. Wells Fargo Bank of Texas, 321 F.3d at 491-92.

Section 7.4006 is designed to prevent state actions, like the Commissioner's attempt to apply Conn. Gen. Stat. §§ 36a-486 and 36a-51's licencing requirements to Wachovia Mortgage, that hinder a national bank in the exercise of its authorized powers through a subsidiary.

In this case in particular, the Commissioner's threatened enforcement of the Connecticut statutes would interfere with two powers which the bank is authorized to exercise – the establishment of subsidiaries and the authority to engage in real estate lending. As the American Bankers Association argues in its brief amicus curiae [Dkt No. 42], the evolution of the banking industry, and specifically the mortgage-lending business, has resulted in a market structure which favors, if not necessitates, the subsidiary structure at issue here. As the Association explained, "because of the way that the residential home mortgage market has developed, the establishment of a separate operating subsidiary is the most efficient way for federally-chartered banking institutions to conduct the business of mortgage lending," and "restricting national bank's use of the operating subsidiary structure would frustrate their ability to compete and create greater risk for the bank's depositors and for the government." Id. at 6. Thus, the OCC's determination, that state regulation of operating subsidiaries to a greater extent than regulation of national banks themselves would potentially hinder the bank's "incidental" power, granted by regulation and implicitly acknowledged by statute, to conduct its banking business through a subsidiary, is

22

reasonable.

The core of the Commissioner's argument, which focuses on the importance of allowing Connecticut to regulate the operations at issue here, is a policy one. While a state may have a legitimate interest in protecting mortgage lending abuses within its borders, that interest is not before the court. Courts have repeatedly acknowledged that the Act's preemption of state law at times creates disparities between the national bank and state bank competitors, and may at times even create a competitive advantage in the national bank. See, e.g., First Union, 48 F. Supp. 2d at 138; see also Franklin Nat'l Bank v. New York, 347 U.S. 373 (1954).[8]

Preemption, however, depends on the reasonableness of the OCC's interpretation of the statute, not on a court's assessment of the equities. That assessment is entrusted by Congress to the agency. The court will defer to the agency's decision "if [its] choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by statute . . . unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." De La Cuesta, 458 U.S. at 154 (quoting United States v. Shimer, 367 U.S. 374, 383 (1961)). While the OCC's conclusion might not be the only conclusion that could be reached, the issue here is

---

[8] The subsidiaries at issue here, however, are covered by substantive OCC regulation. 12 CFR § 5.34.

23

thus not how this court would interpret the statute in the first instance, or the policy choice that it would make, but whether the OCC's interpretation was "reasonable" or "permissible."  As the Supreme Court cautioned in <u>Chevron</u>, "When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.   In such a case, federal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do." <u>Chevron</u>, 467 U.S. at 866.

The court finds that section 7.4006 is a reasonable interpretation of the National Bank Act.  Therefore, plaintiffs are entitled to a declaratory judgment that the Commissioner cannot enforce the Connecticut state laws in issue against Wachovia Bank's operating subsidiary, Wachovia Mortgage, in connection with the mortgage lending business of the latter.

### C.     Section 1983

Wachovia also asserts claims against the Commissioner under 42 U.S.C. § 1983 for deprivation of the rights granted to it by the National Bank Act.  The state argues that Wachovia cannot maintain these claims because, while "the Supremacy Clause can be used to enjoin enforcement of a state statute that runs afoul of a federal legislative scheme, it does not provide a basis for a claim under section 1983."  Def.'s Opp. and Cross-Motion for

Summ. J. at 18-19 (quoting <u>Western Air Lines v. Port Auth. of New York and New Jersey</u>, 817 F.2d 222, 225-26 (2d Cir. 1987)).

The defendant correctly points out that just because a federal law preempts a state law does not mean that there is a right of action under § 1983. However, the plaintiffs' claim is different: they argue that they may use § 1983 to pursue vindication of the rights granted to them by the National Bank Act. The "mere coincidence that the federal law in question in this case contains its own preemption language does not affect" the analysis as to whether it may also provide the basis for an action under § 1983. <u>Western Air Lines</u>, 817 F.2d at 225-26.

The plaintiffs' claim thus implicates the tripartite test of <u>Blessing v. Freestone</u>. 520 U.S. 329 (1997). Accordingly, this court must examine whether Congress "intended that the provision in question benefit the plaintiff"; whether "the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence"; and whether "the provision giving rise to the asserted right [is] couched in mandatory, rather than precatory, terms." <u>Id.</u> at 340-341 (internal quotation marks omitted).

### 1.    Wachovia Bank

The first step in analyzing whether a private plaintiff can use § 1983 for enforcing an alleged federal "right" against a state is to determine "whether Congress *intended to create a*

*federal right.*"  Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002) (emphasis in original).

For the statute to create such a right, it must "confer rights on a particular class of persons,"

id. at 285, and be "phrased in terms of the persons benefitted," id. at 284 (internal

quotations omitted).  The Supreme Court has emphasized that, because "[s]ection 1983

provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by

the Constitution and laws' of the United States . . . it is *rights*, not the broader or vaguer

'benefits' or 'interests,' that may be enforced under the authority of that section."  Id. at

283.

  The National Bank Act was clearly intended to confer advantages on national banks

like Wachovia, and, more particularly, the precise benefit of being free from state visitation.

The statute explicitly provides, "[n]o national bank shall be subject to any visitorial powers

except as authorized by Federal law, vested in the courts of justice or such as shall be, or

have been exercised or directed by Congress or by either House thereof or by any

committee of Congress or of either House duly authorized."  12 U.S.C. § 484(a).  As

discussed supra, the statute does not explicitly discuss whether it intends to preempt state

licensing of a national bank's mortgage-lending subsidiary, but it is reasonable and within

the OCC's authority to interpret this preclusion against visitation to extend to that activity.

No matter how "visitation" is defined, however, Congress clearly intended that national

banks be subject to federal visitation only, except where specifically provided.[9]

Moreover, that advantage is a "right" within the meaning of § 1983. Whereas other statutes simply set forth a ban on certain conduct, here Congress expressly phrased § 484 with an "unmistakable focus on the benefitted class." Gonzaga, 536 U.S. at 287 (quoting Cannon, 441 U.S. at 690-93). Like the language in Titles VI and IX, which provides that "no person . . . shall . . . be subjected to discrimination," and has been found to confer enforceable rights, see Cannon v. Univ. of Chicago, 441 U.S. 677, 691 (1979), section 484 similarly decrees that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law . . . ." 12 U.S.C. § 484. Here, Congress also made explicit its intent to alter the "usual constitutional balance between the states and the federal government." Gonzaga, 536 U.S. at 286 (quoting Will v. Michigan Dept. Of State Police, 491 U.S. 58, 65 (1989)). In light of these considerations, the court concludes that Congress intended to create a federal right vis `a vis national banks.

Nor is this right "so 'vague and amorphous' that its enforcement would strain judicial competence." Blessing, 520 U.S. at 340-41. Rather, it is limited and concrete, providing a national bank with a cause of action under section 1983 only when its right to be free from unlawful visitation pursuant to section 484, as determined according to the

---

[9] Nor is there any administrative mechanism for enforcing that right. See Gonzaga, 536 U.S. at 280 (quoting Wright v. Roanoke Redev. and Housing Auth., 479 U.S. 418, 426 (1987)).

27

applicable regulatory scheme, has been impinged upon.

Finally, section 484 is "couched in mandatory, rather than precatory, terms."
Blessing, 520 U.S. at 340-341.  Unlike the statute at issue in King v. Town of Hempstead,
161 F.3d 112, 115 (2d Cir. 1998), section 484 is not phrased in terms of "goals" or
"objectives," but instead mandates that national banks may be subject to only those visitorial
powers authorized by federal law.  This satisfies the third prong of the Blessing test.

### 2.    Wachovia Mortgage

Wachovia Mortgage's ability to pursue a section 1983 claim is less clear.  Wachovia
Mortgage derives its injured "right" not from statute itself, but from regulation, section
7.4006.  The courts of appeal are divided on whether a regulation can create a federal right
enforceable through section 1983, though the recent trend is to find that an agency
regulation, alone, cannot create a 1983 right.  Compare Save Our Valley v. Sound Transit,
335 F.3d 932, 940 (9th Cir. 2003) (action can be maintained under regulations only where
right is created by statute, and merely defined in scope by regulations); S. Camden Citizens
in Action v. New Jersey Dep't of Envtl. Prot., 274 F.3d 771, 784 (3d Cir. 2001); Harris v.
James, 127 F.3d 993, 1008 (11th Cir. 1997); Smith v. Kirk, 821 F.2d 980, 984 (4th Cir.
1987) (regulation cannot create enforceable § 1983 interest not already implicit in the
enforcing statute); with Loschavo v. City of Dearborn, 33 F.3d 548, 553 (6th Cir. 1994)
(regulation can create federal right for purposes of § 1983); and with Samuels v. District of

28

Columbia, 770 F.2d 184 (D.C. Cir. 1985).  The Second Circuit has declined to reach this issue.  King, 161 F.3d at 115.

The Supreme Court has emphasized that cases involving rights of action pursuant to section 1983 are not separate and distinct from those discussing rights of action implied from other statutes.  See Gonzaga, 536 U.S. at 283.  While the inquiries are different, the Court emphasized that the first step is the same, "in either case, we must first determine whether Congress intended to create a federal right."  Id. (emphasis added); see also Alexander v. Sandoval, 532 U.S. 275, 286 (2001) ("like substantive federal law itself, private rights of action to enforce federal law must be created by Congress"); Save Our Valley, 335 F.3d at 938-40 (discussing Supreme Court's implied right of action and section 1983 jurisprudence).

It cannot be said, however, that Congress affirmatively intended the interest that section 7.4006 confers on national bank subsidiaries.  See Save Our Valley, 335 F.3d at 940 (action can be maintained under regulations only where right is created by statute, and merely defined in scope by regulations); Smith, 821 F.2d at 984.  As examined at length in relation to step one of Chevron, the statutes here are silent with respect to national bank operating subsidiaries.  It thus cannot be said that Wachovia Mortgage's "right" was created by the National Bank Act itself.  Rather, that "right" was created as to Wachovia Bank, through section 24(Seventh).  Section 7.4006 defines the scope of that right as to Wachovia

29

Bank and other national banks, and is a reasonable exercise of the OCC's authority in its visitorial authority over such banks. However, while reasonable, the regulation does not create a statutory right as to Wachovia Mortgage, enforceable under section 1983.

## III.    CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment [Dkt. No. 11] is GRANTED on both the preemption claim and Wachovia Bank's § 1983 claim. The Defendant's Cross-Motion for Summary Judgment [Dkt. No. 23] is DENIED, except as GRANTED on Wachovia Mortgage's § 1983 claim.

**SO ORDERED.**

Dated this 25th day of May, 2004, at Bridgeport, Connecticut.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

30